W. Adam Duerk, Esq.
Dylan McFarland, Esq.
MILODRAGOVICH, DALE
& STEINBRENNER, P.C.
620 High Park Way
P.O. Box 4947
Missoula, Montana 59806-4947
Telephone: (406) 728-1455
Telefax: (406) 549-7077
E:Mail:  aduerk@bigskylawyers.com
         dmcfarland@bigskylawyers.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TAMARA DOWNEN, Individually and as Personal Representative for the ESTATE OF STANLEY L. DOWNEN, Deceased,<br><br>　　　　　Plaintiff,<br><br>　-vs-<br><br>MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES; CITY OF COLUMBIA FALLS; MIKE JOHNSON; and DAVID G. PERRY,<br><br>　　　　　Defendants. | Cause No.  CV-13-121-M-DWM<br><br>**PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF BRIEFS OPPOSING SUMMARY JUDGMENT** |

## I. Stanley Downen's Admission to the Montana Veterans' Home

1. Stanley Downen, a seventy-seven year-old Navy Veteran, was living with Plaintiff, Tamara Downen, after being diagnosed with advancing Alzheimer's Disease and dementia. Depo. Tamara Downen 29:19-20; 38:1-6; 39:14-19 (Nov. 7, 2013), attached as Exh. A.

2. Mr. Downen's advancing Alzheimer's made it difficult for Tamara to care for him, and on February 23, 2012, he was admitted to Pathways. Exh. A, Depo. Downen at 57:17-12. Shortly thereafter he was transferred to Expressions Inc., a facility Tamara chose because it was a lock-down facility so that Mr. Downen could not wander off site. *Id*. at 74:1-14.

3. The Expressions facility became too expensive, and Mr. Downen expressed a desire to live at the Montana Veterans' Home ("MVH"). Exh. A, Depo. Downen at 49:6-7; 71:12-14; 80:14-25. In May, 2012, Tamara submitted an application to MVH. *Id*. at 83:4-5; Depo. Helen Lyman 20:9-12 (Nov. 26, 2013), attached as Exh. B.

4. MVH has a locked-down, special care unit in which it places its patients suffering from severe dementia. Exh. B, Depo. Lyman at 13:16-22; Depo. Celestia Rose McElderry 15:12-14 (Nov. 26, 2013), attached as Exh. C. Helen Lyman, the social services director at MVH and the employee in charge of

admissions, explained that she generally places patients in the special unit when they are unable to orient to time, place, and situation. Exh. B, Depo. Lyman at 13:16-22.

     5.     Before admitting Mr. Downen, MVH requested and reviewed his medical records, including those from Expressions, and invited him to the facility to meet him and give him a tour. Exh. B, Depo. Lyman at 27:8-29:13. Lyman also discussed with Tamara the use of the WanderGuard system at MVH, which is a bracelet worn by residents that sounds an alarm if the resident wanders to a restricted area, such as outside the building. *Id*. at 29:10-7.

     6.     Lyman was aware that Mr. Downen suffered from Alzheimer's and dementia, and testified that she noted instances of aggression and agitation in his records, but that there were "no red flags." Exh. B, Depo. Lyman at 28:19-21; 29:22-30:1; 31:8-11. On May 31, 2012, Mr. Downen was admitted to the regular 50-bed unit of the MVH, not to the special lock-down unit. Exh. C, Depo. McElderry at 25:11-22. At the time of his admission, there was no care-plan team in place for Mr. Downen. Exh. B, Depo. Lyman at 41:16-19.

## II. Tasing Incident

     7.     On June 1, 2012, the first full day following his admission to MVH, Mr. Downen grew agitated. He had been sitting quietly in a chair, and then

suddenly got up, began pacing, and expressed a desire "to go home." Exh. C, Depo. McElderry at 28:11-17. The LPN assigned to his unit, Rose McElderry, was unable to redirect him or calm him down. *Id*. at 28:11-17. At this point, McElderry looked at Mr. Downen's charts for the first time, and discovered his diagnosis of Alzheimer's and dementia. *Id*. at 40:4-13.

8. Mr. Downen wandered around the facility, including into an enclosed, outdoor courtyard area. Exh. C, Depo. McElderry at 29:1-4. A CNA was assigned to follow him for safety. *Id*. at 29:1. Nursing staff attempted to orally administer a dose of Ativan to calm Mr. Downen, but he refused the medication. *Id*. at 30:8-31:4.

9. As Mr. Downen's agitation increased, two male CNA's held Mr. Downen's arms so that McElderry could administer an injection of Haldol in Mr. Downen's shoulder. Exh. C, Depo. McElderry at 31:11-32:15. Haldol is a drug that calms patients downs and makes them more responsive to verbal direction. *Id*. at 32:1-2.

10. After his injection, Mr. Downen continued to wander, and eventually exited the facility. Depo. Vicky Briggs 12:17-13:8 (Nov. 26, 2013), attached as Exh. D. At MVH, residents "are allowed to go where they want to go...They can go outside all they want." Exh. C, Depo. McElderry at 47:19-24. Mr. Downen

was not in the locked-down special unit, and was not breaking any laws, or even MVH rules, by exiting the facility. *Id*. at 46:11-13.

11. Upon exiting the facility, Mr. Downen was followed by two CNA's, Leo Flesch and Sam Nakwas, and CNA Supervisor Vicky Briggs. Exh. D, Depo. Briggs at 15:19-21. Rose McElderry, LPN, arrived just a few minutes later. *Id*. at 15:22-25. The MVH staff could not re-direct him, and so they continued to walk behind him, at a distance of 8-10 feet, "just to make sure he was being safe." *Id*. at 15:4-8.

12. Though Mr. Downen was agitated, he did not make any physical contact or threaten any other residents. Exh. C, Depo. McElderry at 36:14-20. While such agitation was not ordinary behavior for Mr. Downen, such outbursts were to be expected based on his prior medical records. Exh. B, Depo. Lyman at 28:19-21; 29:22-30:1; 31:8-11. Furthermore, this type of agitation from patients with Alzheimer's and dementia is of a type MVH staff had dealt with before. Exh. C, Depo. McElderry at 37:1-3.

13. Mr. Downen headed towards the end of the MVH driveway, and picked up a couple of landscaping rocks. Exh. C, Depo. McElderry at 39:24-40:3. The rocks "were big enough to hold in his palm, but not much bigger than that." Exh. D, Depo. Briggs at 16:7-11. As long as MVH staff followed him at a

distance of 8-10 feet, they did not hear him yelling, and Mr. Downen did not threaten them with the rocks he held. *Id*. at 19:7-18; Exh. C, Depo. McElderry at 43:7-8.

14. While MVH staff followed Mr. Downen, another nurse from the facility phoned the Columbia Falls Police Department ("CFPD") to request assistance. Exh. C, Depo McElderry at 42:3-4. At the time the call was made, Officer Mike Johnson was just going off-duty and Officer Gary Stanberry's shift was just beginning. Depo. Mike Johnson 69:9-15 (Nov. 25, 2013), attached as Exh. E; Depo. Gary Stanberry 38:18 (Nov. 25, 2013), attached as Exh. F. Though his shift was over, Officer Johnson volunteered to accompany Officer Stanberry on the call. *Id*. at 41:15-17. On the way to the MVH, the Officers did not have any conversation regarding the nature of the call. *Id*. at 42:24-43:4; Exh. E, Depo. Johnson at 70:8-13.

15. Approximately two minutes after leaving the station, Officers Johnson and Stanberry arrived at MVH. Exh. F, Depo. Stanberry at 41:10-12. Upon arrival, the Officers saw "a male walking down the road with a group of -- I believe they were nurses and stuff that were near him," walking in a horseshoe formation around Mr. Downen. Exh. E, Depo. Johnson at 72:2-21; Exh. F, Depo.

Stanberry at 44:6-10. Mr. Downen proceeded walking toward the Officers, surrounded by 5 MVH staff members. *Id*. at 44:6-7.

16. Officer Stanberry testified that they had no intention of arresting Mr. Downen. Instead, the Officers intended to "get him back into the nursing home, get him calmed down, maybe get some medication on board." Exh. F, Depo. Stanberry at 56:6-11. The Officers "were there to de-escalate the situation...[Mr. Downen] was just wandering aimlessly with the rocks..." *Id*. at 64:10-15.

17. Officer Stanberry noted that Mr. Downen appeared to be approximately 85 years old. Officer Stanberry Report 2012-00002316, attached as Exh. G. Officer Johnson testified that Mr. Downen appeared to be 5'6" or 5'8" and weighed about 140-150 pounds. Exh. E, Depo. Johnson at 89:7-12. At the time, Officer Johnson was 6'1" and weighed 230 pounds. *Id*. at 32:13-20. Officer Stanberry was also 6'1" inch, and weighed 180 pounds. Exh. F, Depo. Stanberry at 58:17-19.

18. Officer Johnson had on his person a handgun, two handcuffs, a taser, a pocket knife, his radio, and keys. Exh. E, Depo. Johnson at 88:2-20. In the patrol car, he had a shotgun and an AR-15. *Id*. at 89:1. Though he had been issued pepper spray, he did not have it on him during his call to the MVH. *Id*. at 25:19-23; 88:8-9.

PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT
OF BRIEFS OPPOSING SUMMARY JUDGMENT                                                      Page 7

19. Upon exiting their vehicle, the Officers did not turn on the camera in their patrol car, and Officer Johnson did not turn on his lapel camera. Exh. E, Depo. Johnson at 91:22-92:2; Exh. F, Depo. Stanberry at 41:20-22. One of the MVH staff members immediately alerted the Officers that Mr. Downen carried rocks. Exh. E, Depo. Johnson at 74:3-6.

20. Except for hearing that Mr. Downen carried rocks, the Officers did not speak to the nursing staff, or inquire as to Mr. Downen's condition. In fact, officer Johnson admits that he "didn't really pay attention to what the nurse staff had to say." Exh. E, Depo. Johnson at 95:15-19.

21. As soon as Officer Johnson saw that Mr. Downen had rocks in his hands, he drew his taser weapon, and told Mr. Downen he would be tased if he did not drop the rocks. Exh. E, Depo. Johnson at 81:18-82:4. Officer Stanberry never drew his taser, thinking that "there [were] enough of us there, I was hoping that we could get together, try to coordinate something where we can just kind of rush in, grab the rocks, but that just -- it didn't happen. The incident occurred way too fast --" Exh. F, Depo. Stanberry at 63:17-64:1.

22. Mr. Downen was standing on asphalt, near a baseball field, and appeared to be facing the MVH. Mr. Downen just "wanted to get away from everybody." Exh. E, Depo. Johnson at 78:1-19. He told the Officers "that he

wanted to leave and to leave him alone." *Id*. at 79:1.  Though Mr. Downen, was cursing, his language and anger was not geared toward any one individual.  Exh. F, Depo. Stanberry at 48:22-24.

23. Officer Johnson alleges that Mr. Downen "raised his arm to throw the rock right at me." Exh. E, Depo. Johnson at 80:12-13.  However, a witness standing near the baseball fields wrote a letter of complaint to the CFPD indicating that this "is absolutely not true, Stan's hands were strait [sic] down at his side the whole time."  Letter to CFPD from Danielle Jones, attached as Exh. H.

24. Officer Johnson tased Mr. Downen, with his X26 taser in dart mode. Exh. E, Depo. Johnson at 80:12; TASER X26 Use Report, attached as Exh. I.  The taser probes pierced Mr. Downen's left bicep area and the rear of his pants, near the waistline.  Exh. G, Stanberry Report; Exh. I, TASER X26 Use Report.

25. The taser administered 30,000 volts to Mr. Downen for a full cycle of five seconds.  Exh. E, Depo. Johnson at 115:9-18.  Mr. Downen "stiffened up" and fell, and Officer Stanberry heard the "thud" as Mr. Downen's head hit the pavement.  Exh. F, Depo. Stanberry at 54:15-55:1.  Mr. Downen sustained multiple facial lacerations.  Exh. G, Stanberry Report.

26. Plaintiff Tamara Downen has retained and disclosed two law enforcement expert witnesses: Will Cordes and Larry Smith.  Both of these law

enforcement experts have opined that Mr. Downen was not a threat at the time he was tased, and that Officer Johnson's use of a taser weapon on Mr. Downen constituted an excessive use of force in violation of standard and accepted police practices. Expert Report, Will Cordes (Dec. 16, 2013), attached as Exh. J; Expert Report, Larry Smith (Dec. 16, 2013), attached as Exh. K. Will Cordes' research indicated that no officer has been killed by a thrown rock in over seven decades, and no data was available on *any* instances of an officer being killed by a person over the age of seventy-five (75). Exh. J, Expert Report, Will Cordes.

27. After falling to the ground, Mr. Downen continued yelling, and was handcuffed. At this point, Officer Johnson turned on his lapel camera. Exh. E, Depo. Johnson at 91:5-12.

28. Officer Stanberry indicated a very short time elapsed between the Officers arriving on scene and Officer Johnson tasing Mr. Downen. In his incident report, Officer Stanberry noted that:

> As Officer Johnson and I, exited my car, contact was made, both of us maintaining a safe distance, telling the subject to drop the rocks. The subject failed to comply. *Within a few seconds*, he drew his right hand back as to throw the rocks at Officer Johnson. Officer Johnson, with taser drawn, deployed the taser...

Exh. G, Stanberry Report (emphasis added).

29. Officer Johnson testified that about five minutes elapsed between the time he exited the patrol car and the time he tased Mr. Downen. Exh. E, Depo. Johnson at 79:14-16. However, Officer Stanberry testified that Officer Johnson deployed his taser "within a minute or so" of exiting the vehicle. Exh. F, Depo. Stanberry at 47:14-16.

30. After placing Mr. Downen in handcuffs, face down, on the pavement, Officer Johnson notified dispatch of his taser deployment and requested EMS services. Approximately 15-20 minutes later, Mr. Downen was transported to the Kalispell Regional Medical Center. Exh. F, Depo. Stanberry at 62:17-63:2; Exh. A, Depo. Downen at 127:1-2.

31. The Officers did not take statements that day. Instead, Officer Stanberry returned at a later date to the MVH to take collect statements from the nursing staff. Exh. E, Depo. Johnson at 97:2-10; Exh. F, Depo. Stanberry at 59:3-4. The identities of the witnesses standing near the baseball field were not ascertained, and no statements were taken from these witnesses. *Id*. at 60:6-13.

32. The MVH phoned Tamara Downen the same day and notified her that Mr. Downen had gotten out of the facility, tripped, and fallen. Exh. A, Depo. Downen at 124:14-22. She was not notified that Mr. Downen had been tased, and actually discovered what happened when her brother showed her a newspaper

clipping a couple days later. *Id*. at 129:7-20.

33. Over the next three weeks while Mr. Downen was in the hospital, his condition deteriorated rapidly. Exh. A, Depo. Downen at 137:19-20. He refused to wear clothes, lost all functions, was incontinent, and often was restrained to his bed. *Id*. at 137:21-24. "He just completely went downhill." *Id*. at 137:24-25. Treating nurse practitioner Paul Coats opined that the tasing incident increased Mr. Downen's stress levels significantly and exacerbated the dementing process. Pl.'s Expert Disclosures,(Dec. 16, 2013), Exh. N. Mr. Downen died 23 days later, on June 24, 2012, without ever having been discharged from the hospital. Discharge Summary (June 24, 2012), attached as Exh. L.

### III.  Columbia Falls Police Department Complaints

34. Police Chief David Perry is responsible for handling complaints for the CFPD, and is responsible for deciding which complaints to investigate. Depo. David Perry 68:24-69:8 (Nov. 25, 2013), attached as Exh. M.

35. Chief Perry distinguishes between formal and informal complaints. Exh. M, Depo. Perry at 68:12-19. Formal complaints must be submitted on a special form, and no record is kept of any complaints not submitted on the special form. *Id*. at 69:15-70:8. Chief Perry does not keep a log or any other statistics of how many complaints the CFPD receives each year. *Id*. at 70:12-14.

36. Shortly after Officer Johnson tased Mr. Downen, Tamara visited Chief Perry. Exh. M, Depo. Perry at 52:2-3. Chief Perry testified that Tamara wanted answers to questions, such as "how can a 70-some-year-old man be tased with dementia or Alzheimer's or whatever be tased." *Id*. at 53:21-23. Chief Perry did not believe that Tamara verbalized any complaint. *Id*. at 53:21.

37. After Officer Johnson tased Mr. Downen, Chief Perry also received a phone call from a witness expressing concerns about Officer Johnson's conduct. Exh. M, Depo. Perry at 67:11-20. Chief Perry made no record of this complaint, and dismissed it based on his sense that she "was not an impartial witness." *Id*. at 68:3-10.

38. Several days later, the same witness delivered a written letter to Chief Perry regarding Officer Johnson's conduct. Exh. H, Letter from Danielle Jones; Exh. M, Depo. Perry at 68:11-12. Chief Perry did not inform her that there was a formal complaint process. *Id*. at 68:13-15.

39. Regardless of his conversations with Danielle Jones and Tamara Downen, Chief Perry testified that in regards to Mr. Downen's tasing, "I did not receive a complaint. I had two different individuals that had concerns about it, but no complaint." Exh. M, Depo. Perry at 51:23-25.

40. Regardless of the "concerns" expressed by Danielle Jones and Tamara Downen, other than brief conversations with Officers Johnson and Stanberry, Chief Perry did not conduct any further investigation into the incident, did not reprimand or discharge any employees, and did not make any changes in officer training. Exh. M, Depo. Perry at 52:9-21; 56:4-13. In fact, Chief Perry made no further inquiry into the matter whatsoever. *Id*. at 54:17-19.

41. Based on his discussions of the incident with Officer Johnson, Chief Perry supports Officer Johnson's claim that Mr. Downen posed a threat, and agrees that the situation warranted taser deployment. Exh. M, Depo. Perry at 66:19-24. In fact, Chief Perry explained to Tamara "what took place out there, what position the officers were in, and by my account of everything, the force that was used was justified." *Id*. at 54:16-18. Tamara corroborates this account, stating that Chief Perry told her "the officers had justice because [Mr. Downen] was threatening to throw rocks..." Exh. A, Depo. Downen at 203:5-9. Officer Johnson expressed no concerns about his taser use on Stanley Downen and would use his taser in exactly the same way if presented with this situation again today. Exh. E, Depo. Johnson at 121:7-13. (Chief Perry attended Officer Johnson's deposition).

42. Plaintiff's law enforcement expert, Will Cordes, has opined that in the type of environment that exists at the CFPD, where complaints are ignored, incidents are not investigated, and discipline is not considered, meaningful supervision cannot exist. Exh. J, Expert Report, Will Cordes.

## IV. Columbia Falls Police Department Policy and Procedure Manual

43. Chief Perry's duties include reviewing and revising policies for the CFPD. Exh. M, Depo. Perry at 27:2-5. In performing these duties, Chief Perry relies on model policies provided by the International Association of Chiefs ("IACP"). *Id*. at 27:14-15. Chief Perry is also on the Montana Law Enforcement Academy model policy development committee. *Id*. at 27:15-19.

44. When Chief Perry assumed duties as CFPD Chief of Police, the department did not have a policy manual. Exh. M, Depo. Perry at 29:1-2. Chief Perry implemented the CFPD Policy & Procedure Manual in 1998. *Id*. at 28:21-29:1.

45. In 2008, Chief Perry revised the CFPD policies and procedures. Exh. M, Depo. Perry at 28:6-9. Though he cannot recall precisely which policies were revised, he does remember that he made very few changes. *Id*. at 28:11.

46. In 2011, Chief Perry attended a Montana Municipal Interlocal Authority ("MMIA") meeting, which included county attorneys, other chiefs of

police, and representatives from the Attorney General's office. Exh. M, Depo. Perry at 30:8-19. At this meeting, the MMIA discussed and reviewed model ECW (Electronic Control Weapons) policies from the IACP. *Id*. at 30:20-23.

47.     On June 1, 2012, when Officer Johnson tased Mr. Downen, the CFPD did not have an ECW policy in place. In fact, there was not a single reference to a taser or other ECW weapons in any of the CFPD policies or procedures at that time. Exh. M, Depo. Perry at 32:8-18.

48.     In July of 2012, approximately one month after Officer Johnson tased Mr. Downen, Chief Perry implemented a taser policy for the CFPD. Exh. M, Depo. Perry at 32:22-24. Chief Perry testified to the fact that, as Police Chief for the CFPD, he has final policy-making authority. *Id*. at 60:11-19.

49.     Both of Plaintiff's law enforcement experts have opined that the CFPD's failure to have any sort of taser or ECW policy in place violated standard police practices and led to a lack of guidance and supervision for CFPD officers. Exh. J, Expert Report Will Cordes; Exh. K, Expert Report Larry Smith.

### V.     <u>Columbia Falls Police Department Training</u>

50.     The CFPD Officers were trained in the use of taser weapons in 2006, when they were first issued tasers. Exh. M, Depo. Perry at 23:16-19. Chief Perry

did not attend this training, and has never been certified in the use of a taser. *Id*. at 18:17-19; 20:12-14.

51. Officer Johnson attended the training, which was taught by Travis Bruyer, a deputy with Flathead County. Exh. E, Depo. Johnson at 18:14-19:1. Though Officer Johnson claims he received a certificate at the end of this training, no certificate has been located or produced. *Id*. at 19:11-13. Chief Perry is not aware of any certification issued to his Officers by TASER International. Exh. M, Depo. Perry at 21:1-3.

52. Since 2006, Officer Johnson has had only a single "refresher course" that lasted "a few hours." Exh. E, Depo. Johnson at 20:8-10. This "refresher course" occurred in July of 2012, *after* he tased Mr. Downen. Exh. M, Depo. Perry at 23:20-22. Officer Johnson has not maintained taser certification. Exh. E, Depo. Johnson at 20:11-12.

53. In training, Officer Johnson volunteered to be tased. Prior to being tased, he was asked questions about his health. Exh. E, Depo. Johnson at 30:21-25. He was tased while standing on a rubber mat, with officers to hold him up. *Id*. at 31:19-25.

54. Officer Johnson did not receive any written material when he was issued his taser weapon, and was not asked to review any taser policy. Exh. E,

Depo. Johnson at 117:5-12. Prior to tasing Mr. Downen, Officer Johnson had not been asked to review any warning materials related to the Taser X26. *Id*. at 118:17-22. Officer Johnson is not aware of any warning materials regarding the use of tasers on the elderly, infirm, or other individuals at risk for falls. *Id*. at 118:23-119:22.

55. TASER International recommends that officers be re-certified in the use of taser weapons annually. Exh. K, Expert Report, Larry Smith. TASER International also explicitly warns of heightened risks associated with the use of a taser on persons who are infirm, elderly, pregnant, or otherwise at risk for falls. *Id*.; Exh. J, Expert Report, Will Cordes.

56. The IACP model policy for taser weapons also limits the use of a taser weapon on members of a "sensitive population group" to exceptional circumstances in which the potential benefit of taser deployment outweighs the increased risks and concerns. Exh. K, Expert Report, Larry Smith; Exh. J, Expert Report, Will Cordes.

57. Both of Plaintiff's law enforcement experts have opined that Officer Johnson's training on the use of a taser weapon was insufficient and in violation of standard and accepted police practices. Exh. K, Expert Report, Larry Smith; Exh. J, Expert Report, Will Cordes.

DATED this 14th day of January, 2014:

By: /s/ W. Adam Duerk

MILODRAGOVICH, DALE
& STEINBRENNER, P.C.
*Attorneys for Plaintiff*

13049/2 (cfmk/leb)
L:\worldox\DOCS\CLIENTFL\13049\002\RES\00477867.WPD