# EXHIBIT B

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DIVISION OF MONTANA
 2                      MISSOULA DIVISION

 3
      Cause No. CV-13-121-M-DWM
 4   ─────────────────────────────────────────────────

 5    TAMARA DOWNEN, Individually and as Personal
      Representative for the ESTATE OF STANLEY L. DOWNEN,
 6    deceased,

 7              Plaintiff,

 8         vs.

 9    MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF
      PUBLIC HEALTH SERVICES; CITY OF COLUMBIA FALLS;
10    MIKE JOHNSON; and DAVID G. PERRY,

11              Defendants.

12   ─────────────────────────────────────────────────

13

14

15
                   DEPOSITION OF HELEN LYMAN
16                     November 26, 2013

17

18

19         Pursuant to Notice and the Federal Rules of

20    Civil Procedure, this deposition, called by Plaintiff, was

21    taken at 145 Commons Loop, Suite 200, Kalispell, Montana,

22    at 12:43 p.m., before Sheri J. Hazlett, Registered

23    Professional Reporter and Notary Public of the State of

24    Montana.

25
```

1  differentiate. I've been calling it all day the SCU.

2      A    Special care unit.

3      Q    Special care unit and then the general facility;
4  is that right?

5      A    There's a difference in that waiting list. The
6  special care unit is a longer waiting list merely because
7  it's 15 beds as opposed to 90.

8      Q    How long is the waiting list at the special care
9  unit?

10     A    There's -- it varies. I've had people sitting
11 on it for a year; I've had people on for six months. It
12 just varies.

13     Q    What's the difference in the admission
14 process -- or is there a difference between the special
15 care unit and the general facility?

16     A    The special care unit is locked down.

17     Q    What other circumstances or considerations do
18 you need to make for admission in the special care unit?

19     A    If someone has severe dementia, if they're not
20 oriented to time, place, situation, I'm most likely going
21 to admit them into the special care unit unless they're
22 not mobile.

23     Q    Okay.

24     A    Again, it goes case by case. If someone is not
25 mobile and they have severe enough dementia where all of

1  A   January or February of that year.

2  Q   **And what did you do at that point in time?**

3  A   So she told me what his situation was, she told me he was in assisted living, she told me that he wanted to be there. She did mention that she was having a hard time financially paying that bill because she was on her own doing it, that her family wasn't helping with that, and so I sent her an admission application.

9  Q   **Did she return that application to you?**

10 A   She did.

11 Q   **Do you recall when she returned it to you?**

12 A   Beginning of May.

13 MR. McFARLAND: Sean, was that the copy that you gave me yesterday, the admissions packet?

15 MR. GOICOECHEA: I've got a copy here, Dylan, if you want to use it, but it's the admissions materials.

17 Q   **(BY MR. McFARLAND) As the admissions materials -- and I think it's better if you can kind of explain to me what you have in front of you and what portions you use and how it's used.**

21 A   Well, there's lots of forms. Do you want me to start at the beginning here (indicating)?

23 Q   **Just generally --**

24 A   This is his DD 214, so this tells me whether he was honorably discharged or not and how much active duty

1   Q   Do you set an admission day after you've
2 determined the person is eligible and appropriate for the
3 facility?
4   A   (Nodded head.)  And we have a spot.
5       MR. McFARLAND:  Before we get too far, let's
6 mark this as an exhibit.
7                  (Exhibit 16 marked.)
8   Q   (BY MR. McFARLAND)  For Mr. Downen did you
9 receive his medical records?
10  A   I did, I received them from Expressions.
11  Q   Do you recall which medical records you
12 received, were they just from Expressions, or how far back
13 do they go?
14  A   I believe they went back to his admission -- and
15 he wasn't there that long -- up to the day that I
16 requested them, which I want to say was the -- after we
17 gave him his tour.  I wanted to give him a tour to see
18 what he was like before I requested medical records and
19 then, you know, talk to Tamara about a possible admission
20 day.
21  Q   What do you remember about the tour?
22  A   There was nothing out of the ordinary.  He was
23 very pleasant, he -- you know, we asked him if he wanted
24 to be there, and he did.  He talked to Paul Venditti, who
25 is our business manager.  He knew him, because Paul's been

1 there for so long; they shook hands. I mean he certainly
2 seemed appropriate.
3     Q    Did you discuss any -- did you request any
4 medical records prior to Expressions, or did you review
5 any medical records prior to Expressions?
6     A    No.
7     Q    Was there anything in the medical --
8     A    I'm sorry, Alpine Family Medicine had medical
9 records as well.
10     Q    Did you review those records?
11     A    Uh-huh.
12     Q    And you reviewed Expression records as well?
13     A    Uh-huh.
14     MR. GOICOECHEA: Yes?
15     THE DEPONENT: Yes.
16     Q    (BY MR. McFARLAND) Was there anything in those
17 records which made you think Mr. Downen might not be a fit
18 for your facility?
19     A    There was no red flags. There certainly was
20 talk about him being agitated, aggressive at times, but he
21 had been placed on a medication that leveled him out.
22     Q    Are there other residents at the veterans' home
23 who get agitated or aggravated?
24     A    Yes.
25     Q    Is that necessarily out of the ordinary?

1     A    No.

2     Q    Do you recall when the tour was, when Mr. Downen
3  went on his tour of the facility?

4     A    I believe it was the 4th.

5     Q    The 4th of May?

6     A    Yes, the 4th of May.

7     Q    Do you recall any conversations with Tamara
8  about WanderGuards or locked doors or anything of that
9  nature?

10    A    I probably told her that we had a WanderGuard
11 system.

12    Q    What is the WanderGuard system?

13    A    It's a bracelet that goes on an arm or a
14 wheelchair, somewhere around the body, that it can alert
15 staff to somebody going into a different area of the
16 building, or it can also alert staff for a resident going
17 outside.

18    Q    Was there any discussion about putting
19 Mr. Downen in the special care unit?

20    A    No.  If that had been a discussion, I would have
21 placed him on the waiting list.

22    Q    Okay.  From your records review, did you know
23 that Mr. Downen had Alzheimer's?

24    A    Yes.

25    Q    Did you know that he had dementia?

1   A   Yes.

2   Q   There wasn't a concern about him -- or the need
3   for him to be in the special care unit?

4   A   No. Just based on the medical records that we
5   had and his tour, he seemed very appropriate.

6   Q   And you talked earlier about getting over the
7   hump of dementia.

8   A   Uh-huh.

9   Q   Was he -- I guess I'm looking at it as before or
10  after where would you place Mr. Downen on that hump of
11  dementia?

12  A   I don't know.

13  Q   If Mr. Downen, you didn't think it was
14  appropriate for him to be -- or if he needed to be in the
15  special care unit, you would have put him on a waiting
16  list?

17  A   Absolutely.

18  Q   You can deny admission to the veterans' home; is
19  that right?

20  A   If I feel like somebody needs to be on the
21  special care unit, then I will say he needs to be on the
22  waiting list. So that's not a denial; that's just
23  somebody waiting for an appropriate placement. I can
24  deny, yes.

25  Q   In what situations would you deny somebody

1  admittance?

2      A    Somebody that is actively threatening, hitting.
3  I probably wouldn't admit somebody that murdered a family
4  member.  I've had those before.

5      Q    Sounds like fair criteria.

6           And as far as Mr. Downen went, did you see any
7  of that in his history that caused you concern?

8      A    No.  I saw certainly aggression and agitation,
9  but, again, nothing out of the ordinary that made me say,
10 Wait a minute, we need to think about the special care
11 unit or no admission.

12     Q    Did you meet with Mr. Downen when he was
13 admitted?

14     A    I did not.  I did his paperwork.  I can't
15 remember what else I was doing that day.  I do know that
16 he was feeling displaced.

17     Q    Is that unusual for new residents?

18     A    Not necessarily.  And this admission, of course,
19 was unique in that Tamara was supposed to bring him, and
20 that just kind of provides this transition, a loved one is
21 taking him from one place into a new place.  Even though
22 he had been there, it's still -- you know, it's different.
23 That did not occur.  We ended up transporting him.

24     Q    So you transported him -- by "you" I mean the
25 veterans' home transported him from Expressions to the

1  like that.

2      Q    Did you have any concerns at the time that
3  Stanley Downen was admitted to the Montana Veterans' Home
4  about the ability to care for him?

5      A    No.

6      Q    Do you know how many residents that you have
7  with Alzheimer's or dementia at any given time?

8      A    No.

9      Q    You know, if you give me about five minutes to
10 go through my notes, I think we're about done.

11     A    Okay.

12          (Recess taken 1:35 p.m. to 1:39 p.m.)

13     Q    (BY MR. McFARLAND)  You talked about a care-plan
14 team earlier.  Do you recall that?

15     A    Describing what a care plan -- uh-huh.

16     Q    Was the care-plan team used in Stanley Downen's
17 situation?

18     A    No.  There wasn't an instance that required
19 that.

20     Q    And what's an instance that would require --

21     A    Somebody coming in and saying we have a problem.

22     Q    Did you talk to Joren about the admission of
23 Stanley Downen at all?

24     A    I don't believe so.

25     Q    Is there anything else that you recall, any