# EXHIBIT J

# WILL CORDES
## Expert Report

**FACTS CONSIDERED/RECORDS REVIEWED:**

1. Complaint and Demand for Jury Trial dated April 3, 2013.
2. First Amended Complaint and Demand for Jury Trial dated April 18, 2013.
3. Defendant Columbia Falls Police Department's Answer to First Amended Complaint dated May 28, 2013.
4. Defendant Montana Veterans Home's Answer to First Amended Complaint dated June 11, 2013.
5. Second Amended Complaint and Demand for Jury Trial dated June 18, 2013.
6. Defendant Columbia Falls Police Department, City of Columbia Falls, Mike Johnson, and David G. Perry's Answer to Second Amended Complaint dated July 1, 2013.
7. Defendant Montana Veterans Home and State of Montana Department of Health & Human Services' Answer to Second Amended Complaint dated July 17, 2013.
8. Plaintiff's Initial Disclosure dated July 16, 2013.
9. Initial Disclosure of Defendant, Columbia Falls Police Department dated July 25, 2013.
10. Initial Disclosure of Defendant, Montana Veterans Home and State of Montana Department of Health & Human Services dated June 11, 2013.
11. Plaintiff's Preliminary Pretrial Statement dated September 24, 2013.
12. Defendant Columbia Falls Police Department, City of Columbia Falls, Mike Johnson, and David G. Perry's Preliminary Pretrial Statement dated September 23, 2013.
13. Defendant, Montana Veterans Home and State of Montana Department of Health & Human Services' Preliminary Pretrial Statement dated September 24, 2013.
14. Plaintiff's Responses to Defendant, Columbia Falls Police Department's First Interrogatories dated July 12, 2013.
15. Plaintiff's Responses to Defendant, Columbia Falls Police Department's First Request for Production dated July 12, 2013.
16. Plaintiff's Responses to Defendant, Montana Veterans' Home's First Discovery Requests dated July 12, 2013.
17. Joint Responses of Columbia Falls Police Department and City of Columbia Falls to Plaintiff's First Combined Discovery Requests dated August 16, 2013.
18. Plaintiff's Third Amended Complaint and Demand for Jury Trial dated October 25, 2013.
19. City of Columbia Falls, Mike Johnson, and David G. Perry's Answer to Third Amended Complaint dated November 7, 2013.
20. Defendant, Montana Veterans' Home and DPHHS' Answer to Third Amended Compliant dated November 12, 2013.
21. Plaintiff's First Supplemental Responses to Defendant, Columbia Falls Police Department's First Request for Production dated November 5, 2013.
22. Plaintiff's First Supplemental Responses to Defendant, Montana Veterans' Home's First Discovery Requests dated November 5, 2013.

23. City of Columbia Falls' First Supplemental Responses to Plaintiff's First Combined Discovery Requests dated October 21, 2013 (includes 2 videos on CD).
24. Deposition Transcript for Tamara Downen.
25. Deposition Transcript of Officer Mike Johnson, along with video (taken on 11/25/13).
26. Deposition Transcript of Chief David Perry (taken on 11/25/13).
27. Deposition transcript for Officer Gary Stanberry (taken on 11/25/13).
28. Deposition transcript for Celestia Rose McElderry (taken on 11/26/13).
29. Deposition transcript for Helen Lyman (taken on 11/26/13).
30. Deposition transcript for Vicky Briggs (taken on 11/26/13).
31. Deposition transcript for Jami Flickinger (taken on 11/26/13).
32. Draft policies prepared by the International Association of Chiefs of Police (IACP).
33. The Taser International Instructor Manual.
34. The Taser use guidelines from the Missoula International Airport Department of Public Safety.
35. The Use of Force Policy from the City of Billings (MT) Police Department.
36. "Getting Stoned" an article on police fatalities by Brian Palmer (2010).

**FACTS:**

On June 1, 2012, Mr. Stanley Downen—a 77-year-old veteran of the United States Navy, who suffered from Alzheimer's disease and dementia—encountered two (2) officers with the Columbia Falls Police Department (CFPD) while he was walking on the grounds of the Montana Veteran's Home (MVH). One of the CFPD officers, Officer Mike Johnson, deployed a Taser (brand) X-26 (model) electronic control weapon (ECW), which propelled two (2) wire-attached darts. The darts struck Mr. Downen in his left arm and the left side of his buttocks. According to eyewitness accounts, Mr. Downen was struck by the darts from the ECW as he was turning to walk away from the police officers, in the direction of the MVH. In essence, Mr. Downen was struck in the back, and he was never advised—either before or after the use of the ECW—that he was under arrest. Mr. Downen was never charged with any crime.

Deposition testimony from Officer Johnson and the other responding CFPD officer, Officer Gary Stanberry, indicated that no response plan was discussed between the officers during their short trip from the CFPD headquarters to the MVH. Nothing of Mr. Downen's ailments or background was known to the responding officers, and the officers did not make inquiries to that effect with the dispatching authority. Upon their arrival at MVH, neither officer sought or received any substantive information about Mr. Downen from the MVH nursing staff, who were present upon the officers' arrival.

By their own official accounts—through reports filed by both Officer Johnson and Officer Stanberry—the officers observed an elderly man, estimated to be over eighty (80) years of age, walking on the MVH grounds. Both officers were larger, taller, and heavier than Mr. Downen. Both officers had been issued or were otherwise equipped with both lethal (handguns and knives) and non-lethal (oleoresin capsicum—OC—spray and ECWs) personal defense implements. Both officers were carrying handcuffs and portable radios. A shotgun was

available in the CFPD police patrol car. Mr. Downen, the elderly man the officers encountered, was unarmed, weighed approximately twenty (20) pounds less than either officer, and suffered from Alzheimer's disease.

Mr. Downen was still on the grounds of the MVH when the CFPD officers arrived. Several members of the MVH nursing staff were between eight (8) to thirty (30) feet behind Mr. Downen when the officers arrived on the scene and blocked his path, some fifty (50) yards from the facility entrance gate. A chain-link fence surrounds the MVH grounds. Statements from the MVH nursing staff show that Mr. Downen had received a dosage of Haldol, a sedative, almost immediately prior to the call to the police dispatcher and well before the CFPD officers' arrival.

During the first one (1) to five (5) minutes the CFPD officers were on the scene at the MVH, neither of the officers and none of the MVH nursing staff exchanged any information about Mr. Downen's mental health, dementia, Alzheimer's condition, or the medication (in this case, Haldol) that had been administered to Mr. Downen.

According to his own deposition testimony, Officer Johnson drew his Taser (brand) ECW within seconds of exiting the front passenger seat of the CFPD police patrol vehicle. Mr. Downen was carrying several rocks in both his hands. Mr. Downen appeared to be confused by his surroundings and agitated as a result. He was wandering in a general direction toward the MVH entrance gate, and he did not appear to be an immediate threat, as was indicated by the behavior of the MVH nursing staff members who were following him. He was not running or making any unexpectedly rapid movements. At the time Officer Johnson deployed his ECW, Mr. Downen was a significant distance from the MVH entrance gate. Mr. Downen posed no threat to himself at the time the ECW was used, and he posed no threat to the on-scene members of the MVH nursing staff or the even more distant members of the public, who were present as spectators on the baseball fields adjacent to the MVH. Statements from the MVH nursing staff members who were present at the time the ECW was used on Mr. Downen reflected their lack of concern for their own safety, as they said they were careful to maintain a safe distance from him.

According to eyewitness testimony, Mr. Downen was struck by the ECW deployed by Officer Johnson, as Mr. Downen was turning back toward the MVH housing facility. The impact locations of the ECW darts—in this case, Mr. Downen's left arm and buttock—indicate that Mr. Downen was neither advancing upon Officer Johnson nor threatening Officer Johnson with a throwing posture. Although both CFPD officers wrote in their official reports that Mr. Downen had raised his arm in a manner the officers viewed as a threatening motion immediately prior to the deployment of the ECW, no other eyewitnesses on the scene corroborate the officers' version of the incident.

After being struck with the darts from the ECW and receiving the accompanying electrical charge, Mr. Downen fell head first onto the hard paved surface of the MVH entrance drive. After action photographs taken by CFPD show that he struck his head on the pavement, which resulted in bleeding from the wound he sustained in the fall. Officer Stanberry handcuffed Mr. Downen while he was still face down on the pavement and still suffering from the effects of the

3

ECW. Mr. Downen remained on the ground and handcuffed until an ambulance arrived on the scene some time later.

Even though the CFPD officers observed eyewitnesses among the spectators from the nearby baseball fields, the CFPD made no effort to further identify those eyewitnesses, even though some of those spectators were observed to be recording the incident with portable cameras and telephones. In fact, the CFPD officers took no action when members of the MVH nursing staff took it upon themselves to disperse the spectators from the fence separating the baseball fields from the MVH grounds. The only witness statements obtained by the CFPD came from members of the MVH nursing staff.

The rocks that Mr. Downen was holding in his hands at the time he was struck by the ECW were not seized and maintained as evidence—even though they represented the "threat" the CFPD officers noted in their official reports.

Despite the fact that the CFPD police patrol car was equipped with a video camera and Officer Johnson wore an individual lapel camera on his uniform, no recording of the actual incident was captured or retained by CFPD.

## OPINIONS:

The following opinions are stated on a more likely than not basis. My opinions are based upon my knowledge, skill, training, and experience as a law enforcement officer with over twenty-five (25) years of full-time, active service, as stated in my Curriculum Vitae, as well as my review of the records indicated above. As a career law enforcement officer, I have personally made thousands of arrests, and I have been present during many more thousands of arrests. Additionally, as a sheriff's deputy and sheriff's supervisor, I have been actively engaged in custody issues other than criminal arrests, such as the execution of physician's certificates and probate court orders, which result in the physical apprehension and detention of persons held for mental health evaluations and commitments.

#1     The use of the Taser (brand) ECW on Stanley Downen was not necessary. The use of an ECW on a 77-year-old United States Navy veteran suffering from Alzheimer's disease and advancing dementia constitutes a failure to follow the accepted standards of practice governing the use of force by law enforcement officers.

## BASIS OF OPINION:

An ECW (in this case, a Taser) should not have been used on Stanley Downen based upon the model policies and procedures for ECW use developed by the International Association of Chiefs of Police (IACP), the Taser International Instructor's Manual, and my experience as a career law enforcement officer. The circumstances in Mr. Downen's case did not justify this level of force. Outside of some extreme circumstance (not at issue in this case), an ECW should not be used on the infirm, on the elderly, or on individuals at risk for falls. *Please see Taser Manual, ECD [in this case—Electronic Controlled Devices—which is an interchangeable term for ECWs] Warnings, pg. 3 of 6: warning against using a taster if the subject "could fall and suffer*

4

*impact injury to the head or other area . . . is physically infirm, elderly, or pregnant." Please also see IACP Model Policy Electronic Control Weapon, pg. 1, which identifies the elderly and infirm as a sensitive population group. Also see pg. 2: "The ECW shall not be used on those who passively resist as defined in this policy, and should not generally be used . . . c. In any situation where the officer has a reasonable belief that the subject might fall resulting in death or serious physical injury, and the circumstances do not justify that risk." and 7: "Officers shall be aware of the general concerns raised when an ECW is used on a member of a sensitive population group. Officers are not prohibited from using an ECW on such persons, but the use is limited to those exceptional circumstances where the potential benefit of using the device (i.e. injury reduction) reasonably outweighs risks and concerns."* Stanley Downen was infirm, elderly, and at risk for a fall at the time he was struck with the ECW. Additionally, the IACP Model Policy on Dealing with the Mentally Ill directs officers facing such incidents to take steps to calm the situation before any attempt is made to restrain or detain the individual, as the use of restraints on the mentally ill has the potential of aggravating the issue. *Please see IACP Model Policy Dealing with the Mentally Ill, ppg. 2-3.*

No exigent circumstances existed to justify the use of an ECW. When the officers of the CFPD responded to the scene, Mr. Downen had not committed a crime. In the depositions of Officers Johnson and Stanberry, both officers noted that Mr. Downen was not arrested or charged with any felonies, misdemeanors, or local ordinance violations. Although Mr. Downen was disoriented, agitated, and confused, such behavior did not qualify as exigent circumstances justifying the use of an ECW.

Documented examples of exigent circumstances that might justify the use of an ECW are noted in materials relating to the use of force or the use of force continuum. Such examples include a person who is a flight risk; a person actively engaged in the commission of a crime; a person armed with a weapon; and a person who is larger than the responding officer or officers. None of these stated factors existed in Mr. Downen's case.

Mr. Downen had committed no crime; was physically smaller than either (and especially both) of the responding CFPD officers; was elderly and infirm; was not a flight risk and posed no real threat of harm to the CFPD officers or the MVH nursing staff. Although the CFPD officers claimed that Mr. Downen was a threat by holding rocks in his hands, the facts show that the rocks posed no real threat to a properly cautious person. The MVH nursing staff members had followed Mr. Downen for several minutes without expressing any fears for their own safety, by simply maintaining a safe distance from him. In the depositions of the MVH nursing staff members, they indicated a safe distance was somewhere between eight (8) and thirty (30) feet. The accounts of both CFPD officers show that they maintained a "safe" distance of fifteen (15) feet from Mr. Downen.

#2  Mr. Downen was not advancing towards law enforcement at the time they deployed the ECW.

BASIS OF OPINION:

In any law enforcement investigation, physical evidence outweighs witness testimony. Hypothetically, had Mr. Downen died as a result of his fall, and had the CFPD officers been the only existing witnesses to the incident, the physical evidence that was present after the ECW deployment (e.g. the ECW dart strike wounds on Mr. Downen's left arm and buttock) would not support the officers' contention that Mr. Downen was advancing upon or engaged in throwing one or more rocks at either officer. As it stands factually, the dart probe wounds in Mr. Downen's left arm and buttock would indicate that Mr. Downen was turning away from Officer Johnson, rather than moving toward him. If, as the CFPD officers stated in their depositions, Mr. Downen had been advancing toward Officer Johnson, the ECW darts would have been embedded in the front of Mr. Downen's torso. Witnesses from the adjacent baseball fields also stated that Mr. Downen was turning away from the CFPD officer at the time of the ECW deployment, and those witness statements are consistent with the actual location of the ECW dart wounds.

#3   Mr. Downen was not a threat to himself or others at the time he was struck by the ECW.

**BASIS OF OPINION:**

The facts of this case indicate that Mr. Downen was not a threat to his own safety. At the time the CFPD officer deployed the ECW, Mr. Downen was on the MVH property. Although there are discrepancies in the witness and officer accounts, Mr. Downen was a significant distance from the exit gate of the MVH at the time the ECW was deployed, and Mr. Downen presented no immediate threat of leaving the facility and creating further danger to himself or the public beyond. In addition, the CFPD police presence, which included a police patrol car utilized to block traffic on the MVH entrance drive and two (2) uniformed officers, created an additional barrier between Mr. Downen and the MVH exit gate. Aside from those two (2) CFPD officers, the MVH nursing staff had at least three (3) members present, essentially surrounding Mr. Downen, who was not moving at the time the ECW was deployed. Prior to leaving the MVH housing unit, Mr. Downen had been administered a dosage of Haldol, a sedative, by the MVH nursing staff, and it is unknown to what degree this drug had taken effect at the time the ECW was deployed.

Mr. Downen was not a threat to the public. Mr. Downen was effectively stopped by the arrival of the CFPD officers well before he reached the MVH exit gate, and Mr. Downen was on the paved MVH driveway, several feet away from the spectators at the adjacent baseball fields. A chain-link fence also separates the ball fields from the MVH property, and Mr. Downen's physical condition would have prevented him from negotiating such an obstacle. At any rate, Mr. Downen never made any effort to approach those members of the public, despite attempts by the CFPD officers and the MVH nursing staff to direct him to the grassy area between the pavement and the fence.

Mr. Downen was not a threat to the MVH nursing staff. From their depositions, the MVH nursing staff members said they followed Mr. Downen from the housing unit down the driveway. The MVH nursing staff members stated they were aware of the rocks Mr. Downen

6

was carrying, and they kept at what they considered to be a safe distance, between eight (8) and thirty (30) feet, as they followed him.

As stated above, there are discrepancies in the accounts of the perceived threat to the law enforcement officer(s). Physical evidence would indicate that Mr. Downen was turning away from Officer Johnson at the time the officer deployed the ECW. If, as he stated, he truly felt threatened, Officer Johnson could have easily backed away to give Mr. Downen more space, something MVH nurse McElderry had done a few minutes earlier.

#4  The Use of Force implemented by Officer Johnson exceeded the perceived threat to the officer.

BASIS OF OPINION:

A search of archived documents revealed that no police officer has been killed by a thrown rock in over seven decades. Additional research was unable to identify a physical attack by a person over seventy-five (75) years of age that resulted in the death of a police officer. Eyewitness accounts indicate that Mr. Downen never raised a rock as if to throw it at either CFPD officer. The statement of Danielle Jones is clear on that issue.

Mr. Downen was an elderly man, and the rocks he was alleged to have carried were described as large and presumably heavy, but those rocks were not preserved as evidence. Since the rocks cannot be examined, it is unknown at what distance the rocks might be considered as a threat. It is known, however, that the individual carrying the rocks was elderly and suffered from Alzheimer's disease and dementia. As stated above, Officer Johnson was not cornered, backed up against a barrier, or in any type of position that would have prevented a tactical retreat to a safe distance. There was no immediate threat to anyone involved in this incident, and Officer Johnson made a conscious choice to close the distance between himself and Mr. Downen. As stated above, if Officer Johnson had truly felt he was threatened by Mr. Downen, the officer could have easily backed away, taking the same action as MVH nurse McElderry.

Again, as stated above, the physical evidence of the ECW dart wounds would contradict Officer Johnson's statement that Mr. Downen posed a threat. The wounds to Mr. Downen's left arm and buttock would indicate Mr. Downen was not facing the officer but turning away, which would rule out any exigent circumstances requiring the use of the ECW.

#5  The CFPD officers failed to consider reasonable alternatives to using an ECW in Mr. Downen's case. The officers failed to de-escalate the situation involving Mr. Downen. Other reasonable alternative means of redirecting, de-escalating, or reorienting Mr. Downen were available to the CFPD officers on the day he was subjected to the ECW, and those alternative means should have been employed by the officers. That failure to use other alternative means to control the situation constitute a failure to meet acceptable standards of practice.

BASIS OF OPINION:

Alternative means of responding to the incident with Mr. Downen, other than the ECW, were not adequately considered by the CFPD officers. IACP model policies, accepted standards of practice, the "use of force continuum," as well as the basic certification training provided to all first responders dictate that other alternatives should be considered before ECW deployment.

According to the use of force continuum, the IACP Model Policy on Use of Force, and the IACP policies noted above, the officers on the scene should have first tried to de-escalate the situation. Rather than doing so, according to his deposition, Officer Johnson prepared to deploy his ECW within seconds of exiting the CFPD police patrol vehicle. There was no plan of action discussion between Officer Johnson and Officer Stanberry during their short trip to the MVH grounds, and no words were passed between the officers after they arrived at the scene. From the action taken by Officer Johnson, it would appear that no other alternative was voiced or considered, which is a direct violation of the use of force continuum.

The IACP Model Policy on the Use of Force states that "It is the policy of this law enforcement agency that officers only use the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer or others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances." pg. 1.

The use of force continuum (*Please see Billings Police Department Policy Manual, Policy Number 3-1. Use of Force*) states that before an increased level of force is used, less forcible alternatives should be exhausted first. Additionally, the IACP policy on Use of Force states that objectively reasonable force means "that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of the threat or resistance presented by the subject, and the danger to the community." pg. 1.

In Mr. Downen's case, Officer Johnson deployed his ECW almost immediately upon arrival. Officer Stanberry's deposition indicated that Officer Johnson deployed the ECW within a few minutes of their arrival at the scene, with no discussion or consideration of alternative means between the officers. Lower levels of force could have included physical containment without actually approaching Mr. Downen, who had stopped his advance toward the MVH exit upon the officer's arrival. The officers could have gained additional information about Mr. Downen by speaking to the MVH nursing staff members who were present, and the officers might have learned of the sedative (Haldol) that had been administered to Mr. Downen some fifteen (15) minutes earlier. In such a case, the officers could have waited for the sedative to take effect. If the officers had considered the danger of Mr. Downen falling on the hard pavement surface, they could have made a more concerted attempt to direct him to the grassy area between the pavement and the MVH boundary fence. Both officers had been issued OC spray, but this alternative non-lethal application was not discussed or considered, even though the danger of a fall is less likely when OC spray is administered. The disregard of any of these alternatives was a departure from accepted police training and practices.

By failing to glean any background information on Mr. Downen from the MVH nursing staff prior to deploying his ECW, Officer Johnson entered into a relatively unknown situation without consideration of the guidelines established by police training and practices or common sense, and he deployed his ECW on an elderly man who was clearly exhibiting signs of mental illness, contrary to the guidelines of the use of force continuum.

#6    The CFPD failed to adopt policies and procedures defining when an ECW should NOT be used.

BASIS OF OPINION:

Model policies from the IACP, policies from other Montana police agencies, and the Taser International User Manual all state that ECWs should not be used on the elderly, the infirm, or those who are at risk of falling. ECW policies from the IACP and other departments in Montana offer warnings and precautions about ECW use with particular segments of the population. Said policies are regularly updated, as standards in law enforcement evolve or case law more clearly defines ECW application. Chief Perry and the CFPD failed to adopt, implement, or incorporate any accepted ECW use policies in the CFPD policy manual.

The policy manual for the CFPD, according to Chief Perry's testimony, was first drafted in the late 1990s. In 2006, the CFPD issued the Taser (brand) ECW to its officers and, in doing so, effectively implemented ECW use by practice rather than written mandate. At that time, it would have been appropriate to incorporate a well-defined ECW policy into the CFPD manual, but that did not occur.

In 2008, the CFPD and Chief Perry performed an overall revision and review of the CFPD policy manual, which would have presented an ideal time to include an ECW use policy, but Chief Perry failed to do so.

The policies in place for the CFPD make no mention of ECWs or the trade name Taser in the versions on file prior to June 1, 2012. As a result, there was no ECW policy in effect at the time Mr. Downen was subjected to ECW use. No policy for officer encounters with Alzheimer's patients has ever existed in Columbia Falls, and the CFPD pays only a brief lip service to individuals identified as "Mentally Impaired" in a policy section titled "ASSISTANCE TO DESTITUTE PERSONS, RUNAWAYS AND THE MENTALLY IMPAIRED" with a direction to its officers to "take custody and properly dispose of . . . those mentally impaired who need assistance" (*Please see CFPD policy section number 2.79*). The unnecessarily vague wording of this policy section gives no clear direction to the CFPD officers. According to Chief Perry, an ECW policy for the specific Taser (brand) ECW in use by CFPD was finally drafted and put into place in July of 2012—after Mr. Downen was subjected to ECW use. Chief Perry was unable to say that this policy was adopted because of the incident with Mr. Downen.

Based upon his deposition testimony, Chief Perry was clearly aware of IACP policies, and he also agreed that those policies are an authoritative source of information regarding currently accepted police policies and practices. In November 2011, Chief Perry conducted a review of the ECW policy provided to him by the Billings (MT) Police Department. The Billings police

9

manual specifically references the Taser International Manual, for its ECW use guidelines. Even a cursory review of the Taser manual would show that ECWs should not be used on the elderly, the infirm, or those at risk for falls. Chief Perry's failure to incorporate these ECW use policies into his own department's policy manual demonstrates his disregard of accepted standards of police practice and a failure to provide direction to the officers under his supervision and command. This failure on Chief Perry's part essentially validates the action taken by Officer Johnson on June 1, 2012, and the chief's failure put Mr. Downen at risk.

The policy outlined in the IACP and Billings manuals—both available to the CFPD prior to June 1, 2012—clearly states that all applications of ECWs "shall conform to the principals outlined in the [Taser] training and certification program." (*Billings Policy 3-1 Use of Force, pg. 4*). As referenced above, the Taser International Training Manual and the IACP model policy of ECWs show that ECWs should not be used on the elderly, the infirm, or those at risk of falls.

I was informed that Chief Perry had been asked to provide a copy of the current CFPD Use of Force and Taser policies that were adopted by the CFPD in July of 2012—one month after the incident with Mr. Downen—but, as of this date, the policies have not been supplied to me. If, after receiving said policies, I have additional comments, I would like the option of supplementing my opinions.

The failure to draft and/or implement an ECW use policy by the CFPD after adopting the Taser (brand) ECW in 2006 was a departure from acceptable police practices.

#7 **The CFPD failed to implement policies and procedures pertaining to ECW use (specifically the issued Taser brand ECW); Alzheimer's Patients; Use of Force; and interaction with Mentally Incapacitated Persons.**

**BASIS OF OPINIONS:**

The standard accepted practice for the use of ECWs can be found in the IACP policies and position documents. These model policies serve as "the Bible" in the field of law enforcement work. They are the definitive authoritative text on police procedure, and should have been used as a reference source for police policies related to ECW use, interaction with Mentally Incapacitated Persons, and encounters with Alzheimer's Patients by the CFPD. Chief Perry concedes as much in his deposition.

By their failure to calm the situation, as defined by the IACP policies, Officers Johnson and Stanberry acted contrary to what should have been well-known principles of law enforcement. The officers' deposition testimony indicates that any policies in the CFPD manual were not regularly reviewed by Officers Johnson or Stanberry, which is contrary to modern police practice. Chief Perry failed to enforce a common practice of periodic policy review, revision, or training. The failure of the CFPD to research, revise, and adopt current policies is a departure from accepted police practices, and the failure of the CFPD to properly train their officers in the field also constitutes a departure from accepted police practices.

#8    The CFPD failed to adequately train and supervise its officers in the use of force—
particularly the use of the Taser (brand) ECW.

**BASIS OF OPINIONS:**

The CFPD failed to ensure that Officer Johnson was adequately trained and supervised. Based on his deposition and the training records provided by CFPD, Officer Johnson received no updated training on the use of the Taser (brand) ECW in the two years prior to his use of the device on Mr. Downen. According to the Taser International Manual, officers should be regularly recertified with the device. Such recertification, by definition, includes hands-on training with the issued device. Such training did not occur in Officer Johnson's case, and the officer was not aware of the full capabilities of the Taser model ECW he was carrying. In fact, there is no record of Officer Johnson receiving ECW training by the CFPD prior to the June 1, 2012 incident with Mr. Downen, which constitutes a complete disregard of accepted police practices. In Officer Johnson's deposition, he stated that his only review of the CFPD policy manual occurred shortly after her was hired—years before the incident with Mr. Downen—and there was no ECW policy in the CFPD manual at that time. No such policy existed at the time Officer Johnson was issued the Taser (brand) ECW by the CFPD. When asked about it in his deposition, Officer Johnson said he was unaware of any revision to the CFPD policy manual after his initial (and only) review following his hiring. This would indicate that there is no procedure in place by the CFPD to maintain a current policy in any area of police practices, and no training program to keep the CFPD officers informed of changes policies that had been adopted by other, more forward-thinking agencies.

Chief Perry was unable to provide any training records for ECW training by any of his officers, and Chief Perry has never been trained in the proper use of an ECW. This lack of proper training makes Chief Perry unsuited to the supervision of officers so equipped, since he is unfamiliar with the most basic warnings against the use of ECWs on the elderly, the infirm, and those in danger of falling.

Additionally, from his deposition, Chief Perry stated there is no clear means for recording complaints with the CFPD. According to Chief Perry, complaints must be submitted on a designated form in order to be lodged as a proper "complaint," but the chief did not tell any of the complainants about the form or even that the form exists. Even when documents are submitted to the CFPD listing a specific complaint, if they are not written on the designated CFPD form, they do not, by Chief Perry's definition, constitute a complaint. In that regard, the letter to Chief Perry by Danielle Jones, complaining about the CFPD treatment of Mr. Downen on June 1, 2012, did not qualify as a complaint according to the chief's arbitrary standard. The same thing occurred when Tamara Downen voiced her complaint to Chief Perry, who did not document her concerns as a valid complaint. As a result of those "technicalities," no follow-up investigation was ever initiated by CFPD, and no associated reprimand or disciplinary action was ever considered as a result of Mr. Downen's case. In this type of environment, where complaints are ignored, incidents are not properly investigated, and discipline is not even considered, meaningful supervision cannot exist.

11

For all those reasons listed above, the CFPD failed to train or supervise Officer Johnson in a manner that would protect both the officer and the public, in violation of the accepted standards of law enforcement.

#9   The CFPD failed to preserve evidence pertaining to the case.

BASIS OF OPINION:

Based upon deposition testimony by Chief Perry, Officer Johnson, and Officer Stanberry, evidence in the case involving Mr. Downen was not preserved. The rocks allegedly held by Mr. Downen—and described as "weapons" by the CFPD—were not seized as evidence, with an appropriate evidence designation and chain of custody record. Additionally, an actual video record of the incident was either not made or not preserved, and on-scene interviews with witnesses were not conducted. The rocks, though photographed to scale, were left at the scene, and any value they might have had as evidence has since been lost. The only preserved video record of the incident was made post-incident, and it does nothing to support the officers' contention of aggressive acts by Mr. Downen. Based on section 2.862(II)(b)(1) and (2) of the CFPD policy manual, the officers had a duty to preserve property of an evidentiary value and small enough to fit in the officers' patrol vehicle, and the rocks met such evidentiary standards. Additionally, the CFPD policy does not contain defined procedures for evidence handling and preservation, and their policy only states "(Insert Our Procedures)," without listing said procedures.

The CFPD Policy and Procedure Manual section 2.85(I)(A)(1)(d) – Crime Scene Integrity – requires the responding officer to "Fully identify persons present and their status as . . . witnesses and separate witnesses as required." Witness Daniel Jones was on scene on June 1, 2012, and she should have been observed by the CFPD officers, but she was never identified by the officers or questioned by them. Ms. Jones's letter of complaint about the incident, mailed to Chief Perry, was never classified as a complaint or a witness statement by the CFPD. Witnesses Tania and Hannah Kelly were never interviewed by CFPD, and neither were any of the other spectators who were present along the fence separating the ball fields from the MVH property. By failing to conduct any follow-up investigation, the CFPD violated its own policies. There is no CFPD policy on the proper preservation of evidence (*Please see CFPD section 2.86 III*). This constitutes a complete failure by the CFPD to draft, implement, and update policies and procedures necessary for the effective performance of expected law enforcement functions.

Common law enforcement practices require the preservation of evidence (the rocks), the identification of witnesses (in this case, the spectators from the ball field), and the proper capture of a video record of the incident. CFPD failed in each regard.

CONCLUSION:

Stanley Downen should not have been subjected to ECW deployment. The use of a Taser (brand) ECW on an unarmed 77-year-old United States Navy veteran with Alzheimer's disease, who had committed no crime and was still on the Montana Veteran's Home grounds, was a

12

violation of accepted practices for law enforcement. The Columbia Falls Police Department, Chief Perry, Officer Johnson, and Officer Stanberry failed to meet the standards of care for law enforcement professionals in all the ways outlined above.

These opinions may be supplemented as additional facts and information are discovered in this case.

**POTENTIAL EXHIBITS:**

1. IACP Model Policies
2. Columbia Falls Police Department's Policies
3. Taser Manual
4. Columbia Falls Police Department's Responses to Discovery Requests
5. Columbia Falls undated Taser Policy (anticipated)

This list may be supplemented.

**WITNESS QUALIFICATIONS:**

I was initially certified as a law enforcement officer in DeKalb County (GA) in 1974. I hold Basic, Intermediate, Advanced, Supervisory, and Instructor certifications issued by the Georgia Peace Officers Standards and Training (POST) Council, and I also hold Basic, Intermediate, and Advanced certifications issued by the Montana POST Council.

As stated previously, I have made thousands of arrests as a certified law enforcement officer, law enforcement supervisor, and law enforcement administrator between February 1974 and June 1995, my last period of field work. During the same time period, I witnessed many more thousands of arrests performed by other officers, and I was present during the execution of many hundreds of physician's certificates and probate court orders to temporarily detain persons in need of emergency mental evaluations. The same physical aspects of arrests were applied in those instances.

I received my first training with the Taser (brand) ECW in 1986, and I have used the Taser on numerous occasions. In Georgia, I served as a county police patrolman (1974 to 1980), a county sheriff's deputy (1982), a county sheriff's fugitive squad investigator (1983 to 1985), a county sheriff's sergeant (1985 to 1989), a county sheriff's lieutenant (1989 to 1991), and a county sheriff's captain (1991 until my retirement in 1996).

As a supervisor (sergeant and above), I was responsible for the annual evaluations of all subordinate employees, which included a review of all reports generated, to ensure compliance with departmental policy and applicable laws. In my lieutenant's assignment, I was the commander of the DeKalb County Sheriff's Office Internal Affairs Unit, and in that capacity I was required to review all departmental incident reports to ensure compliance with departmental policy and applicable laws. One of my assignments as captain was commander of the department's Training Section, where I was charged with developing policy and reviewing existing policy for compliance with applicable laws.

I have written policy on DUI traffic arrest procedures, domestic violence arrest procedures, and a use of force section on the ASP (brand) expandable baton. As a supervisor (at every level), I conducted policy reviews and revisions with all subordinate personnel, to ensure each employee's policy manual was current. My initial POST instructor certification (1983) was in the field of police report writing, and I was later POST certified as a firearms instructor in 1985.

After my retirement in Georgia, I was employed by the Montana Department of Justice Division of Criminal Investigation (MTDOJ/DCI) as the resident criminal investigator in Missoula (1996 to 2001). In that capacity, I conducted major case investigations, which included the collection, preservation, and proper documentation of evidence. I am also certified as a Montana POST firearms instructor, and I have provided instruction on pre-event planning (as a result of working on the 1996 Atlanta Olympics), homicide investigation, firearms instructor certification, and documentary investigation for the Montana Law Enforcement Academy (MLEA) in Helena, MT.

After my retirement from MTDOJ/DCI, I was employed as a public safety officer (a combination of law enforcement and aircraft rescue firefighting duties) with the Missoula County Airport Authority Department of Public Safety (2002), and I worked two (2) separate periods as a contract detective with the Missoula County Sheriff's Office (2002 and 2003), engaged in major case investigations. I currently hold Montana state certifications (through the Montana Department of Labor and Industry) as a private investigator and firearms instructor.

### PUBLICATIONS AUTHORED:

I have written articles for *The Police Times*, the publication of the National Association of Chiefs of Police, and *Tactical Shooter* magazine, a police-related sister publication of *Precision Shooting* magazine. I have also written dozens of articles for *The Single Shot Exchange*, a monthly publication catering to the interests of antique and classic firearm enthusiasts. I have also self-published two novels, but I have not written for publication since 2004.

### PREVIOUS TESTIMONY:

Marc Hardesty, Plaintiff vs. Glen Barcus, Col. Michael Tooley, the Montana Highway Patrol, cause 11-103-M-DWM-JCL (2012), as expert witness for the plaintiff.

### STATEMENT OF COMPENSATION:

$100.00 per hour for research/document review/document preparation and $200.00 per hour for testimony (to include deposition).

SIGNED:

_____  DEC. 16, 2013

Will Cordes                     Date

14

# Curriculum Vitae – William J. Cordes

1974 – P.O.S.T. (Peace Officers Standards and Training—GA) Basic Law Enforcement Officer Certification (DeKalb County), Master Shooting Classification (3 consecutive perfect qualification scores)

1983 – P.O.S.T. (GA) Certified Law Enforcement Instructor (Police Report Writing)

1985 – P.O.S.T. (GA) Certified Law Enforcement Firearms Instructor (Handguns and Shotguns)

1986 – P.O.S.T. (GA) Special Weapons and Tactics (SWAT) Certification

1987 – P.O.S.T. (GA) Intermediate Law Enforcement Officer Certification, P.O.S.T (GA) Advanced Law Enforcement Officer Certification, P.O.S.T. (GA) Field Training Officer (FTO) Certification, P.O.S.T. (GA) Law Enforcement Supervision Certification

1988 – National Rifle Association (NRA) Law Enforcement Rifle Instructor Certification (still current)

1989 – Federal Bureau of Investigation (FBI) Police Countersniper Certification, Reid Institute (Chicago) Interviews and Interrogations Basic Certification

1990 – Institute of Police Technology and Management (U of FL) Internal Affairs Certification, Reid Institute (Chicago) Advanced Interrogations Certification

1991 – FBI Advanced Police Countersniper Certification, NRA Long Range Rifle Instructor Certification, Anacapa Sciences (CA) Analytical Investigations Certification

1992 – FBI National Academy Graduate (170th Session) – Internationally recognized as a handgun marksman as a result of firing a perfect score on the FBI Tactical Handgun Course; my name is on the "Possible Club" wall of the FBI National Academy at Quantico, VA

1995 – Rollins College (Orlando, FL) Complex Criminal Investigations Certification

1996 – Retired as a captain, with the DeKalb County Sheriff's Office, hired as a state agent with the Montana Department of Justice Criminal Investigation Bureau (CIB – later changed to the Division of Criminal Investigation, or DCI)

1998 – P.O.S.T (MT) Law Enforcement Firearms Instructor Certification, U.S. Secret Service Questioned Documents Examiner Certification

2001 – Retired from MT DOJ

2002 (to present) – I have worked three (3) separate periods as a contract detective for the Missoula County Sheriff's Office, and I am a Montana Licensed Private Investigator and Firearms Instructor

**Other notable accomplishments or significant information:**

I have had articles published in *The Police Times*, the publication of the National Association of Chiefs of Police, *Tactical Shooter*, a law enforcement supplement of *Precision Shooting* magazine, and I am internationally recognized as a firearms authority as a result of dozens of articles published in *The Single Shot Exchange* (*SSE*), a monthly publication catering to the interests of antique and classic firearms enthusiasts (subscribers in all 50 states and 11 foreign countries). My articles for *SSE* primarily dealt with custom loading for obsolete or obscure rifle calibers.

I developed and taught the ballistic component of the first Patrol Rifle Instructor Course at the Georgia Police Academy in 1992, and this class is still in use today. The ballistic data presented to students in this class pertains, in part, to the behavior of projectiles in flight and upon impact.

I have conducted major case investigations involving the use of firearms in both Internal Affairs-related cases and criminal investigations, and I am experienced in collecting the physical evidence in shooting-related crimes. I have also provided firearms and ballistic related services to the Missoula County Public Defender's Office.

Since childhood, I have loaded my own centerfire rifle and handgun ammunition, and I presently load for approximately 100 different calibers.

I have performed handwriting analysis in criminal investigations for the Montana DCI, the Missoula County Sheriff's Office, and the Lake County Sheriff's Office.

I am a competitive handgun shooter, and I have been a member of the Montana "Governor's Twenty" (made up of the top 20 law enforcement marksmen in the state) since I moved to Montana in 1996. I am usually one of the top three or four shooters—despite being the oldest competitor in the state matches—and in 2007 I was the "Grand Champion." Most recently (August 3, 2013), I placed fourth overall in the state match.