# EXHIBIT M

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DIVISION OF MONTANA
2                 MISSOULA DIVISION

3    Cause No. CV-13-121-M-DWM

4    _____

5    TAMARA DOWNEN, Individually and as Personal
     Representative for the ESTATE OF STANLEY L. DOWNEN,
6    deceased,

7               Plaintiff,

8         vs.

9    MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF
     PUBLIC HEALTH SERVICES; CITY OF COLUMBIA FALLS;
10   MIKE JOHNSON; and DAVID G. PERRY,

11              Defendants.

12   _____

13

14

15          DEPOSITION OF CHIEF DAVID GORDON PERRY
16                 November 25, 2013

17

18

19          Pursuant to Notice and the Federal Rules of

20   Civil Procedure, this deposition, called by Plaintiff, was

21   taken at 145 Commons Loop, Suite 200, Kalispell, Montana,

22   at 3:04 p.m., before Sheri J. Hazlett, Registered

23   Professional Reporter and Notary Public of the State of

24   Montana.

25

1    that would be helpful.

2         A    Okay.  The first time I saw it, it was like

3    2006, Lewiston, Idaho, at the chief's convention.  TASER

4    came into our -- and talked to all the chiefs and put on a

5    demonstration.  And that was the first time I'd heard

6    about the tasers.

7         Q    2006?

8         A    Yes.

9         Q    All right.

10        A    Maybe '5 -- '5 or '6.

11        Q    No problem.  But at that 2006 convention, you

12   were not certified in taser use?

13        A    No.

14        Q    Okay.  Next time you had any experience with

15   tasers in a training or certification capacity as an

16   observer?

17        A    I would say -- well, I didn't do the 2006, the

18   initial one that we did.  I attended the July 2012 taser

19   training.

20        Q    Okay.  During Officer Stanberry and

21   Officer Johnson's depositions, you were present for their

22   testimony about the 2012 taser training; is that right?

23        A    Correct.

24        Q    And there was a little bit of confusion about

25   the precise date of that taser training.  I believe you

192b4f10-8375-41da-b99f-936bfe09f155

1    just testified that that training occurred in July of

2    2012; is that right?

3        A    Correct.

4        Q    And where was that training, Chief?

5        A    Columbia Falls Police Department.

6        Q    Okay.  Who was the instructor?

7        A    Josh Buls, B-o-l-h-s (sic).

8        Q    Where was Mr. Buls from?

9        A    Flathead County Sheriff's Department.

10       Q    Okay.  How long did the training last?

11       A    I believe it's a four-hour class -- four or six.

12       Q    When did you -- did you have any role in

13   scheduling that training?

14       A    Yes.

15       Q    All right.  When did you initiate conversations

16   with Mr. Buls or anyone else to set up that training?

17       A    Well, initially it was with Travis Bruyer,

18   B-y-u-e-r (sic), Flathead County Sheriff's Department.

19   He's their master taser instructor.

20       Q    Okay.

21       A    He was unable to make the date that was set, so

22   one of the other instructors, Josh Buls.

23       Q    And when did you originally have a conversation

24   with Mr. Bruyer?

25       A    Sometime before the class.

192b4f10-8375-41da-b99f-936bfe09f155

1       Q      Okay.  Was it before the tasing incident in

2    Stanley Downen's case?

3       A      I can't recall.

4       Q      Okay.  Can you recall if you set this class up

5    in response to the Stanley Downen taser incident?

6       A      I don't recall.

7       Q      You can't recall either way?

8       A      No.

9       Q      In terms of that July 2012 taser class, did you

10   take the class as an attendee?

11      A      Yes.

12      Q      All right.  Were you certified in the use of a

13   taser?

14      A      No.

15      Q      Was anyone certified in the use of a taser?

16      A      I think my whole department was.

17      Q      Do you have records of that certification?

18      A      Josh Buls would.

19      Q      And did you see the certifications received?

20   Here's what I'm getting at.  I've seen the

21   TASER International certification form, but I haven't seen

22   any records of TASER International certification for any

23   of the officers at the police department in

24   Columbia Falls.

25      A      Correct.

192b4f10-8375-41da-b99f-936bfe09f155

1    Q    Are you aware of any certifications issued by

2  TASER International --

3    A    No.

4    Q    -- to police department -- I'm sorry, to police

5  officers at the Columbia Falls Police Department?

6    A    No.

7    Q    In terms of the certifying body then that issued

8  these certificates to the law-enforcement officers at the

9  Columbia Falls Police Department, who was the certifying

10  body?

11    A    Would have been the instructor.  First time

12  around it would have either been -- I believe it was

13  Rich Wicks, prior employee, and Sean Murphy, both of them

14  were sergeants and instructors.

15    Q    Prior to the 2012 taser training in July in

16  Columbia Falls, were there any other taser trainings that

17  you're aware of that certified any of the other officers

18  at the Columbia Falls Police Department?

19    A    Yes.

20    Q    What other certifications are you aware of?

21    A    Well, just like with Officer Stanberry, he was

22  certified later on.  Because the initial certification was

23  2006, and then when a person got hired, we would conduct

24  it in the FTO program, and then we got to a point where it

25  was easier to go through the sheriff's department, because

192b4f10-8375-41da-b99f-936bfe09f155

1    A    Yes.

2    Q    All right.  And who issued those taser

3  instructor certificates?

4    A    That would be the person that taught them, and

5  it was somebody local.  I don't know if it was Travis

6  Bruyer or . . .

7    Q    And, Chief, are you aware of whether or not

8  Travis Bruyer or Rick Wicks or Sean Murphy were actually

9  certified by TASER International as taser instructors?

10   A    Do I believe?  I have no reason to doubt.

11   Q    Sure.  Have you ever seen any

12  TASER International certificates for any of those

13  individuals?

14   A    I think I have.  And also I think they're on

15  their transcripts as instructors.

16   Q    All right.  So 2006 we've got a taser training

17  in Columbia Falls at the same time that the tasers are

18  issued?

19   A    Correct.

20   Q    And then again in July of 2012 there was another

21  taser training?

22   A    Correct.

23   Q    Okay.  In that intervening period, are you aware

24  of any other taser trainings that were given in

25  Columbia Falls?

192b4f10-8375-41da-b99f-936bfe09f155

1    A    Just the ones they mentioned.

2    Q    Okay.  All right.  Some of your duties as a

3  police chief involve reviewing and revising policies with

4  the police department.  Fair?

5    A    Correct.

6    Q    Okay.  And if you could explain the nature of

7  your duties, that would be helpful.

8    A    Well, my job is to when a policy is needed or a

9  standard operating procedure is needed, to develop that,

10  implement it, and monitor it.

11    Q    Okay.  What sources do you look to in terms of

12  guidance related to drafting policies and procedures for

13  the police department?

14    A    Some are through the International Association

15  of Chiefs of Police Model Policies.  I'm also on the

16  Montana Law Enforcement Academy model policy development

17  committee as a law-enforcement representative with --

18  joint with MMIA, and we develop -- in the current policy

19  we have and we developed for electronic control devices.

20    Q    Okay.

21    A    But aside from that, most of the time I will get

22  it from some other department and modify it to our needs.

23    Q    And how often do you do that -- how often do you

24  look at model policies from the IACP or other police

25  departments in revising Columbia Falls' policies?

192b4f10-8375-41da-b99f-936bfe09f155

1      A     Not that often, because there really isn't a

2   need for it.  Law enforcement really doesn't change, you

3   know, their basic standard operating procedures.  You

4   know, your policy end of it has pretty much been the same

5   throughout time.

6      Q     Okay.  When was the last time you revised the

7   policies and procedures at the police department in

8   Columbia Falls?

9      A     2008.

10     Q     What changes did you make in 2008?

11     A     I don't recall.  Very little.

12     Q     Any specific policies you revised that you

13  recall?

14     A     No.

15     Q     Prior to 2008, when was the last time before

16  2008 that you revised policies and procedures at

17  Columbia Falls?

18     A     1995.

19     Q     Okay.  And do you recall any of the policies and

20  procedures that you revised back in 1995?

21     A     Correction.  Couldn't have been '95, because I

22  wasn't chief in '95.  So it would probably be '97, '98.

23     Q     Okay.  With that understanding, any policies or

24  procedures that you recall revising in '97, '98?

25     A     Well, it wasn't revising.  That's when I

1    developed it, because before that I don't think the

2    department had a policy manual.

3        Q    What sources did you look to in creating that

4    policy and procedure manual for the Columbia Falls Police

5    Department?

6        A    IA -- or International Association of Chiefs of

7    Police didn't have a model policy yet.  The one I got was

8    out of Florida.  I forget what county.  Because it pretty

9    much was the same as what I was looking for.  An officer

10   by the name of Dave Nutzman, N-u-t-z-m-a-n, and myself

11   re-molded it to fit the needs of the Columbia Falls Police

12   Department.

13       Q    All right.  Were those policies and procedures

14   essentially the scaffolding for Columbia Falls Police

15   Department's policies and procedures in that period from

16   1998 to 2008?

17       A    Yeah.

18       Q    Okay.  And then in 2008 what prompted you to go

19   back and review and revise the Columbia Falls Police

20   Department's policies?

21       A    I think somebody recommended it.

22       Q    Okay.  Do you recall who that was?

23       A    No.

24       Q    Earlier you were talking about the IACP model

25   policies, and I believe you mentioned another acronym in

1   there.  Was it MI --

2       A    Well, Montana Law Enforcement Academy.

3       Q    MELA?

4       A    Right.

5       Q    Gotcha.

6       A    And MMIA.

7       Q    Gotcha.

8       A    The city's insurance company.  They have a

9   committee, and it's like county attorneys, it's two chiefs

10  of police, myself, and the Billings chief of police,

11  there's some other people in there, AG's office and that.

12  We meet probably twice -- or I mean every two years and go

13  over new policies that need to be put in place.  And last

14  time that we met was one of the electronic control

15  devices.

16      Q    What year was that?

17      A    What's this year, '13.

18      Q    Yep.

19      A    I'd say 2011.

20      Q    All right.  And during that meeting with MMIA,

21  did you go over model policies from IACP related to

22  electronic control devices?

23      A    Yes.

24      Q    And IACP, the International Association of

25  Chiefs of Police, they provide model policies and model

192b4f10-8375-41da-b99f-936bfe09f155

Page 32

1    A   No.

2    Q   The use of force policy in that policy and

3 procedure manual is the only policy that deals with

4 weapons.  Is that true?

5    A   I don't know.

6    Q   Okay.  And here's why I ask, Chief.  I've been

7 looking for any of the policies in that Columbia Falls

8 policy and procedure manual that refer to tasers.  Is

9 there any policy in that manual that refers to tasers,

10 other than the use of force policy?

11    A   No.

12    Q   Is there any mention of tasers in any of that

13 material from the Columbia Falls policy and procedure

14 manual?

15    A   No.

16    Q   And as I read it, I didn't even see the word

17 taser anywhere in the manual.  Is that true?

18    A   That's true.

19    Q   And is that still true today, Chief?

20    A   No.  We have the taser policy that we adopted

21 that MMIA and MELA recommended.

22    Q   And when did that policy on tasers go into

23 force?

24    A   July 2012.

25    Q   July of 2012, okay.

1      Q      There's never been a complaint?

2      A      Never.

3      Q      What procedure do you have that you follow if

4   you do hear a complaint about an officer?

5      A      When somebody comes in and complains about it, I

6   will do a preliminary investigation, basically look at

7   their report, talk to the officers involved, and basically

8   determine if there needs to be an official investigation.

9           And the difference between a preliminary

10  investigation and an official one is when you do the

11  preliminary, you don't involve the union.  When you do the

12  official one, it's much more union involved.  The employee

13  has to have the right to representation.  Usually in a

14  situation like that, you know something went wrong.

15          But the initial preliminary investigation,

16  because we get so many people, not complaints but

17  basically question, Why did the officer do this?  Well,

18  that doesn't make sense, and I'll go back and look.  Well,

19  two sides of the story, the person wasn't correct

20  and . . .

21     Q      Did you ever receive any complaints regarding

22  what happened to Stanley Downen?

23     A      No, I didn't receive a complaint.  I had two

24  different individuals that had concerns about it, but no

25  complaint.

192b4f10-8375-41da-b99f-936bfe09f155

1      Q    Okay.  Who were those individuals?

2      A    First one was, I believe, Tamara.  She came in

3   and talked to me about it shortly after the incident took

4   place.

5      Q    Okay.  Where did that conversation occur?

6      A    My office.

7      Q    Then roughly when did that conversation occur?

8      A    Shortly after -- days after June 1.

9      Q    Okay.  And what did you know about that episode

10  at the time you had the discussion with Tamara?

11     A    Mike Johnson notified me at the scene that he

12  had -- he tased an older gentleman that was leaving the

13  vets' home, advised me of the rocks, debriefed me briefly.

14     Q    Did you have any follow-up conversations with

15  Officer Johnson about that?

16     A    After Tamara came in and talked to me, I

17  followed up with Johnson and Stanberry.

18     Q    What did you discuss during that meeting with

19  Johnson and Stanberry?

20     A    Just their side of the story.  What was the

21  context, I don't know.

22     Q    What more did you learn about that incident,

23  aside from what you had previously known based on

24  Officer Johnson's report?

25     A    Just more details.

192b4f10-8375-41da-b99f-936bfe09f155

1      Q    Okay.  How long after your talk with

2  Tamara Downen did that conversation with Officers Johnson

3  and Stanberry occur?

4      A    It had to have been within three days.

5      Q    Okay.

6      A    Because Tamara came back in and talked to me.

7      Q    After Officer Johnson and Stanberry came in?

8      A    Right.

9      Q    Let's start with the first conversation that you

10  had with Tamara.  How long did that conversation last?

11      A    Probably 10 to 15 minutes.

12      Q    All right.  And how much of that 10 to

13  15 minutes was Tamara talking to you?

14      A    Probably about 80 percent.

15      Q    And what did she tell you at that time?

16      A    She explained the situation, that that was

17  her -- I understood it as her grandfather.  I learned

18  there that she had the power of attorney, that he was

19  placed there at the veterans' home.  What else did I

20  learn?

21           She never verbalized a complaint.  Her thing was

22  is how can a 70-some-year-old man be tased with dementia

23  or Alzheimer's or whatever be tased.  Again, I didn't say

24  much.  I like getting everybody's story together before I

25  commit myself.  So I told her, I said I would check into

1     it and give her my results.  So then she left.  Her

2     demeanor both times she came in were very polite and, you

3     know, I understood her concerns, but, you know.

4             So then I talked to Officer Stanberry, talked to

5     Officer Johnson.  I got their story.  I don't --

6        Q    **Chief, had they given you their narrative**

7     **reports at the time that you spoke with them?**

8        A    I believe that I had that, because they have to

9     have it done within -- our policy is the end of the

10    following shift they work.  So I would have had that.

11       Q    **So you had their reports and you spoke to them.**

12    **Sorry I interrupted.  Please continue.**

13       A    I had their report, talked to them.  I don't

14    remember if Tamara came in on her own or if I called

15    Tamara to come in or whatever, but she did come back in.

16    I explained to her what took place out there, what

17    position the officers were in, and by my account of

18    everything, the force that was used was justified.

19       Q    **And any time during that second meeting with**

20    **Tamara or in the first meeting did you tell Tamara that**

21    **she could make a complaint?**

22       A    No.

23       Q    **Did you explain to her that there was a written**

24    **complaint process?**

25       A    No.

192b4f10-8375-41da-b99f-936bfe09f155

1    change training protocols?  Did you do anything as a
2    result of this meeting with Tamara specifically?
3        A    No.  There was no need to.
4        Q    Did you conduct any further investigation of the
5    matter?
6        A    No.
7        Q    Did you reprimand anyone?
8        A    No.
9        Q    Did you discharge anybody?
10       A    No.
11       Q    Did you make any changes in how you train
12   officers at the Columbia Falls Police Department?
13       A    No.
14       Q    It doesn't sound like there was any admission of
15   any errors to Tamara; is that right?
16       A    No.
17       Q    Was there any further inquiry into the matter by
18   you?
19       A    No.  There was no need to.
20       Q    Okay.  Any follow-up investigation after that
21   second meeting with Tamara?
22       A    No.
23       Q    At that point, in your mind was that matter
24   concluded from the perspective of the Columbia Falls
25   Police Department?

192b4f10-8375-41da-b99f-936bfe09f155

1     A     No.

2     Q     Okay.  Any reason for that?

3     A     Not really.  I mean IACP is good.  It's a little

4  bit for bigger departments, where Billings is more of our

5  size.

6     Q     Okay.  Couple of quick questions.  I think we

7  can shoot through these rapidly.  Then I'll take a quick

8  break, and then we might be close to wrapping up.  Okay,

9  Chief?

10    A     Close?

11    Q     Close.  You had final policy-making authority

12  for the Columbia Falls Police Department since you've been

13  police chief there, correct?

14    A     Yeah.

15    Q     Sorry, is that a yes?

16    A     Yes.

17    Q     And you've had final policy-making authority for

18  the Columbia Falls Police Department since what year?

19    A     1995.

20    Q     All right.

21    A     When it comes to police policy.

22    Q     When it comes to police policy, yes.

23          No one other than you has had final

24  policy-making authority with the Columbia Falls Police

25  Department?

1       Q       And had you chosen to, you could have adopted

2    any policies or procedures from any other police

3    department's manual for your own in Columbia Falls,

4    correct?

5       A       Correct.

6       Q       Okay.  We were talking about Tamara Downen

7    coming in and speaking with you on two occasions about the

8    tasing incident in Stanley Downen's case; is that right?

9       A       Correct.  You know, it was two or three, but in

10   my mind I think it was two.

11      Q       Okay.  And prior to that last meeting with

12   Tamara Downen, you spoke with both Officers Johnson and

13   Stanberry, correct?

14      A       Correct.

15      Q       And what was your understanding of why

16   Officer Johnson decided to deploy his taser?

17      A       Because Stan Downen posed a threat to

18   Officer Johnson.

19      Q       Okay.  Do you support Officer Johnson's

20   decision, given that reasoning?

21      A       Yes.

22      Q       And you agree that this was a situation that

23   warranted taser deployment?

24      A       Yes.

25      Q       And you explained that to Tamara Downen?

1      A    Yes.

2      Q    And at the time that you explained that

3   rationale to Tamara Downen, you had reviewed previously

4   the IACP policy on the use of tasers in 2011 in Helena,

5   correct?

6      A    Correct.

7      Q    Who was the other person that came into the

8   police department to discuss the taser use in

9   Stanley Downen's case?  Pardon me, I said come into the

10  police department.

11          Did you ever receive any letters, phone calls,

12  visits of any kind from citizens of Columbia Falls related

13  to the Stanley Downen tasing incident?

14     A    One person.

15     Q    Who was that?

16     A    I don't remember the name off the top of my

17  head.

18     Q    When did that occur?

19     A    It was a female individual.  She called me after

20  the incident -- shortly after, within a couple days.

21     Q    And what can you recall about that conversation?

22     A    I listened -- I asked her what took place, and

23  she described that the officers tased this guy, he had his

24  hands down to his side, and -- what was the other thing?

25  She came across as -- she came across as knowing

1    Johnson -- Officer Johnson.

2         Q    Okay.

3         A    I took her complaint.  First off, there were so

4    many other witnesses that saw the hands go back with the

5    rock, one, but then the other thing was just the way she

6    came across, I believe she wanted Officer Johnson

7    disciplined or something.  And so I sensed there was a

8    little -- this was not an impartial witness; this was a

9    person who had issues with Officer Johnson.

10        Q    Did you record her complaint in any way?

11        A    Not the telephone conversation, but I did get --

12   she sent in a letter to me or dropped a letter off to me.

13        Q    Did you let her know that there was a formal

14   complaint process?

15        A    No, not that I'm aware of.

16        Q    How long after that telephone conversation with

17   this female did she drop the letter off to you?

18        A    I would say a couple more days.

19        Q    Did you meet with her in person?

20        A    No.

21        Q    Did you have any follow-up conversations with

22   her?

23        A    No.

24        Q    Are you the person at the Columbia Falls Police

25   Department that is responsible for handling complaints?

1     A     Yep.

2     Q     All right.  Is there anyone else?

3     A     Nope.

4     Q     Is it your responsibility to decide whether to

5   investigate those complaints or not?

6     A     Well, to investigate?

7     Q     Yes.

8     A     Yes.

9     Q     Is there anyone else that's involved in that

10  process?

11    A     To investigate complaints, no.

12    Q     Is there any log that you keep of all the

13  complaints that are registered with the department?

14    A     No.

15    Q     And if a complaint comes to you, but it's not --

16    A     Formal.

17    Q     -- a formal complaint, is there any place that

18  that's recorded by you?

19    A     No.

20    Q     Okay.  And do you have a sample form that you

21  use for registering formal complaints?

22    A     Yes.

23    Q     Okay.  And if I ask for that in discovery,

24  Chief, is that something that's pretty easy to find?

25    A     Yes.

192b4f10-8375-41da-b99f-936bfe09f155

1      Q    And earlier in the deposition I was asking you

2    about your duties to record and log these formal

3    complaints.  Is the form that I'm going to ask for the

4    formal-complaint form that you actually log then?

5      A    Well, it isn't really a log.  It's filed with

6    the complaint --

7      Q    Okay.

8      A    -- or with the results of the complaint.

9      Q    All right.  Was this letter that this lady

10   brought to you ever filed as a formal complaint?

11     A    No.

12     Q    Does your office keep statistics of how many

13   complaints it gets per year?

14     A    No.  Right here in my head.

15     Q    It's all in your head, okay.

16          Are there other complaints similar to the one

17   that you heard from this lady or from Tamara Downen about

18   episodes in Columbia Falls that you hear on occasion that

19   don't get logged as formal complaints?

20          MS. PRINZING JONES:  Object as vague.

21     Q    (BY MR. DUERK)  Go ahead.

22     A    Well, you have to understand complaints.  In the

23   law-enforcement world, you know, I mean I don't get

24   complaints, I'll get comments, you know, where it will

25   cause me a little bit of disruption.  I think, well, if