# EXHIBIT N

W. Adam Duerk, Esq.
Dylan McFarland, Esq.
MILODRAGOVICH, DALE
& STEINBRENNER, P.C.
620 High Park Way
P.O. Box 4947
Missoula, Montana 59806-4947
Telephone: (406) 728-1455
Telefax: (406) 549-7077
E:Mail:   aduerk@bigskylawyers.com
          dmcfarland@bigskylawyers.com
      *Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| TAMARA DOWNEN, Individually and as Personal Representative for the ESTATE OF STANLEY L. DOWNEN, Deceased, | ) ) ) ) | Cause No. CV-13-121-M-DWM |
| | ) | **PLAINTIFF'S DISCLOSURE** |
| Plaintiff, | ) ) | **OF DAMAGE AND LIABILITY EXPERTS** |
| | ) | |
| -vs- | ) ) | |
| | ) | |
| MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES; COLUMBIA FALLS POLICE DEPARTMENT; CITY OF COLUMBIA FALLS; MIKE JOHNSON; DAVID G. PERRY; and JOHN DOES 1-10, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

COMES NOW the Plaintiff, by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 26(a)(2)(B), submits his disclosure for damage and liability experts as follows:

## I.  Will Cordes
**5003 23rd Avenue**
**Missoula, MT 59803**

Mr. Cordes is a retired Captain with the DeKalb County Sheriff's Office, and has also worked with the Montana Department of Justice Criminal Investigation Bureau. Most recently he has performed work as a contract detective for the Missoula County Sheriff's Office, and works as licensed private investigator and firearms instructor. His extensive credentials are more thoroughly described in his *Curriculum Vitae*, attached hereto as **Exhibit A.**

### A.  Subject Matter of Expected Testimony

Mr. Cordes is expected to testify as to the standard of care for police departments in use of force. Specifically, Mr. Cordes will offer opinions on whether use of a taser on Stanley Downen violated accepted standards of police practices, whether the use of force was excessive in light of the perceived threat, and whether alternatives to this level of force were available. Mr. Cordes will also testify as to whether the Columbia Falls Police Department violated accepted police standards by failing to implement taser-specific policies, failing to

implement effect complaint mechanisms, and failing to preserve evidence. Finally, Mr. Cordes will offer opinions on which direction Downen was facing when he was tased and whether Downen posed any threat to the safety of others.

**B.    Grounds for Opinion**

Mr. Cordes has been provided with the pleadings and all discovery to date, including: initial disclosures and preliminary pretrial statements; documents produced in discovery such as the Columbia Falls Police Department policy and procedure manuals and officer training records; and depositions of Tamara Downen, Officers Mike Johnson and Gary Stanberry, and Police Chief David Perry. Mr. Cordes has also reviewed literature from TASER International, as well as various Montana law enforcement taser use and policy guidelines. As additional discovery becomes available, such information will be provided to Mr. Cordes. Mr. Cordes bases his opinions regarding the conduct of the Columbia Falls Police Department and its Officers on his substantial training, experience, and expertise in the field of law enforcement.

**C.    Substance of Facts and Opinions**

Mr. Cordes' expert report, attached hereto as **Exhibit B**, and this disclosure provide the substance of his expected testimony. Mr. Cordes is expected to testify to the following facts and opinions:

1.    Stanley Downen was a 77 year old Navy veteran with Alzheimer's disease and dementia. On June 1, 2012, he was tased by Officer Johnson of the Columbia Falls Police Department. Officer Johnson deployed an X26 Taser in dart mode into Downen's left arm and buttock. Eyewitness reports and the location of the taser probes in Downen's person indicate that Downen was tased as he turned away from the officer.

2.    When Officers Johnson and Stanberry were dispatched to the Montana Veterans' Home, they were given no information about Mr. Downen's medical condition or background. Upon arrival at the Veterans' Home, the officers found an elderly man wandering about the premises with rocks in his hands. Both officers significantly outweighed Downen, and were armed with pistols, tasers, and knives. They had immediate access to handguns, radios, and a shotgun.

3.    Stanley Downen had been administered a sedative, which had yet to take effect, and was still on the Veterans' Home grounds. The rocks in his hands were small enough that he was able to hold them in his palm, and he appeared confused and agitated. He was not threatening any bystanders and posed no danger to himself. Regardless, immediately after exiting the patrol car, Officer Johnson drew his taser.

4. Officer Johnson instructed Downen to put down the rocks. When Downen failed to comply, Officer Johnson declined the use of any further de-escalation techniques and tased the elderly man. Both responding officers claim that Downen had raised his arm as though to throw the rocks at officer Johnson, though no eyewitness testimony corroborates this claim. To the contrary, the location of the taser darts in Downen's left arm and buttock actually indicate he was turning away from Officer Johnson and toward the Veterans' Home when he was tased.

5. After being tased, Stanley Downen fell face-first onto the asphalt and sustained multiple facial lacerations. He was handcuffed on the ground, and then transported by ambulance to the Kalispell Regional Medical Center.

6. Nursing home staff were permitted to disperse bystanders, and the officers did not request statements from any of the independent eyewitnesses. The only statements taken by the police were from Veterans' Home staff. The rocks held by Downen were photographed, but not kept as evidence. Furthermore, no video of the incident was captured despite the fact that recording devices were available through the patrol vehicle and on Officer Johnson's lapel.

   a. <u>Stanley Downen should not have been tased</u>

1. Model policies generated by the International Association of Chiefs

of Police ("IACP") establish that tasers should not be used where there is a risk of death or serious injury from falling, and cautions against use of taser devices on members of a "sensitive population group." The IACP suggests that tasers should be used in such circumstances only where the potential benefit reasonably outweighs the associated risks and concerns. The IACP model policies also provide that additional steps should be used to calm a situation prior to attempting to restrain or detain a mentally ill individual.

2.     TASER International specifically warns against use of taser devices on members on elderly or infirm individuals, and also warns about the risk of injury as a result of falling.

3.     Examples of exigent circumstances that might justify the use of force involve situations where the person poses a flight risk, a crime is being committed, the person has a weapon, or the person is much larger than the law enforcement officers.

4.     It is Mr. Cordes' opinion that no exigent circumstances existed to justify the use of a taser on Stanley Downen, a 77 year old Alzheimer's patient. The record reveals that Downen was committing no crimes and posing no threat or danger. Far from being a flight risk, it appears as though he had turned back toward the Veterans' Home. Both officers outweighed Downen, and the rocks he

held posed no real threat, as evidenced by the fact that Veterans' Home staff had been trailing him for some time without injury. Though Downen was agitated, disoriented and confused, these emotions did not justify the use of a taser against him

      b.    <u>Stanley Downen was not approaching law enforcement</u>

1.    Officer reports and photographs indicate that the X26 taser probes were removed from the back of Downen's left arm and left buttock. Witnesses indicated that Downen was actually turning away from Officer Johnson at the time he was tased.

2.    It is Mr. Cordes' opinion, based on eyewitness testimony and the location of the taser probes, that Downen had not been advancing toward Officer Johnson with his arm raised to throw a rock, but rather that he was tased as he turned away from Officer Johnson.

      c.    <u>Stanley Downen was not a threat to himself or others</u>

1.    It is Mr. Cordes' opinion that at the time he was tased, Stanley Downen was not a threat to his own safety. The record indicates that Downen was tased on Veterans' Home property. He was not about to leave the grounds, enter a public road, or otherwise harm himself. The road was blocked by the patrol car, and the exit to the property was blocked by the police officers. Furthermore,

medical records indicate that Downen had been recently given a shot of Haldol, a sedative, prior to exiting the facility, and it seems this drug was not given time to take effect.

2.    It is also Mr. Cordes' opinion that at the time he was tased, Stanley Downen did not pose a threat to anyone else, including bystanders, Veterans' Home staff, or law enforcement. Onlookers at the nearby baseball field were separated from Downen by a chain link fence, and Downen had made no movement toward the onlookers. The Veterans' Home staff had been following Downen the road, with no altercation. Finally, Downen made no attempt to approach the police officers. If Officer Johnson felt threatened by Downen's rocks, he needed only to step back a safe distance while he attempted to talk to Downen and calm him down.

### d.    Officer Johnson used excessive force

1.    Mr. Cordes will testify that his research indicates no police officer has been killed by a thrown rock in over seven decades. Further, no physical attack by a person over the age of 75 has ever resulted in the death of a police officer.

2.    It is Mr. Cordes opinion that the rocks carried by Downen did not pose a threat to Officer Johnson that justified the use of a taser. Downen was an

elderly man suffering from advanced Alzheimer's. Officer Johnson was significantly larger than Downen, and was not cornered, blocked, or in any way prevented from backing away from Downen to what he perceived as a safe distance. Even more, the location of the taser probes in Downen's left arm and buttock, and they eyewitness testimony of Danielle Jones makes clear that Downen was actually turning *away* from Officer Johnson and heading in the direction of the Veterans' Home when he was tased. Officer Johnson's use of force was excessive in this circumstance.

e.  <u>Officers Johnson and Stanberry failed to properly de-escalate the situation</u>

1.  IACP policies, accepted standards of practice and the "use of force continuum" dictate that de-escalation techniques should have been used on Stanley Downen prior to the application of significant force. The IACP Model Policy on Use of Force establishes that "only use the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer or others" should be employed. The policy also provides that this is an objective standard and that an officer "must only use that force which a reasonably prudent officer would use under the same or similar circumstances." The use of force continuum states that before an increased level of force is used,

less forcible alternatives should be exhausted first.

2.      It is Mr. Cordes' opinion that failing to gather information, consider additional or alternative means to the use of a taser, and by using a taser on an elderly man with clear mental illness, Officer Johnson failed to meet the standard of care required by reasonable policies, procedures, or common sense.

3.      Officers Johnson and Stanberry did not apply any de-escalation or alternative, lesser means of force prior to tasing Stanley Downen. Officer Johnson tased Downen within minutes of his arrival, and no alternative means of de-escalating the situation were attempted or discussed. The officers did not wait for the Haldol injection to take effect, did not direct Downen to a softer grassy area prior to tasing him, and did not opt to use a less dangerous method of control such as OC spray.

4.      The officers also failed to gather necessary and crucial information upon their arrival at the Veterans' Home. They were faced with an obviously disoriented and distraught elderly resident of a nursing home, but did not take the time to discuss Downen's mental condition or needs prior to tasing him.

        f.      <u>The Columbia Falls Police Department failed to adopt appropriate policies and procedures</u>

1.      The IACP provides model policies for taser use, and Taser

International provides guidelines for taser use on elderly and infirm individuals. These policies and guidelines are regularly updated as law enforcement standards and case law evolve. Chief Perry was familiar with IACP policies and agreed that IACP policies are an authoritative source of information regarding police policy. Chief Perry had also reviewed the ECD Policy for Billings, Montana, as late as November of 2011.

2.     The Columbia Falls Police Department's policies were first drafted in the late 1990's. In 2006, the Columbia Falls Police Department implemented the use of Tasers by their officers, but failed to implement any policies specific to taser use. In 2008, Chief Perry revised the original policies, but again failed to address taser use. Chief Perry testified that a taser policy was finally drafted and implemented in July of 2012, shortly after Stanley Downen had been tased.

3.     It is Mr. Cordes' opinion that by failing to incorporate taser-specific policies into Columbia Falls Police Department's policies and procedures, Chief Perry failed to meet accepted standards of police practice in terms of appropriately updating and revising policies in his own department.

4.     Policies in place for the Columbia Falls Police Department fail to mention the words "taser" or "Electronic Control Device" in the versions on file prior to June 1, 2012. Accordingly, there was no taser policy in effect when

Stanley Downen was tased. There were also no policies for dealing with persons with Alzheimer's or the mentally incompetent. It is Mr. Cordes' opinion that the absence of these policies caused direct harm to Mr. Downen.

5. Deposition testimony establishes that even for the scant policy and procedure manuals that were implemented by the Columbia Falls Police Department, they had little impact on the department's officers. Policies were reviewed by officers only after an infraction. There was no follow-up review or training regarding department policies and procedures. It is Mr. Cordes' opinion that failure to train field officers in the subject areas covered by the existing policies constitutes a departure from accepted police practices as well.

g. The Columbia Falls Police Department failed to adequately train and supervise its officers in the use of force

1. Chief Perry could produce no training records whatsoever regarding taser training for his officers. Chief Perry himself is not trained in the use of a taser. Chief Perry was unfamiliar with Taser International warnings against taser use on the on the elderly, the infirm, and those with balance problems. The supervisor of all officers and the decision maker with final policy authority at Columbia Falls Police Department was unfamiliar with taser use.

2. The Columbia Falls Police Department failed to ensure that Officer

Johnson was adequately trained and supervised in the use of force. According to training records and deposition testimony, Officer Johnson had not been trained in the use of a taser in the two years prior to tasing Mr. Downen. In fact, the last time he had been trained in use of force with a taser was in 2008, a full four years prior to tasing Mr. Downen. According to the Taser International Manual, officers should be regularly re-trained. It is Mr. Cordes' opinion that the failure of the Columbia Falls Police Department to maintain timely training for its officers in taser use is a violation of accepted police practices.

h. **The Columbia Falls Police Department failed to maintain an acceptable mechanism for citizen complaints**

1. Chief Perry testified at his deposition that complaints must be filed on a special complaint form. However, Chief Perry does not tell anyone that these complaint forms exist. Both oral and written complaints are disregarded if they are not submitted on the official complaint form.

2. In Stanley Downen's case, Danielle Jones wrote a letter to the Columbia Falls Police Department complaining about Officer Johnson's conduct. However, Chief Perry did not count this as a complaint, and did not conduct any follow-up investigation. Likewise, Chief Perry did not count Tamara Downen's discussion with him as a complaint.

3. It is Will Cordes' opinion that in an environment where complaints are disregarded, incidents are not investigated, discipline is irregularly administered, and meaningful supervision does not exist. The lack of meaningful policy for dealing with complaints and resultant lack of supervision over officers such as Officer Johnson is a violation of accepted law enforcement standards.

h. The Columbia Falls Police Department failed to properly preserve evidence

1. A review of the record in Mr. Downen's case indicates that evidence was not properly preserved by the Columbia Falls Police Department. The rocks held by Downen were photographed, but not saved as evidence. Despite the fact that Officer Johnson had a lapel camera, the only video preserved was of what occurred on-scene post-accident. Despite a number of independent eye-witnesses, the only statements taken were from Veterans' Home staff.

2. It is Mr. Cordes' opinion that based on common practices in law enforcement, both the rocks, witness identification information and the video should have been preserved. Failure to preserve this evidence constituted a departure from the accepted standards of practice for law enforcement.

D. **Reservation of Privilege to Amend and Supplement**

Discovery in this matter is ongoing and Mr. Cordes reserves the right to

supplement his opinions based upon additional information obtained through discovery. This report will be considered amended to include by reference the deposition testimony he is expected to offer.

## II. Larry Smith
950 Beaumont Avenue #3210
Beaumont, CA 92223-3210

Mr. Smith has worked in law enforcement for 30 years, 10 of which were spent on a SWAT team. He has approximately 15 years in experience training officers through the San Bernadino County Sheriff's Academy and Valley Junior College. He has trained law enforcement personnel on local, state, and national levels. He earned his certification as a Taser International Instructor in 2008. His extensive credentials are more thoroughly described in his *Curriculum Vitae*, attached hereto as **Exhibit C**.

### A. Subject Matter of Expected Testimony

Mr. Smith is expected to testify generally as to taser function and use by explaining what a taser is, what it does, and associated risks. Mr. Smith is also expected to offer opinions as to the standard of care for police departments in training officers in the use of taser weapons, in implementation of proper policies and procedures regarding taser use, and in deploying taser weapons against the elderly and infirm.

## B.    Grounds for Opinion

Mr. Smith has been provided with the pleadings and all discovery to date, including: initial disclosures and preliminary pretrial statements; documents produced in discovery such as the Columbia Falls Police Department policy and procedure manuals and officer training records; and depositions of Tamara Downen, Officers Mike Johnson and Gary Stanberry, and Police Chief David Perry. Mr. Smith has also reviewed literature from Taser International and the International Association of Chiefs of Police. As additional discovery becomes available, such information will be provided to Mr. Smith. Mr. Smith bases his opinions regarding the conduct of the Columbia Falls Police Department and its Officers on his substantial training, experience, and expertise in the field of law enforcement.

## C.    Substance of Facts and Opinions

Mr. Smith's expert report, attached hereto as **Exhibit D**, and this disclosure provide the substance of his expected testimony. Mr. Smith is expected to testify to the following facts and opinions:

1.      On June 1, 2012, Stanley Downen, a 77 year old patient and resident at the Montana Veterans Home suffering from advanced Alzheimer's, wandered from the nursing facility. Nursing staff, unable to return Mr. Downen to the

facility, called 911 to request police assistance. Police Officers Mike Johnson and Gary Stanberry from the Columbia Falls Police Department responded to the call. Officer Johnson was not on duty when the call came in, but returned to duty to assist Officer Stanberry in responding.

2.     When they arrived on scene the officers found Stanley Downen walking around with rocks in his hands, appearing agitated, while multiple Veterans' Home staff members escorted him and attempted to get him to return to the facility. Officer Stanberry described Downen as "a white male, approximately 85 years old" and noted that he held two rocks of approximately 5 and 7 inches in his right hand, and several smaller rocks in his left hand. Officer Johnson estimated that Downen weighed 140 or 150 pounds. In comparison, Officer Johnson weighed 230 pounds and was 6'1", and Officer Stanberry weighed 180 pounds and was 6'1".

3.     Despite the significant age and size differences between the Officers and Downen, almost immediately after arriving on-scene Officer Johnson removed his taser from his holster. Officer Johnson instructed Mr. Downen to drop the rocks. Stanley Downen swore at Officer Johnson and did not relinquish the rocks, but he also did not attempt to run or approach the officers. Officer Johnson then deployed his X26 Taser in dart mode, which entered Downen's left bicep and left

buttock.

4. Upon being tased by Officer Johnson, Downen fell face first onto the asphalt and sustained facial lacerations. Officer Johnson claims that Downen had raised his arm as if to throw the rocks, and that he deployed his taser because of the danger Downen posed to his safety. However, a written complaint from an eyewitness indicates that Downen never raised his hands, which is consistent with the fact that the taser probes entered his left arm and buttock. Upon being tased, Downen fell to the asphalt and sustained facial lacerations. Downen was hospitalized and died 23 days later.

 a. <u>The Columbia Falls Police Department failed to properly train its officers in the use of taser devices</u>

1. Taser International provides numerous documents that must be signed by officers who attend a Taser training and certification course. Some of these documents, including warnings and liability releases, must be signed and returned to Taser International. Other documents, such as certificates of completion, are meant to be filed with the officer's department. The Columbia Falls Police Department has no record of its 2006 taser training. There are no documented certificates of completion and attendance roster.

2. It is Mr. Smith's opinion that the lack of training records itself

violates accepted police practices. Furthermore, Mr. Smith is of the opinion that the lack of certification records, particularly in light of the fact that numerous other training certificates have been produced, is indicative of the fact that the 2006 training may not have been conducted by certified training taught by Taser Instructors.

3.    Taser International certified training is critical, because certified training courses provide officers with materials and releases that officers must review and sign. These materials include warnings against taser use on the elderly and infirm, and warn of fall risks associated with taser use. Thus, failure to conduct a certified taser training course for the purposes of training and certifying officers in the use of taser weapons violates standard and accepted police practices.

4.    Taser International recommends that end-users, like Officer Johnson, be re-certified annually. Re-certification involves firing two live cartridges and reviewing the Taser annual update, product warnings, and current training bulletins. The Columbia Falls Police Department issued tasers to its officers in 2006, and conducted a training at this time. After this 2006 training, no additional taser training was provided until after Downen was tased in 2012. Officer Johnson testified that he did not review any taser materials or warnings between

the 2006 training and the 2012 training. Indeed, he was unaware of any taser warnings regarding the use of a taser on the elderly, infirm, and persons with fall risks. It is Mr. Smith's opinion that the failure to conduct regular taser trainings is a departure from accepted police practices.

5.     Chief Perry, who is responsible for developing policies and procedures including weapons policies and use of force policies, testified that until 2012, he had *never* attended a taser training, and that he was not certified to use a taser. The failure of the Chief to have any training on weapons he should have been establishing policies and procedures for is also a departure from accepted police practices.

b.     The Columbia Falls Police Department failed to implement policies and procedures regarding the use of tasers

1.     Chief Perry's testimony shows that the Columbia Falls Police Department Policy & Procedure Manual was implemented by Chief Perry in the late 1990s. Taser weapons were issued to officers in 2006, and the manual was not updated to include a taser policy. The manual was revised by Chief Perry in 2008, but no taser policy was included. In fact, no mention whatsoever of "tasers" or "electronic control weapons" was included in any of the department's policies or procedures until *after* Stanley Downen was tased.

2.     Taser International encourages law enforcement agencies that purchase its products to adopt taser-specific policies. Model taser policies are widely available from Taser International, the IACP, and sister police departments. Chief Perry testified that he was aware of and in fact used IACP model policies.

3.     It is Mr. Smith's opinion, based on his experience, that law enforcement is a constantly changing profession requiring timely and regular policy and procedure updates. It is the Chief of Police's responsibility to design and implement these updates. Furthermore, it is standard practice for agencies to adopt polices and procedures *prior* to issuing new equipment. It is Mr. Smith's opinion that Chief Perry's failure to adopt a taser policy for 6 years after his officers were issued tasers is a deviation from accepted police practices.

### c.     Officer Johnson violated standard and accepted police practices by tasing Stanley Downen

1.     Upon arriving at the Veterans' Home, Officers Johnson and Stanberry encountered a 77 year old Alzheimer's patient holding some rocks. Downen was weak and disoriented. Officer Johnson, an athletic 6'1" and 230 pound man. The substantial age, weight, and health difference between the two rendered Downen an insignificant threat to Officer Johnson.

2.     The record indicates that the Taser probes entered the back of

Downen's left arm and buttock, consistent with being tased from behind. Further, eyewitness accounts contradict the officers' statement that Downen appeared poised to throw a rock. Downen's position and behavior simply did not pose a significant threat to the officers, and tasing him constituted excessive force in violation of accepted police practices.

3. The record indicates a serious lack of communication. Nursing staff did not relay Downen's condition to the responding officers, and the officers did not make any inquiries of the nursing staff. The officers' failure to communicate both with each other and with nursing staff was not in keeping with standard police practices.

4. To the extent that Officer Johnson truly did believe force was necessary, he nevertheless was not justified in using a Taser. He should have opted for a less invasive and less risky control weapon such as OC Spray.

5. Taser International's Instructor Certification packet states clearly that ECD use has not been scientifically tested on the infirm or the elderly, and warns that "ECD use on these individuals could increase the risk of death or serious injury". The International Association of Chiefs of Police, ("IACP") Model Policy for Electronic Control Weapons ("ECW") clearly state that ECW's are not to be deployed in situations where "the officer has a reasonable belief that the subject

might fall resulting in death or serious physical injury, and the circumstances presented do not justify that risk." The Model Policy further provides that "Officers shall be aware of the general concerns raised when an ECW is used on a member of a sensitive population group. Officers are not prohibited from using an ECW on such persons, but use is limited to those exceptional circumstances where the potential benefit of using the device (i.e., injury reduction) reasonably outweighs the risks and concerns." These documents establish standard practices for police departments in use and deployment of taser devices.

6. Additional warnings are contained in the Covenant Not to Sue which every officer must sign when attending a Certified Taser training course. These warnings also caution that "persons who are physically infirm or pregnant are among those who may be at a high risk." These warnings establish the standard practices for police departments in use and deployment of taser devises. Tasing an elderly man suffering from advanced Alzheimer's falls well outside the standard police practice. Officer Johnson should never have drawn, much less deployed, his taser to subdue Stanley Downen.

### D. Reservation of Privilege to Amend and Supplement

Mr. Smith reserves the privilege of amending or supplementing this disclosure as additional information becomes known to him. This report will be

considered amended to include by reference the deposition testimony he is expected to offer.

**III.  Katherine Willock**
**Salish Kootenai College**
**Nursing Department**
**PO Box 70**
**Pablo, MT 59855**

Ms. Willock is a licensed registered nurse in the state of Montana, and the Director of Nursing at the Salish Kootenai College. She has extensive experience teaching the standard of care to nursing students, and also has past work experience as a house supervisor at a nursing facility that included a locked Alzheimer's unit. Ms. Willock has done continuing education for nursing home staff and is familiar with the standards of care for geriatric patients. Her extensive credentials are more thoroughly described in her *Curriculum Vitae*, attached hereto as **Exhibit E**.

**A.  Subject Matter of Expected Testimony**

Ms. Willock is expected to testify to the standard of care for nursing home facilities in admitting, supervising, and caring for residents. In particular, Ms. Willock will testify to her opinion that Stanley Downen should have been placed on a secure unit when he was admitted to the Veterans' Home, that he was not properly supervised and should never have been permitted to leave the Veterans'

Home facility, that nursing staff failed to properly de-escalate the situation when Downen became disoriented and agitated, that nursing staff were not properly trained to de-escalate agitated patients, that the Veterans' Home failed to properly notify Tamara of Stanley Downen's tasing incident, and that these various breaches constitute a violation of numerous state and federal regulations.

**B.     Grounds for Opinion**

Ms. Willock has been provided with the pleadings and all discovery to date, including: initial disclosures and preliminary pretrial statements; documents produced in discovery such as Stanley Downen's medical records; and depositions of witnesses and parties thus far deposed. This includes the depositions of Helen Lyman, Jami Flickinger, Vicky Briggs, and Rose McElderry from the Veterans' Home. As additional discovery becomes available, such information will be provided to Ms. Willock. Ms. Willock bases her opinions on her knowledge, skill, training, and expertise in the field of nursing.

**C.     Substance of Facts and Opinions**

Ms. Willock's expert report, attached hereto as **Exhibit F**, and this disclosure provide the substance of her expected testimony. Ms. Willock is expected to testify to the following facts and opinions:

1.     Stanley Downen was a 77 year old man with severe Alzheimer's and

dementia who was admitted to the Veterans' Home. The Veterans' Home requested medical records, reviewed his medical records, and ensured that he met the VA requirements. It admitted Stanley Downen after a short interview and tour of the building. Downen was admitted to the general facility rather than the secured unit that Veterans' Home generally used for Alzheimer's patients.

2. On Downen's first full day at the Veterans' Home he became disoriented and agitated. Medical records indicate that he had been sitting in a recliner, suddenly rose, and began pacing and expressing a desire to return home. CNA's followed Downen as he paced and wandered. As his agitation increased nursing staff elected to administer a sedative. Medical records indicate that Mr. Downen was given .4 milligrams of Haldol, although deposition testimony suggests that this was a recording error and that Downen was actually administered 2 milligrams of Haldol.

3. Shortly after administering the Haldol and before the sedative had time to take affect, Downen left the facility. Nursing staff followed Downen and attempted to get him to return the facility. He became increasingly agitated and picked up rocks. Nursing staff called the Columbia Falls Police Department to request assistance. No information about Downen's condition or the fact that he had Alzheimer's was provided to the dispatcher. De-escalation attempts were

minimal, and limited to requesting that Downen return to the facility.

4.    Almost immediately after arriving Officer Johnson drew his taser. At this point nursing staff made no attempt to describe Downen's condition to the officers. They did not inform the police officers that Downen was suffering from Alzheimer's and dementia, or that he was disoriented and new to the facility

5.    Officer Johnson instructed Downen to drop the rocks that he was holding. When Downen failed to comply Officer Johnson tased him. Downen fell face first onto the pavement sustaining facial lacerations. Nursing staff remained with Downen until an ambulance arrived and transported him to the Kalispell Regional Medical Center. Downen died twenty-three days after the tasing incident, without ever having been discharged from the hospital.

      a.    <u>Montana Veterans' Home Breached the Standard of Care in its Admissions Process</u>

1.    Ms. Willock will testify based on the record that the decision was made by the Social Service Director Helen Lyman to accept Mr. Downen as a patient for the Veterans' Home general floor. The admission process was limited to filling out a two-page admission packet, obtaining medical records from other facilities, and assuring that the veteran applicant meets admission criteria. The Veterans' Home did perform an interview with Tamara Downen, and gave Stanley

Downen a tour of the facility

2. In reviewing Downen's medical records, Helen Lyman took note of documented behavioral problems, but testified that this did not raise any "red flags". Despite his Alzheimer's diagnosis and documented behavioral history, Downen admitted to the general 50 unit section of the facility, rather than the secured unit usually used for Alzheimer's residents. No care plan was developed or deemed necessary for Downen. Further, contrary to their preferred practice, the Veterans' Home admitted Downen without the presence of a family member to ease the transition.

3. Ms. Willock will testify that standard practices for nursing homes is to fully evaluate a potential resident to assure that they can adequately care for the individual's needs. In addition to reviewing medical records, an admitting facility should interview staff at the current facility to get a better picture of the patient's condition and behaviors. If a facility is not equipped to handle the needs of a patient, the facility should decline or defer the admission.

4. It is Ms. Willock's opinion that the Veterans' Home failed to properly evaluate and prepare for Downen's arrival. Downen's Alzheimer's and documented behavioral problems necessitated his placement in the secured unit. The Veterans' home breached its obligation to ensure residents are safe and

supervised by failing to place him in the secured unit. If a bed was not available for Downen in the secured unit, his admittance should have been deferred or denied.

5.     It is Ms. Willock's opinion that the Veterans' Home failed to properly investigate and prepare for Downen prior to his admission. A special care plan should have been implemented for Downen based upon his documented behavioral problems. In particular, staff should have been informed of his behaviors, and a plan developed to guide staff in handling them.

6.     It is Ms. Willock's opinion that the Veterans' Home breached the standard of care by admitting Downen on a day when no family member was unavailable to help with the transition to the new facility. Instead, the admission should have been postponed. Veterans' Home staff, who work with elderly patients suffering from cognitive disorders on a regular basis, should have been aware of the potential for agitation upon arrival at a new facility, and taken all necessary and available steps to mitigate such problems.

     b.    <u>Montana Veterans' Home Breached the Standard of Care in its Supervision of Downen</u>

1.     The night of Downen's admission to the Veterans' Home 50 bed, medical records indicate some wandering behaviors but an otherwise uneventful.

night. The next morning LPN Rose McElderry was assigned to Downen's unit, with responsibilities including overseeing resident care and passing medications. McElderry stated that she had received no information regarding Downen and knew nothing of his diagnosis, history nor care needs. Though she was responsibly for Downen's care, she did not read his charts until *after* Mr. Downen's episode began.

2. When Downen's wandering began, he was placed on 1:1 with a male CNA. He was also equipped with a Wander Guard, which was to alarm if the Downen exited through certain doors. Neither the CNA assigned to him nor the Wander Guard prevented him from exiting the facility.

3. It is Ms. Willock's opinion that it is the responsibility of a long term care facility to provide a safe environment for its residents, where they will not harm themselves or others. Additionally, all providing and treating staff must be made aware of a new patient's diagnosis, history, and care needs. Patient information should also be communicated to non-staff members who have interactions with the patient. Finally, nursing staff administering medications are tasked with knowing the effects, contraindications, side effects and standard dosage of medications that they administer to patients.

4.  It is Ms. Willock's opinion that the Veterans' Home breached its responsibility to adequately supervise Downen and to protect him from harm. In particular, Downen's diagnosis, needs, behaviors, and history contained in Downen's medical records should have been communicated to oncoming staff, and proper steps should have been implemented to accommodate Downen's individual needs implicated by his medical history. For example, medical records document increased aggression toward males, yet a male CNA and eventually a second male CNA were assigned to watch him. Ms. McElderry had no idea how the medication Haldol worked, yet she administered it to Downen.

5.  The Veterans' Home also breached its responsibility to adequately supervise Downen and to protect him from harm when a CNA was assigned 1:1 with Downen to observe his actions without intervention. Supervision implicates action in addition to watchfulness. The facility's outside doors should have been locked, and the CNA should have placed himself between the patient and the door.

6.  The Veterans' Home also breached the standard of care in supervising residents when its staff failed to take advantage of opportunities to secure Downen after he became agitated. When Downen was administered the Haldol injection, he was still in the building. Two male CNA's held down Downen's arms to

administer the injection. This was the opportunity to escort him into a secure environment.

  c. <u>Montana Veterans' Home Failed to Properly De-Escalate the Situation</u>

  1. When Downen became agitated, McElderry ordered an injection of Haldol, a sedative, to calm him down. Medical records indicate that at 1645 Mr. Downen received Haldol .4 mg IM in Left deltoid, though deposition testimony suggests that this was a chart recording error and that Downen actually received a 2 mg injection. Normal dosage is 2-5 mg q 1-8 hours not to exceed 100mg in 24 hours. Onset of IM Haldol is 20-30 minutes with peak effect 30-45 minutes. Regardless of whether Downen was administered .4 mg or 2 mg of Haldol, it was a low dosage. Even more important is that the Haldol was not given time to take effect prior to Downen's tasing. The police were called and arrived before the Haldol had time to take full effect. EMS arrived at 1715 and Mr. Downen had already been tased.

  2. Two male CNA's held Downen's arms so the injection could be administered. At this time, nursing staff had control of Downen. He should have been placed in a wheel chair and taken to a secure section of the facility. He

should never have been permitted to continue wandering where there were unlocked doors through which he could exit the building.

3. The Veterans' Home staff, including both licensed and unlicensed personnel, should be trained to employ specific de-escalation techniques with agitated patients. This is not unexpected behavior in long term care patients. Considering Downen's behavioral history, assigning a male for 1:1 supervision could be expected to *increase* his aggressive behavior, rather than de-escalate it. Adding the second male CNA only compounded the situation.

4. When a patient is placed on 1:1, the expectation is that they will attempt to de-escalate the patient, not just observe his actions. Considering Downen's prior attempts at elopement, the accessible doors should have been locked or Downen should have been placed in a secure part of the facility. No attempts to distract Downen from elopement were documented. Attempting to get the patient interested in anther activity, watching TV, playing a game, looking at birds, offering something to eat, etc. are often common distraction and de-escalation techniques for an agitated Alzheimer's patient. Furthermore, no attempts were made to contact Tamara Downen, even though that technique had been successful in the past.

5.     There were no less than four Veterans' Home staff members trailing Downen after he left the facility.  If these employees did not have the training or experience to deal with aggressive patients, then assistance should have been sought from the staff of the special care unit that certainly deals with this type of patient.

6.     After police arrived on-scene, nothing in the record indicates that Veterans' Home staff informed the officers that Downen had dementia or that he had been medicated.  There was no discussion of how to best meet his needs or de-escalate the situation.  When the police demanded that Downen drop the rocks, none of the staff informed the police that he may not have understood their directions.  Little if any attempt was made to redirect and de-escalate Downen prior to utilizing the taser.

7.     It is Ms. Willock's opinion that in accepting Stanley Downen as a resident, the Veterans' Home had a responsibility to protect him from harm.  The Veterans' Home failed in this duty by continually escalating the situation vis-à-vis allowing Downen to exit the building, pick up rocks and eventually be tased by the police, when what they should have done is take proper steps to redirect and de-escalate.

///

d. Montana Veterans' Home Staff Appear Unprepared and
Unqualified to Deal With Residents Like Stanley Downen

1. Though the record indicates that Veterans' Home nursing staff did attend trainings and inservices, it is unclear whether they attended specific trainings in regards to handling and de-escalating Alzheimer's residents, or residents with other cognition problems. Staff, both licensed and unlicensed, that work with elderly patients are required to possess the knowledge and skills necessary to safely care for patients that may display aggressive, agitated behaviors. These skills include de-escalation techniques, ability to build a rapport with patients, and the ability to remain calm and pursue the best course for the patient.

2. It is Ms. Willock's opinion that the Veterans' Home staff lacked the specific training and skills necessary to deal with this type of behavior. Downen's nursing team should have sought assistance from the special care unit, if they could not safely handle Downen. Veterans' Home staff failed to adequately admit, supervise and de-escalate Downen. These failures are indicative of the fact that Veterans' Home staff simply did not possess the requisite skills and training to deal with patients like Downen. The facility's failure to recognize this

incompetence and take measures against it, such as further training and direct supervision of fully competent staff, constitutes a breach of the standard of care.

     e.   <u>Montana Veterans' Home Failed to Properly Notify Stanley Downen's Family of Important Changes in His Medical Condition</u>

1.    When Downen eloped from the Veterans' Home and tased by the police, his family should have been fully informed of the events. Per Tamara Downen's deposition, she was notified on June 1 that Downen escaped the facility, and that staff could not get him back in so the police were called. She was told that Mr. Downen "ran and he tripped and he fell." She was told he was transported to KRMC for treatment of his injuries, but was under the impression the police had escorted him there, not that he was taken in an ambulance.

2.    Tamara, though she held Downen's power of attorney and was his closest relative, did not discover until two days later that Downen had been tased. Further, Tamara was not informed by Veterans' Home staff of what had happened to their resident on their property. Instead, Tamara's brother showed up with a newspaper clipping reporting that an agitated, elderly man was shot in the head with a taser. This is the first indication Tamara had that Mr. Downen had been tased. She learned the rest of the story by seeking out and talking to Chief Perry from the Columbia Falls Police Department.

3.    Long term care facilities have a responsibility to keep a resident's family fully and accurately informed of the patients condition, especially if there has been a change in that condition, particularly family members who hold the resident's power of attorney.  In this case, important medical information, namely that Mr. Downen had been tased, was withheld.  It is Ms. Willock's opinion that information provided to Tamara by the Veterans' Home was misleading and inaccurate, and that this constituted a breach of the applicable standard of care.

### e.    Montana Veterans' Home Violated Numerous State and Federal Nursing Care Regulations

1.    Mont. Code Ann. § 50-5-1104(2)(g) provides that a long term care resident's representative must be notified in a proper manner of any significant accident, unexpected absence or significant change in health.  This code provision also incorporates certain federal provisions regulating skilled nursing facilities, the applicable provisions of which are below.

2.    42 U.S.C. §1395i-3(c)(1)(A)(ii) provides that a skilled nursing facility must protect and promote the rights of each resident, including the right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms.  Restraints

may only be imposed to ensure the physical safety of the resident or other residents, and only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used.

3.      42 U.S.C. §1395i-3(b)(2) provides that a skilled nursing facility must provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, in accordance with a written plan of care.

4.      42 U.S.C. §1395i-3(b)(1)(A) provides that a skilled nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident.

5.      42 C.F.R. § 483.75 provides that a facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.

6.      42 C.F.R. §483.75(b) provides that a facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

7.    42 C.F.R. § 483.75(f) provides that a facility must ensure that nurse aides are able to demonstrate competency in skills and techniques necessary to care for residents' needs, as identified through resident assessments, and described in the plan of care.

8.    42 C.F.R. § 483.25(f) provides that based on the comprehensive assessment of a resident, the facility must ensure that a resident who displays mental or psychosocial adjustment difficulty, receives appropriate treatment and services to correct the assessed problem.

9.    42 C.F.R. § 483.25 provides that each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.

10.    42 C.F.R. § 483.25(h)(2) provides that each resident should receive adequate supervision and assistive devices to prevent accidents.

11.    It is Ms. Willock's opinion that by its acts and omissions, as set forth in the previous portions of this opinion, that the Veterans' Home failed to adhere to these state and federal regulations, and that such failure is a significant breach of the standard of care.

///

### D.    Reservation of Privilege to Amend and Supplement

Ms. Willock reserves the privilege of amending or supplementing this

disclosure as additional information becomes known to her. This report will be

considered amended to include by reference the deposition testimony she is

expected to offer.

### IV.   Walter Peschel, M.D.
   ### 1720 Peggio Lane
   ### Missoula, MT 59802

Dr. Peschel finished medical school in 1970, and completed his medical

internship at the University of Pennsylvania Hospital. He has 35 years of

experience in general practice, surgery, OB, and pediatrics in Missoula, Montana.

He has extensive experience with Alzheimer's patients and nursing home residents

through his practice, and spent ten years as the medical director of the Royal

Manor and Wayside nursing homes. His credentials are more thoroughly

described in his *Curriculum Vitae*, attached hereto as **Exhibit G**.

### A.    Subject Matter of Expected Testimony

Dr. Peschel is expected to provide general background information on

chronic disease progression and the physiological implications of Alzheimer's

Disease. Dr. Peschel is expected to testify to causation. He will explain the

physical effects of electrocution on an individual in the advanced stages of the

progressive disease process, and render the opinion that use of a taser on Stanley Downen contributed to and hastened Stanley Downen's death considerably. Dr. Peschel is also expected to provide an opinion on whether the standard of care was breached in attempts to de-escalate Stanley Downen. Finally, based on his own personal experiences, Dr. Peschel is also expected to provide testimony as to the pain and fear associated with being tased.

**B.     Grounds for Opinion**

Dr. Peschel has been provided with the pleadings and all discovery to date, including: initial disclosures and preliminary pretrial statements; documents produced in discovery such as Stanley Downen's medical records; and depositions of witnesses and parties thus far deposed. Dr. Peschel has also reviewed literature from various medical journals, as listed in his report. As additional discovery becomes available, such information will be provided to Dr. Peschel. Dr. Peschel bases his opinions on his experience, training, and research into the relevant medical and scientific subject matter.

**C.     Substance of Facts and Opinions**

Dr. Peschel's expert report, attached hereto as **Exhibit H**, and this disclosure provide the substance of his expected testimony. Dr. Peschel is expected to testify to the following facts and opinions:

1.      Stanley Downen was a 77 year old resident of the Montana Veterans Home in Columbia Falls who suffered from severe Alzheimer's. His medical records indicate a pattern of confusion, agitation, and verbal aggression as a result of his dementia. When the Montana Veterans Home admitted Downen, they conducted a review of his medical records but opted not to place him on their secure wing, which testimony indicates was often used for residents with Alzheimer's. Instead, they placed him in the main facility.

2.      On June 1, 2012, Downen's first full day at the facility, Downen became highly agitated and began demanding to "go home." The Veterans' Home staff stayed with Downen as he began to wander, and noted his agitation increased. Downen was given a shot of Haldol to calm him down. However, before the shot had time to take effect, Downen wandered outside of the facility and refused to return.

3.      Downen picked up some rocks, small enough to fit in the palm of his hand, and nursing staff called the police. The Veterans' Home nursing staff continued to follow Downen, but kept a safe distance from him because of the rocks. Downen was not throwing the rocks, and was not posing a danger to anyone.

///

4.    Officers Johnson and Stanberry from the Columbia Falls Police Department arrived on scene. Within moments of exiting the vehicle, Officer Johnson pulled his taser from its holster. Officer Johnson asked Downen to drop the rocks. No further de-escalation techniques were employed, and no attempt was made to move Downen from the pavement to a nearby grassy area. When Downen refused to drop the rocks Officer Johnson deployed his taser.

5.    Downen was struck by the taser darts in his left arm and left buttock. He fell face first onto the pavement, and sustained facial lacerations. He was transported and admitted to the Kalispell Regional Medical Center. At the hospital, Downen's health rapidly declined. He suffered increased agitation, decreased ambulation, experienced pain with movement, became constipated and ultimately required a foley catheter. He died in the hospital 23 days after being admitted.

    a.    Personal experience with Tasing

1.    Dr. Peschel is expected to provide testimony regarding his first-hand experience getting tased. In August, 2007, Dr. Peschel assisted a suicidal woman who was locked in her car with a loaded gun and was experiencing a potentially fatal multi-prescription drug overdose. Dr. Peschel stayed with the woman to de-escalate the situation, and asked a bystander to request assistance from the police.

When the police arrived, they instructed Dr. Peschel to step away from the woman's vehicle. Dr. Peschel refused, as the woman threatened to shoot herself if he left her. When the woman eventually drifted into a coma, Dr. Peschel retreated from the vehicle and walked toward the police.

2.      Dr. Peschel was tackled to the ground and handcuffed. He then experienced two very loud noises and lost consciousness. Because he was handcuffed, Dr. Peschel believes he was tased as punishment, rather than control. When he regained consciousness he was short of breath and dazed. A trip to the emergency room revealed that he had suffered an acute myocardial infarction.

3.      In the following days, Dr. Peschel experienced a number of side effects from the tasing, including severe and painful muscle tetany, urinary retention requiring a catheter, weakness and stiffness through the body but most severely in the chest wall, decreased hand function, decreased vital capacity, and cognitive problems such as memory loss and difficulty concentrating.

4.      Similar to Stanley Downen, Dr. Peschel's tasing experience was frightening and painful, and significantly exacerbated his pre-existing conditions. Unlike Downen, however, Dr. Peschel's body gradually repaired and most of the exacerbating problems resolved with time.

///

b.    Progressive physiological implications of Alzheimer's Disease

1.    Dr. Peschel is expected to provide an explanation of the progressive physiological implications of Alzheimers Disease. Alzheimer's Disease is a degenerative disease mainly of the median and lateral temporal cortex in the nuclear basalis of Meynert, the area that generates the neurotransmitter acetylcholine, which is necessary for cognitive thinking. The brain generates an excess of amyloid precursor proteins, which are broken into short fragments that clump together and form abnormal amyloid protein plaques. In trying to remove these plaques the brain generates neurotoxins. Further, the tau proteins maintaining the structural integrity of neurotransmitters breakdown. Ultimately cells begin to die and the Alzheimer's patient experiences a declining ability to think.

2.    Dr. Peschel will explain the various stages of the disease progression. The first gradation of loss of mental ability is a condition termed Benign Forgetfulness of the Elderly. This condition is generally considered a normal part of aging, and the patient does not experience any impaired functioning of daily living activities. The transition stage is Mild Cognitive Impairment, and is characterized by a more noticeable loss of memory. While this stage generally does not affect living skills, it is both measurable and prognostic, and often

evolves into Alzheimer's. In the early stages of Alzheimer's, patients begin to experience aphasia and have difficulty finding words, expressing themselves, and navigating. Daily living skills are impacted and disorientation is common. Finally, in the advanced stages of Alzheimer's, patients become confused, disoriented, and unable to follow instructions. Patients suffer from agitation, delirium, hallucinations, and depression. Ultimately, Alzheimer's patients die from a shutdown of depleted organs, such as through aspiration, pulmonary emoboli, heart attack, or stroke.

3.     Dr. Peschel's opinion is that Stanley Downen was suffering from advanced stage Alzheimer's at the time of the tasing incident. Medical records as well as statements and deposition testimony from Veterans' Home staff and Tamara Downen all indicate Stanley Downen's advancing dementia. Downen's medical records clearly document his disorientation and confusion upon arriving at the Montana Veterans' Home. Severe disorientation, and attendant anger, agitation, and verbal aggression evident in the record in consistent with an advanced Alzheimer's diagnosis.

4.     Dr. Peschel will also provide an explanation of the impact of external insult and trauma on an Alzheimer's patients. Whereas a healthy person exposed to insults will be able to repair damage, in the form of fighting off infection or

repairing injury, a person suffering from Alzheimer's has lost this ability. In particular, an Alzheimer's patient is already suffering from a progression of ubiquitous environmental insults and the patient's immune system has lost its ability to repair. Organs have lost their reserves and are essentially already in organ failure, thus insults to the body carry a much larger risk for the patient.

     c.   <u>Advanced Alzheimer's compromised Stanley Downen's ability to recover and hastened his death</u>

1.    Dr. Peschel will testify that the most common cause of injury based on electrocution, such as by a taser, is a process called electroporation. Electroporation causes critical cell membrane barriers to break down, and allows for harmful mutual diffusion of ions. Important cellular components are thus able to leak out of cells faster than they are generated, and the cells no longer function properly. As a result, cellular metabolic energy is exhausted and the brain cells begin to dysfunction or die. Symptoms of electroporation can vary, depending on the part of the brain in which cells are affected. Electroporation is an insult to the brain which reduces the brain's reserves. Sometimes the effects of electroporation are repairable. However, a person with Alzheimer's disease has already depleted their brain reserves, and has no ability to repair. As Downen was suffering from

advanced Alzheimer's Disease, his brain reserves were depleted and he was at particularly high risk for brain injury, such as that inflicted by taser electrocution.

2.     It is Dr. Peschel's opinion that Stanley Downen was unable to repair and recover from the injuries caused when he was tased, and that being tased accelerated Downen's disease progression and contributed to and hastened Downen's death.  Dr. Peschel's opinions are supported by a markedly increased trajectory in Downen's decline after being admitted to the Kalispell Regional Medical Center.  Medical records indicate that Downen required more one on one care, suffered pain with movement, and ambulated less.  He began experiencing sleep deprivation, constipation, and ultimately required a foley catheter.  This pattern of general decline was also noted by Downen's caretaker, Tamara, in her deposition.

        d.     <u>Failure of the Columbia Falls Police Department and Veterans'<br>Home staff to properly de-escalate the situation</u>

1.     Dr. Peschel will explain three primary approaches to de-escalating situations in which a weapon is involved.  First, for the protection of police and any bystanders, criminal situations should be de-escalated quickly using authority and necessary force.

2.     Second, in suicidal situations, the only danger is to the suicidal person, and so de-escalation should be accomplished by establishing a relationship and alleviating the person's pain. A responder should recognize the absence of coping mechanisms, and thus try to address and diffuse the problems on site rather than by criminalizing the situation.

3.     Finally, in situations such as Stanley Downen's where the person is cognitively impaired, situations should be de-escalated by establishing a relationship and distracting the person using some desire. Generally, this involves identifying something that the agitated person wants or is interested in, and promising to pursue or provide that desire.

4.     Dr. Peschel's opinion, based on his experience with Alzheimer's patients, is that neither the Veterans' Home staff nor the responding officers properly attempted to de-escalate the situation prior to tasing Stanley Downen. Eyewitness reports and depositions from nursing home staff indicated Downen's agitation was based on a desire to "go home." Dr. Peschel is of the opinion that the proper way to de-escalate the situation would have been to promise to take Downen home, to encourage him to return to the facility so that Tamara could be called.

///

### D.   Reservation of Privilege to Amend and Supplement

Dr. Peschel reserves the privilege of amending or supplementing this disclosure as additional information becomes known to him.  This report will be considered amended to include by reference the deposition testimony he is expected to offer.

## V.   Treating Providers

The following disclosed, non-retained expert witnesses have specialized training, knowledge, skills, and experience relating to the claims in this matter. We expect these individuals to express opinions, based upon their training, knowledge, skills, and experience as well as their personal knowledge of their treatment of Stanley Downen.

The following medical and nursing professionals have treated Stanley Downen for health conditions pre-dating the tasing incident, and those health conditions after June 1, 2012.  Their testimony will include diagnosis, treatment, and prognosis, and may include opinions and facts set forth in the medical records which have been produced, or which is anticipated to appear in their depositions. Such testimony is permitted without further formal disclosure pursuant to *Norris v. Fritz*, 2012 MT 27, 364 Mont. 63, 270 P.3d 79 (2012); *See* also *St. Vincent v. Werner Enterprises*, 267 F.R.D. 344, 2010 WL 1508466 (D.Mont.).

These care providers' testimony will show that the tasing incident on June 1, 2012 caused multiple injuries to Stanley Downen. It is anticipated that each of these health care providers will testify about Stanley Downen's medical condition based on their treatment and observations of Mr. Downen. They will testify that Stanley Downen suffered from advancing dementia due to Alzheimer's disease. Each health care provider is anticipated to testify about the proper care and treatment for an Alzheimer's patient. Specifically, these care providers will testify that with any Alzheimer's patients, it is important to calm and redirect patients - not aggravate or agitate them. These providers will also testify about the measures they took to care for Mr. Downen - including, but not limited to, providing a proper environment, providing proper medication, providing proper re-direction, and properly dealing with agitation and combativeness.

These care providers will further testify about the medications and treatment that were used in Mr. Downen's care. These treatments and medications are referenced in Mr. Downen's medical records. These providers will testify about the marked difference in the type and quality of care and treatment received by Mr. Downen before and after the taser incident of June 1, 2012. Notably, testimony by health care providers will show a turning point in Mr. Downen's decline due to the tasing incident and fall from June 1, 2012. This testimony will show that the

tasing incident and the subsequent fall caused physical injury, pain and emotional distress for Mr. Downen. This testimony will further show that the tasing incident and subsequent fall also caused a loss of dignity for Mr. Downen in the form of a loss of independence, incontinence, and decreased ability to communicate in a meaningful manner. This anticipated testimony will establish that Mr. Downen's pre-existing health conditions were aggravated and exacerbated by the tasing incident and fall, hastening his death.

Finally, these health care providers are anticipated to testify that the expenses for medical care in Mr. Downen's case were caused by the tasing incident and his fall, and that these medical expenses were reasonable given the circumstances.

    1.    Elizabeth Schilling, M.D.
             Kalispell Regional Medical Center
             310 Sunny View Lane
             Kalispell, MT 59901

    2.    Darren Lobbestael, RN
             Kalispell Regional Medical Center
             310 Sunny View Lane
             Kalispell, MT 59901

    3.    Matthew Darnick, RN
             Kalispell Regional Medical Center
             310 Sunny View Lane
             Kalispell, MT 59901

4. Jason Bechard, M.D.
   Kalispell Regional Medical Center
   310 Sunny View Lane
   Kalispell, MT 59901

5. Mike Henson, M.D.
   Kalispell Regional Medical Center
   310 Sunny View Lane
   Kalispell, MT 59901

6. Mark D. Harding, M.D.
   Kalispell Regional Medical Center
   310 Sunny View Lane
   Kalispell, MT 59901

7. Patrick Brady, M.D.
   Kalispell Regional Medical Center
   310 Sunny View Lane
   Kalispell, MT 59901

8. Any and all other medical providers at Kalispell Regional Medical Center

9. Mike Rensmon
   Three Rivers EMS
   PO Box 1359
   Missoula, MT 59806

10. Any and all other medical providers at Three Rivers EMS

11. Any and all medical providers at Expressions, Inc.

12. Any and all medical providers at Pathways Treatment Center

///

///

13.  Derek A. Gedlaman, D.O.
     Alpine Family Medicine
     734 9th Street West #12
     Columbia Falls, MT 59912

14.  Any and all medical providers at Alpine Family Medicine

15.  Paul Coats, N.P.
     Neuroscience and Spine Institute
     200 Commons Way
     Kalispell, MT 59901

In addition to the opinions produced in his medical records, Mr. Coats is expected to testify that tasing represents a significant stress on the body, and on the brain in particular, and that such significant levels of stress advance and exacerbate the dementing process. It is Mr. Coats' opinion that in the absence of underlying dementia, Stanley Downen would likely have been better equipped to recover from the electrocution event, and that Downen's condition compromised his ability to recover.

Any additional or future depositions of treating or attending providers that are obtained will supplement this disclosure.

## VI. Experts of Other Parties

Plaintiff may obtain expert opinions helpful to it's case from any expert listed by the Defendants. Plaintiff reserves the right to disclose additional experts in the event the same are required by further discovery or development of the case.

## VII. Rebuttal and Impeachment Expert Witnesses

Pursuant to Mont. Civ. R. P. 26(b)(4)(D) Plaintiff will supplement this disclosure when additional information becomes available.

Any other expert witness which may become necessary for impeachment or rebuttal purposes.

DATED this 16th day of December, 2013.

MILODRAGOVICH, DALE
& STEINBRENNER, P.C.
*Attorneys for Plaintiff*

By:_____
W. Adam Duerk

# CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon the following individuals by the means designated below this 16th day of December, 2013:

[ ] CM/ECF
[X] U.S. Mail
[ ] Fed Ex
[ ] Hand-Delivery
[ ] Facsimile
[X] Email

Sean Goicoechea
MOORE, COCKRELL, GOICOECHEA & AXELBERG, P.C.
PO Box 7370
Kalispell, MT 59904
*Attorneys for Defendants, Montana Veterans' Home and State of Montana Department of Public Health and Human Services*

[ ] CM/ECF
[X] U.S. Mail
[ ] Fed Ex
[ ] Hand-Delivery
[ ] Facsimile
[X] Email

Natasha Prinzing Jones
William L. Crowley
BOONE KARLBERG, P.C.
201 West Main Street, Suite 300
PO Box 9199
Missoula, MT 59807-9199
*Attorneys for Defendant, Columbia Falls Police Department*

Crystal F. Montgomery-Kaler, ACP
Advanced Certified Paralegal to
W. Adam Duerk

13049/2 (cfmk/leb)
L:\worldox\DOCS\CLIENTFL\13049\002\DSC\00472815.WPD