W. Adam Duerk, Esq.
Dylan McFarland, Esq.
MILODRAGOVICH, DALE
& STEINBRENNER, P.C.
620 High Park Way
P.O. Box 4947
Missoula, Montana 59806-4947
Telephone: (406) 728-1455
Telefax: (406) 549-7077
E:Mail:   aduerk@bigskylawyers.com
          dmcfarland@bigskylawyers.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TAMARA DOWNEN, Individually and as Personal Representative for the ESTATE OF STANLEY L. DOWNEN, Deceased, <br><br> Plaintiff, <br><br> -vs- <br><br> MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES; CITY OF COLUMBIA FALLS; MIKE JOHNSON; and DAVID G. PERRY, <br><br> Defendants. | Cause No. CV-13-121-M-DWM <br><br> **PROPOSED FINDINGS OF FACT REGARDING PLAINTIFF'S EXPERT WITNESSES** |

Plaintiff, Tamara Downen, through counsel, respectfully submits the following proposed findings of fact, pursuant to the Court's Order dated January 17, 2014.

## INTRODUCTION

A *Daubert* hearing was held before this Court on January 29, 2014, for the purpose of determining the relevance and reliability of Plaintiff's proposed expert testimony of Dr. Walter Peschel, Will Cordes, Larry Smith, and Paul Coats. Plaintiff's experts Will Cordes and Dr. Peschel were present, and Larry Smith and Paul Coats appeared via video conference.  Based on the positions of the parties as set forth in their motion *in limine* briefing, and the totality of the evidence received at the hearing, the Court makes the following findings of fact:

## FINDINGS OF FACT

### A.   Plaintiff's Expert Dr. Walter Peschel

1.    Plaintiff's expert, Dr. Walter Peschel, graduated from the University of Pennsylvania School of Medicine in 1970, and completed his medical internship at the University of Pennsylvania Hospital in 1971.  (Dkt. 51-1 at 2).

2.    Dr. Peschel has 35 years of experience in general practice, surgery, OB, and pediatrics in Missoula, Montana.  (Dkt. 51-1 at 3).

3.    Since retiring in 2005, Dr. Peschel has been active in medical

research, particularly in the area of degenerative disease progression and the shared pathology of chronic illnesses resulting from immune response to ubiquitous environmental insults.  Dr. Peschel has presented research findings at presentations given at St. Patrick's Hospital in Missoula, Montana.  (Dkt. 51-1 at 11).

4.      Dr. Peschel has experience treating and caring for Alzheimer's patients and nursing home residents through his practice, and spent ten years as the medical director of the Royal Manor and Wayside nursing homes.  (Dkt. 51-1 at 2).

5.      Dr. Peschel has conducted a review of the case record, including reviewing Stanley Downen's medical records, depositions from Montana Veterans' Home staff, and Columbia Falls Police Department officers, as well as all disclosures, statements, and discovery.  (Dkt. 51-1 at 2-4).

6.      Dr. Peschel has consulted scholarly and peer-reviewed articles on cell damage due to electrical shock and the health risks associated with the discharge of electrical control weapons.  (Dkt. 51-1 at 3-4).

I.      **Progressive Pathology of Alzheimer's Disease**

7.      Alzheimer's Disease is a degenerative disease mainly of the median and lateral temporal cortex in the nuclear basalis of Meynert, the area that

generates the neurotransmitter acetylcholine, which is necessary for cognitive thinking.  (Dkt. 51-1 at 6).

8.     Alzheimer's disease progression involves progressive phases, beginning with benign forgetfulness and ultimately progressing to confusion, disorientation, agitation, delirium, hallucinations, and depression, and results in an inability to perform daily living tasks.  Ultimately, Alzheimer's patients die from a shutdown of depleted organs.  (Dkt. 51-1 at 5-6).

9.     Dr. Peschel has opined that whereas a healthy person exposed to insults will be able to repair bodily damage, in the form of fighting off infection or repairing injury, a person suffering from Alzheimer's has lost this ability to repair, and insults to the body carry a much larger risk for the patient.  (Dkt. 51-1 at 6).

10.    Stanley Downen suffered from advanced stage Alzheimer's and dementia, which manifested itself in episodes of confusion, disorientation, and agitation.  (Dkt. 51-1 at 4, 8).

11.    Stanley Downen was suffering from an episode of Alzheimer's related confusion, disorientation, and agitation at the time the Columbia Falls Police Department was called and at the time Officer Johnson tased Mr. Downen. (Dkt. 51-1 at 8).

12.    Dr. Peschel's background information on Alzheimer's disease and

opinions related to Alzheimer's patients' inability to repair after insult, are based upon his knowledge, skill, training, and experience in treating and caring for Alzheimer's patients and nursing home residents through his practice and as medical director of the Royal Manor and Wayside nursing homes.  (Dkt. 51-1 at 2).

## II.   Tasing Event And Causation Of Stanley Downen's Death

13.    A common cause of injury based on electrocution is electroporation, in which cellular metabolic energy is exhausted and cells begin to dysfunction or die.  (Dkt. 51-1 at 8).

14.    Stanley Downen was tased with an X26 Taser, which administered 30,000 volts for a period of 5 seconds.  (Dkt. 50-1 at 6).

15.    Dr. Peschel has opined, to a reasonable degree of medical certainty, that because Stanley Downen was in the late stages of the Alzheimer's disease progression and his ability to recover from a traumatic electrocution insult was compromised, the tasing incident contributed to and hastened Mr. Downen's death.  (Dkt. 51-1 at 9).

16.    Dr. Peschel's opinions in this respect are based upon his knowledge, skill, training, and experience as a medical doctor with over 35 years of experience in working with Alzheimer's patients and patients suffering from other

progressive, degenerative diseases, on a review of scholarly and peer-reviewed articles on cell damage due to electrical shock and the health risks associated with the discharge of electrical control weapons, and on his review of Mr. Downen's medical records.  (Dkt. 51-1 at 3, 8-9).

### III.   De-Escalation Techniques

17.     Plaintiff has alleged that while interacting with Stanley Downen, Defendants had a duty not to further escalate the situation, to ensure employees were properly trained in techniques for interacting with Alzheimer's patients, and to properly de-escalate dementia-related outbursts.  (Pl.'s 3d Amended Compl. ¶¶ 27, 36, 97 (Oct. 25, 2013), Dkt. 24).

18.     Related to this allegation, Dr. Peschel has opined that both the Montana Veterans' Home Staff and the Columbia Falls Police Department failed to utilize de-escalation techniques appropriate for Alzheimer's patients, and that had proper de-escalation techniques been employed that Stanley Downen could have been safely returned to the Veterans' Home facility without any taser deployment.  (Dkt. 51-1 at 9-10).

19.     De-escalation techniques appropriate for Alzhiemer's patients are not exclusive to either the medical field or the law enforcement field.

20.     Dr. Peschel's opinions in this respect are based upon his knowledge,

skill, training, and experience in treating, caring for and de-escalating agitated Alzheimer's patients and nursing home residents through his practice and as medical director of the Royal Manor and Wayside nursing homes, as well as on his review of Mr. Downen's medical records, and deposition testimony from Montana Veterans' Home staff and Columbia Falls Police Department officers.  (Dkt. 51-1 at 2-3).

IV.   **Dr. Peschel's Personal Experience Being Tased**

21.    In August, 2007, Dr. Peschel assisted a suicidal woman who was locked in her car with a loaded gun and was experiencing a potentially fatal multi-prescription drug overdose.  Dr. Peschel stayed with the woman to de-escalate the situation, even after police arrived, until the woman drifted into a coma.  (Dkt. 51-1 at 5).

22.    After Dr. Peschel moved away from the vehicle, he was tackled to the ground, handcuffed, and tased.  He experienced two very loud noises and lost consciousness.  When he regained consciousness he was short of breath and dazed.  A trip to the emergency room revealed that he had suffered an acute myocardial infarction.  (Dkt. 51-1 at 5).

23.    In the following days, Dr. Peschel experienced a number of side effects from having been tased, including severe and painful muscle tetany,

urinary retention requiring a catheter, weakness and stiffness through the body but

most severely in the chest wall, decreased hand function, decreased vital capacity,

and cognitive problems such as memory loss and difficulty concentrating.  (Dkt.

51-1 at 5-6).

24.     Similar to Stanley Downen, Dr. Peschel's tasing experience was

frightening and painful, and exacerbated pre-existing conditions.

**B.     Plaintiff's Expert Will Cordes**

25.     Plaintiff's expert, Will Cordes, has over twenty-five years of active

service as a law enforcement officer.  (Dkt. 51-4 at 5).

26.     In 1996, Mr. Cordes retired as a captain with the DeKalb County

Sheriff's Office.  Prior to his retirement, Cordes earned numerous P.O.S.T.

certifications, including: Basic Law Enforcement Officer Certification; Master

Shooting Classification; Certified Law Enforcement Instructor in Police Report

Writing; Certified Law Enforcement Instructor in Handguns and Shotguns;

Special Weapons and Tactict (SWAT) Certification; Intermediate Law

Enforcement Officer Certification; Advanced Law Enforcement Officer

Certification; Field Training Officer Certification; and Law Enforcement

Supervision Certification.  (Dkt. 51-4 at 16).

27.     Mr. Cordes' additional certifications include:  National Rifle

Association Law Enforcement Rifle Instructor Certification; FBI Police Countersniper Certification; Reid Instituted Interviews and Interrogations Basic Certification; Institute of Police Technology and Management Internal Affairs Certification; Reid Institute Advanced Interrogations Certification; and Rollins College Complex Criminal Investigations Certification. (Dkt. 51-4 at 16).

28.  Mr. Cordes was first trained in the use of a taser weapon in 1986, as a Sergeant with the DeKalb County Sheriff's Office. He was re-certified in the use taser weapons on multiple occasions, and carried a taser weapon in the line of duty, including in the field, as a member of the SWAT team, and in a jail setting. (Anticipated Testimony of Will Cordes, January 29, 2014 Hearing.)

29.  Mr. Cordes was familiar with the policies and procedures related to taser use during the time he carried a taser weapon. Since then, Mr. Cordes has followed the changes and evolution of both taser weapons and their related law enforcement policies and procedures. (Anticipated Testimony of Will Cordes, January 29, 2014 Hearing.)

30.  Mr. Cordes currently provides firearms and use-of-force training for security officers at the Missoula International Airport. Through this training he provides, Mr. Cordes is familiar with Taser International training guidelines for X26 Tasers. (Anticipated Testimony of Will Cordes, January 29, 2014 Hearing.)

PROPOSED FINDINGS OF FACT REGARDING PLAINTIFF'S EXPERT WITNESSES          Page 9

31.     As a Lieutenant with the DeKalb County Sheriff's Office, Mr. Cordes was responsible for reviewing taser use reports and use-of-force reports, and for conducting internal investigations into use-of-force.  Mr. Cordes was also responsible for taking, investigating, and responding to complaints from the public and prisoners regarding taser use.  (Anticipated Testimony of Will Cordes, January 29, 2014 Hearing.)

32.     In his role at the DeKalb County Sheriff's Office, Mr. Cordes has drafted, implemented, and modified policies and procedures related to use-of-force, and these policies have included taser use in the use-of-force continuum.  In creating these policies, Mr. Cordes relied on and consulted model policies from the IACP.  (Anticipated Testimony of Will Cordes, January 29, 2014 Hearing.)

33.     Since retiring from the DeKalb County Sheriff's Office, Mr. Cordes has stayed abreast of changes to the IACP model policies to assist with the use-of-force and firearms training he continues to provide.  (Anticipated Testimony of Will Cordes, January 29, 2014 Hearing.)

34.     After retiring from the DeKalb County Sheriff's Office, Mr. Cordes worked in the Montana Department of Justice Criminal Investigation Bureau.  Mr. Cordes currently works as a contract detective for the Missoula County Sheriff's Office, and is a Montana Licensed Private Investigator and Firearms Instructor.

He also provides firearms and ballistic related services to the Missoula County

Public Defender's Office.  (Dkt. 51-4 at 16).

35.     Mr. Cordes is internationally recognized as a firearms authority, and

has had articles published in *The Police Times*, *Tactical Shooter*, and *The Single*

*Shot Exchange*.  (Dkt. 51-4 at 16-17).

36.     Mr. Cordes has personally made thousands of arrests, and has been

present during many more thousands of arrests.  He has also been actively engaged

in custody issues other than criminal arrests, such as execution of physician's

certificates and probate court orders, which result in the physical apprehension and

detention of persons held for mental health evaluations and commitments.  Mr.

Cordes is familiar with IACP model policies regarding interactions with the

mentally ill or challenged.  (Dkt. 51-4 at 5).

37.     Mr. Cordes has conducted a review of the case record, including

reviewing depositions from Officer Johnson, Officer Stanberry, and Police Chief

Perry.  He has reviewed the Columbia Falls Police Department Policies and

Procedures, and all disclosures, statements, and discovery provided by the City of

Columbia Falls.  (Dkt. 51-4 at 2-3).

38.     Mr. Cordes has consulted model policies, including use of force

policies generated by the International Association of Chiefs of Police ("IACP")

and the City of Billings Police Department, and Taser use guidelines from the

Missoula International Airport Department of Public Safety.  Mr. Cordes also

reviewed extensive documentation from Taser International, including the Taser

International Instructor Manual.  (Dkt. 51-4 at 3).

## I.     <u>Tasing Of Stanley Downen</u>

39.    Plaintiff has alleged that Officer Johnson's use of a taser weapon on

Stanley Downen was an excessive use of force in violation of Mr. Downen's

constitutional rights.  (Pl.'s 3d Amended Compl., Counts VI-VII (Oct. 25, 2013),

Dkt. 24).

40.    Related to this allegation, Mr. Cordes opined that, particularly in light

of Taser International warnings against taser weapon use on sensitive populations,

no exigent circumstances existed to justify the use of a taser on Stanley Downen, a

77 year old Alzheimer's patient, as Mr. Downen committed no crimes, posed no

threat or danger, was not a flight risk, and was outweighed by the younger

officers.  (Dkt. 51-4 at 5-6).

41.    Mr. Cordes' opinion in this respect is based upon his knowledge,

skill, training, and experience as a law enforcement officer with over 25 years of

experience, and on his extensive review of the case record, model police policies,

and Taser International materials.  (Dkt. 51-4 at 2-3, 5).

## II.   Stanley Downen's Position When Tased

42.   Plaintiff has alleged that Officer Johnson's use of a taser weapon on Stanley Downen was an excessive use of force in violation of Mr. Downen's constitutional rights.  (Pl.'s 3d Amended Compl., Count VI-VII (Oct. 25, 2013), Dkt. 24).

43.   Related to this allegation, Mr. Cordes opined that when Stanley Downen was tased, he was not advancing toward Officer Johnson with his arm raised to throw a rock, but rather that he was tased as he turned away from Officer Johnson.  (Dkt. 51-4 at 6-7).

44.   Mr. Cordes' opinion in this respect is based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, and on his extensive review of the case record, including police reports from the incident, photographs of the taser probes in Mr. Downen's body, and eyewitness reports.  (Dkt. 51-4 at 2-3, 5, 7).

## III.   Stanley Downen Was Not A Threat

45.   Plaintiff has alleged that Officer Johnson's use of a taser weapon on Stanley Downen was an excessive use of force in violation of Mr. Downen's constitutional rights.  (Pl.'s 3d Amended Compl., Count VI-VII (Oct. 25, 2013),

Dkt. 24).

46.     Related to this allegation, Mr. Cordes has opined that at the time Stanley Downen was tased, he had recently been given a shot of Haldol, was on Veterans' Home property, was not about to leave the grounds, enter a public road, or otherwise harm himself, and thus did not pose a threat to himself.  (Dkt. 51-4 at 6).

47.     Mr. Cordes also opined that because onlookers at the nearby baseball field were separated from Mr. Downen by a chain link fence, Veterans' Home staff had been following Mr. Downen the road with no altercation, and Mr. Downen made no attempt to approach the police officers, bystanders, or nursing staff, Stanley Downen did not pose a threat to anyone else, including bystanders, Veterans' Home staff, or law enforcement.  (Dkt. 51-4 at 6).

48.     Mr. Cordes' opinions in this respect are based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, and on his extensive review of the case record, including police reports from the incident, eyewitness reports, and deposition testimony from the officers and nursing staff involved in the incident.  (Dkt. 51-4 at 2-3, 5).

## IV.   <u>Excessive Use of Force</u>

49.     Plaintiff has alleged that Officer Johnson's use of a taser weapon on

Stanley Downen was an excessive use of force in violation of Mr. Downen's constitutional rights.  (Pl.'s 3d Amended Compl., Count VI-VII (Oct. 25, 2013), Dkt. 24).

50.     Related to this allegation, Mr. Cordes has opined that because the rocks carried by Stanley Downen did not pose a threat to Officer Johnson, and based the difference in size and age between Mr. Downen and Officer Johnson and the position of Mr. Downen at the time he was tased, Officer Johnson's use of a taser weapon on Mr. Downen constituted an excessive use of force.  (Dkt. 51-4 at 6, 8).

51.     Mr. Cordes' opinion in this respect is based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, on his extensive review of the case record, including police reports from the incident, eyewitness reports, and deposition testimony from the officers and nursing staff involved in the incident.  (Dkt. 51-4 at 2-3, 5).

52.     Mr. Cordes' opinion is also based on his research into police fatalities, which indicates no police officer has been killed by a thrown rock in over seven decades, and that no records exist of a physical attack by a person over the age of 75 that has resulted in the death of a police officer.  (Dkt. 51-4 at 8).

///

V. **De-Escalation**

53.     Plaintiff has alleged that Officer Johnson's use of a taser weapon on Stanley Downen was an excessive use of force in violation of Mr. Downen's constitutional rights.  (Pl.'s 3d Amended Compl., Count VI-VII (Oct. 25, 2013), Dkt. 24).

54.     Related to this allegation, Mr. Cordes has opined that by failing to gather information, to consider additional or alternative means to the use of a taser including de-escalation techniques and lesser amounts of force, and by using a taser on an elderly man with mental illness, Officer Johnson failed to meet the standard of care required by reasonable policies, procedures, or common sense. (Dkt. 51-4 at 9).

55.     Mr. Cordes' opinion in this respect is based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, on his extensive review of the case record, including police reports from the incident, eyewitness reports, and deposition testimony from the officers and nursing staff involved in the incident, and on his review of IACP use of force policies and his own knowledge of the "use of force continuum".  (Dkt. 51-4 at 2-3, 5, 9).

///

## VI.   Columbia Falls Police Department Policies and Procedures

56.    Plaintiff has alleged that Defendant City of Columbia Falls negligently trained and supervised its officers, and that such negligence presented an unreasonable risk of harm.  (Pl.'s 3d Amended Compl., Count II (Oct. 25, 2013), Dkt. 24).

57.    Related to this allegation, Mr. Cordes has opined that by failing to incorporate taser-specific policies into Columbia Falls Police Department's policies and procedures manuals, Chief Perry failed to meet accepted standards of police practice in terms of appropriately updating and revising policies in his own department, and that the absence of these policies caused direct harm to Mr. Downen.  (Dkt. 51-4 at 10-11).

58.    Mr. Cordes also opined that the policy and procedure manuals that were implemented by the Columbia Falls Police Department had little impact on the department's officers, and that failure to train field officers in the subject areas covered by these existing policies and procedures also constitutes a departure from accepted police practices.  (Dkt. 51-4 at 10-11).

59.    Mr. Cordes' opinions in this respect are based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, on his extensive review of the case record, including deposition

testimony from Officer Johnson, Officer Stanberry, and Chief Perry, the Columbia

Falls Police Department Policies and Procedures Manual, and on his review of

IACP model policies and procedures and Taser International warnings and

recommended policies for use on the elderly and infirm.  (Dkt. 51-4 at 2-3, 5, 10-

11).

## VII.   <u>Training and Supervision of Columbia Falls Police Department Officers</u>

60.     Plaintiff has alleged that Defendant City of Columbia Falls

negligently trained and supervised its officers, and that such negligence presented

an unreasonable risk of harm.  (Pl.'s 3d Amended Compl., Count II (Oct. 25,

2013), Dkt. 24).

61.     Related to this allegation, Mr. Cordes has opined that the Columbia

Falls Police Department failed to ensure that Officer Johnson was adequately

trained and supervised in the use of force, as he had not been trained in the use of

a taser for a full four years prior to tasing Mr. Downen, and that this failure to

maintain timely training for officers in taser use is a violation of accepted police

practices.  (Dkt. 51-4 at 12-13).

62.     Mr. Cordes also opined that the Columbia Falls Police Department

fosters an environment where complaints are disregarded, incidents are not

investigated, discipline is irregularly administered, and meaningful supervision

does not exist, and that the lack of meaningful policy for dealing with complaints and resultant lack of supervision over officers such as Officer Johnson is a violation of accepted law enforcement standards.  (Dkt. 51-4 at 12).

63.    Mr. Cordes' opinions in this respect are based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, on his extensive review of the case record, including deposition testimony from Officer Johnson, Officer Stanberry, and Chief Perry, the Columbia Falls Police Department Policies and Procedures Manual, and on his review of IACP model policies and Taser International training recommendations.  (Dkt. 51-4 at 2-3, 5, 12).

## VIII.  Preservation of Evidence

64.    Plaintiff has alleged that the Columbia Falls Police Department spoliated evidence in this case.  (Pl.'s Combined Mot. *in Limine* and Mot. For Spoliation Sanctions (Dec. 18, 2014), Dkt. 30).

65.    Related to this allegation, Mr. Cordes has opined that by failing to save the rocks held by Downen, failing to turn on Officer Johnson's lapel camera when responding to the Montana Veterans' Home call, and failing to take statements from eyewitnesses near the baseball field, the Columbia Falls Police Department failed to properly preserve evidence and departed from the accepted

standards of practice for law enforcement.  (Dkt. 51-4 at 13).

66.    Mr. Cordes' opinion in this respect is based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, on his extensive review of the case record, including deposition testimony from Officer Johnson, Officer Stanberry, and Chief Perry, the Columbia Falls Police Department Policies and Procedures Manual, and on his review of IACP model policies.  (Dkt. 51-4 at 2-3, 5, 13).

**C.    Plaintiff's Expert Larry Smith**

67.    Plaintiff's expert Larry Smith has over 30 years of professional law enforcement and private investigations experience, and has trained law enforcement personnel on the local, state, and national level.  (Dkt. 51-5 at 18).

68.    Mr. Smith has worked as a Deputy Sheriff with the Los Angeles County Sheriff's Department, and as a Police Officer with the Ontario Police Department and the Ontario-Montclair School District Police Department.  (Dkt. 51-5 at 19).

69.    Mr. Smith served in a number of roles with the Fontana Police Department, including Team Sergeant and Team Sergeant in charge of training for the SWAT team, as Field Training Officer, Sergeant of the FTO Program, and as Police Explorer Advisor and Trainer.  While in charge of the Field Training

Officer program, Mr. Smith was responsible for issuing new equipment to employees and writing related policies and procedures.  (Dkt. 51-5 at 18).

70.    Mr. Smith was a Welfare Fraud Police Investigator for San Bernadino County, where he also conducted in-house training.  (Dkt. 51-5 at 19-20).

71.    Mr. Smith has extensive experience training officers, and served for four years as a Training Specialist with the San Bernadino County Sheriff's Academy and for two and a half years as a Criminal Justice Instructor for UEI College.   (Dkt. 51-5 at 19).

72.    Mr. Smith has received extensive instruction on training police officers, including multiple Firearms Instructor Courses, multiple Weaponless Defense Instructors Courses, an Advanced Tactical Communication Instructor Course, and a Chemical Agents Instructor Course (Pepper Spray and Mace).  Mr. Smith also attended the National Use of Force Conference in 2007, and has been a member of the International Law Enforcement Trainers Association since 2007. (Dkt. 51-5 at 20-21).

73.    Mr. Smith was certified as a Taser International Instructor on Taser Models M26 and X26 in 2008.  Two years later, Mr. Smith completed his Taser update via computer course, and scored 100% on the written examination.  (Dkt. 51-5 at 20).

74.     Mr. Smith has previously qualified as an expert witness in use of force and taser use cases in both federal and state courts.  (Dkt. 51-5 at 22).

75.     Mr. Smith has conducted a review of the case record, including reviewing depositions from Officer Johnson, Officer Stanberry, and Police Chief Perry, reviewing the Columbia Falls Police Department Policies and Procedures, and all disclosures, statements, and discovery provided by the City of Columbia Falls.  (Dkt. 51-5 at 4-5).

76.     Mr. Smith has consulted model policies, including use of force and electronic control weapon policies generated by the IACP, as well as Taser International training materials.  (Dkt. 51-5 at 5).

## I.     Taser Training at the Columbia Falls Police Department

77.      Plaintiff has alleged that Defendant City of Columbia Falls negligently trained and supervised its officers, and that such negligence presented an unreasonable risk of harm.  (Pl.'s 3d Amended Compl., Count II (Oct. 25, 2013), Dkt. 24).

78.     Related to this allegation, Mr. Smith has opined that the Columbia Falls Police Department's lack of training records related to taser training violates accepted police practices, and that the lack of Taser Certification records, particularly in light of the fact that numerous other training certificates have been

produced, is indicative of the fact that the 2006 taser training may not have been taught by certified Taser Instructors.  (Dkt. 51-5 at 8).

79.     Mr. Smith also opined that Chief Perry's failure to become trained and certified in the use of weapons for which it was his responsibility to implement policies and procedures is also a departure from accepted police practice, and that these departures.  (Dkt. 51-5 at 9).

80.     Mr. Smith's opinions in this respect are based upon his knowledge, skill, training, and experience as a law enforcement officer with over 30 years of experience, on his extensive review of the case record, including deposition testimony from Officer Johnson, Officer Stanberry, and Chief Perry, the Columbia Falls Police Department Policies and Procedures Manual, and the Columbia Falls Police Department training and certification records.  (Dkt. 51-5 at 3-5, 7-11).

81.     Mr. Smith's opinions are also based on his review of Taser International training and certification documents, which include warnings related to the use of taser weapons on the elderly and infirm, warnings related to the risk of injury from falls associated with taser use, and recommendations that end-users, such as Officer Johnson, be re-certified annually.  (Dkt. 51-5 at 7-11).

82.     Mr. Smith also consulted IACP model taser policies and reports, which also recommend annual recertification and warn that failure to properly

train officers in the use of taser weapons could expose officers, agencies, and the public to increased potential for negative outcomes.  (Dkt. 51-5 at 9).

## II.   Taser Policies and Procedures at the Columbia Falls Police Department

83.    Plaintiff has alleged that Defendant City of Columbia Falls negligently trained and supervised its officers, and that such negligence presented an unreasonable risk of harm.  (Pl.'s 3d Amended Compl., Count II (Oct. 25, 2013), Dkt. 24).

84.    Related to this allegation, Mr. Smith has opined that it is standard practice for police departments to issue polices and procedures for new equipment prior to issuing new equipment to officers, and that Chief Perry's failure to adopt any taser-specific policy for a full 6 years after his officers were issued tasers is a deviation from accepted police practices.  (Dkt. 51-5 at 10-11).

85.    Mr. Smith's opinions in this respect are based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of experience, on his extensive review of the case record, including deposition testimony from Officer Johnson, Officer Stanberry, and Chief Perry, the Columbia Falls Police Department Policies and Procedures Manual, and the Columbia Falls Police Department training and certification records.  (Dkt. 51-5 at 3-5).

86.    Mr. Smith's opinions are also based on his review of the Taser

Instructor Handbook, which includes sample taser policies and procedures, and IACP model taser policies and procedures.  (Dkt. 51-5 at 11).

## III.    Excessive Use of Force

87.    Plaintiff has alleged that Officer Johnson's use of a taser weapon on Stanley Downen was an excessive use of force in violation of Mr. Downen's constitutional rights.  (Pl.'s 3d Amended Compl., Count VI-VII (Oct. 25, 2013), Dkt. 24).

88.    Related to this allegation, Mr. Smith has opined that as Mr. Downen was a 77 year-old Alzheimer's resident who did not appear to be facing Officer Johnson, while Officer Johnson was a 230 pound athletic police officer with a weapons belt, Mr. Downen did not pose a threat that would justify the use of a taser weapon, and that Officer Johnson's use of force was excessive.  (Dkt. 51-5 at 12-13).

89.    Mr. Smith also opined that as a number of foundational police materials specifically warn against tasing an elderly and infirm person, Officer Johnson should have known that the use of a taser weapon against Stanley Downen was not justified.  (Dkt. 51-5 at 12-13).

90.    Mr. Smith's opinions in this respect are based upon his knowledge, skill, training, and experience as a law enforcement officer with over 25 years of

experience, on his extensive review of the case record, including deposition

testimony from Officer Johnson, Officer Stanberry, Chief Perry, and Montana

Veterans' Home staff, police reports, and the Columbia Falls Police Department

training and certification records.  (Dkt. 51-5 at 3-5).

91.     Mr. Smith's opinions are also based on his review of the Taser

Instructor Certification packet, which states that taser use has not been

scientifically tested on the infirm or the elderly and warns that taser use on such

individuals could increase the risk of death or serious injury, and on IACP model

policies for taser weapons, which warn against deploying tasers where there is a

reasonable belief the subject might fall, resulting in serious death or injury.  (Dkt.

51-5 at 3-5).

## D.     Treating Provider Paul Coats, APRN-FNP

92.     Stanley Downen's treating provider, Paul Coats, is a Nurse

Practitioner at Glacier Neuroscience and Spine Institute, a division of Kalispell

Regional Medical Center.  (Dkt. 53 at 16-18).

93.     Mr. Coats' is licensed by the Montana Board of Nursing (license

number RN-16696).  He was first licensed in Montana in 1986, and his license

remains current through December 31, 2014.  (*Licensure QuickConfirm Report*,

Anticipated Exhibit at January 29, 2014 Hearing).

94.    As an APRN-FNP in Montana, Mr. Coats' practice may include establishing medical and nursing diagnoses, treating, and managing patients with acute and chronic illnesses and diseases, and providing initial, ongoing, and comprehensive care.  Admin. R. Mont. § 24.159.1406.

95.    Mr. Coats treated Stanley Downen after he was admitted to the Kalispell Regional Medical Center on June 1, 2013, through the date of his death on June 24, 2012.  (Dkt. 53 at 16-18).

96.    As a treating provider, Mr. Coats' has knowledge of Stanley Downen's Alzheimer's disease, and the care, treatment, and causation of Mr. Downen's  injuries following the June 1, 2012 tasing incident.  (Dkt. 53 at 16-18).

97.    Mr. Coats has knowledge of and opinions regarding the effect of the tasing on Mr. Downen's body, and the interrelation of such effects with Mr. Downen's dementia and ability to recover.  (Dkt. 53 at 16-18).

98.    As a treating provider, Mr. Coats also has knowledge of and opinions regarding Stanley Downen's triggers, and appropriate de-escalation techniques for his behaviors.  (Dkt. 53 at 16-18).

99.    Mr. Coats' opinions are based on his personal knowledge acquired during his care and treatment of Mr. Downen.  (Dkt. 53 at 16-18).

///

**PROPOSED FINDINGS OF FACT REGARDING PLAINTIFF'S EXPERT WITNESSES**          **Page 27**

## CONCLUSIONS OF LAW

100.   Allowing expert evidence despite a lack of first-hand knowledge is based on the assumption that the expert testimony will be both reliable and helpful to the decision maker.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993); Fed. R. Evid. 702.

101.   It is the Court's duty as a gatekeeper to determine whether the offered expert evidence represents specialized knowledge and will assist the decision maker.  *Kumho,* 526 U.S. at 149; *Daubert*, 509 U.S. at 592.

102.   It is the burden of the party offering the expert evidence to establish its admissibility by a preponderance of the evidence.  *Hubbard v. Rite Aid Corp.*, 433 F. Supp. 2d 1150, 1161 (S.D. Cal. 2006).

103.   Reliability requires the expert testimony be based on sound principles and methodology.  *U.S. v. W.R. Grace*, 455 F. Supp. 2d 1181, 1187 (D. Mont. 2006), *aff'd* 526 F.3d 499 (9th Cir. 2008).

104.   Relevancy requires the expert testimony to be sufficiently tied to the facts of the case so as to be useful.  The evidence must "fit" the issues to be determined at trial.  *W.R. Grace*, 455 F. Supp. 2d at 1187-88.

///

**Plaintiff's Experts Dr. Walter Peschel and Paul Coats**

105.    Applying the above law, the testimony of Dr. Peschel and Paul Coats should not be excluded at the trial of this action.

106.    The testimony and opinions of Dr. Peschel and Paul Coats represent specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.

107.    Dr. Peschel and Paul Coats are qualified by knowledge, skill, experience, training and education to testify about the matters referred to in their testimony addressed above.  Fed. R. Evid. 702.

108.    The testimony of Dr. Peschel and Paul Coats regarding the physiological implications of Alzheimer's disease and the effects of the use of a Taser on Mr. Downen is based on sufficient facts and data.  Fed. R. Evid. 702; *U.S. v. W.R. Grace*, 597 F. Supp. 2d 1143, 1145 (D. Mont. 2009).

109.     The testimony and opinions of Dr. Peschel and Paul Coats are the product of reliable principles and methods, and Dr. Peschel and Paul Coats have applied their theories reliably to the facts of this case.  Fed. R. Evid. 702.

110.    The testimony and opinions of Dr. Peschel and Paul Coats have been shown to be based on or tested by reliable scientific study and epidemiological evidence.

**Plaintiff's Expert Will Cordes and Larry Smith**

111.   Mr. Cordes and Mr. Smith intend to offer testimony and opinions at trial that the Defendants used excessive force on Mr. Downen, failed to adopt policies and procedures regarding the use of force, taser use, and dealing with the mentally incapacitated, failed to de-escalate the situation, failed to have an adequate complaint process in place, failed to preserve evidence relating to Mr. Downen's event, and other opinions as set forth in their expert witness disclosures.

112.   Applying the above law, the testimony of Will Cordes and Larry Smith should not be excluded at the trial of this action.

113.   The testimony and opinions of Will Cordes and Larry Smith represent specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.

114.   Will Cordes and Larry Smith are qualified by knowledge, skill, experience, training and education to testify about the matters referred to in their testimony addressed above.  Fed. R. Evid. 702.

115.   The testimony and opinions of Will Cordes and Larry Smith is based on their knowledge, skill, experience, training and education and is admissible at trial.  Fed. R. Evid. 702.

DONE this _____ date of _____, 2014.

_____
Hon. Donald W. Molloy
United States District Court Judge