JULIE M. LAKE
Registered Diplomate Reporter
Certified Realtime Reporter
Martin-Lake & Associates, Inc.
P.O. Box 7765
Missoula, Montana 59807-7765
406/543-6447 office
406/543-5014 fax
jml@martin-lake.net

United States Contract Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TAMARA DOWNEN, Individually and as Personal Representative for the ESTATE OF STANLEY L. DOWNEN, | No. CV-13-121-M-DWM |
| Plaintiffs, | |
| vs. | **TESTIMONY OF WALTER H. PESCHEL** |
| MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES; CITY OF COLUMBIA FALLS; MIKE JOHNSON and DAVID G. PERRY, | *DAUBERT* HEARING |
| Defendants. | |

**BEFORE THE HONORABLE DONALD W. MOLLOY**
**UNITED STATES DISTRICT COURT JUDGE**
**FOR THE DISTRICT OF MONTANA**

Russell Smith United States Courthouse
201 East Broadway, Missoula, Montana 59802
Wednesday, January 29, 2014
11:28 a.m. to 2:28 p.m.

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription.

APPEARANCES

For the Plaintiffs:   MR. W. ADAM DUERK
                      MR. DYLAN MCFARLAND
                      MILODRAGOVICH, DALE & STEINBRENNER
                      601 High Park Way
                      Missoula, Montana 59801


For the Defendant Montana Veterans' Home and State of
Montana Department of Public Health and Human Services:

                      MR. SEAN GOICOECHEA
                      MR. CHRIS DI LORENZO
                      MOORE, COCKRELL, GOICOECHEA &
                      AXELBERG, P.C.
                      P.O. Box 7370
                      Kalispell, Montana 59904-0370
                      sgoicoechea@mcgalaw.com


For the Defendant City of Columbia Falls, Mike Johnson
and David G. Perry:

                      MS. NATASHA PRINZING JONES
                      MR. WILLIAM L. CROWLEY
                      BOONE KARLBERG P.C.
                      P.O. Box 9199
                      Missoula, Montana 59807-9199
                      npjones@boonekarlberg.com
                      bcrowley@boonekarlberg.com



CONTENTS

Reporter's Certificate............................. 54

WITNESS
For the Plaintiff:

WALTER H. PESCHEL, M.D.

    Direct Examination by Mr. Duerk.................. 3
    Cross-Examination by Ms. Prinzing Jones.......... 18
    Cross-Examination by Mr. Goicoechea.............. 40

<u>WEDNESDAY, JANUARY 29, 2014</u>

Thereupon,

WALTER H. PESCHEL, M.D.,

having been first duly sworn to tell the truth, testified

upon his oath as follows:

THE COURT:  Have a seat over here if you would,

please.

For the record, would you state your full name and what

your profession is.

THE WITNESS:  Walter Howard Peschel.  Retired

physician.

THE COURT:  And do you live in Missoula?

THE WITNESS:  Yes.

THE COURT:  Counsel.

<u>DIRECT EXAMINATION</u>

<u>BY MR. DUERK</u>:

Q.  Dr. Peschel, what is your profession?

A.  Retired physician.

Q.  Where did you attend medical school?

A.  I attended medical school at Grand Forks, North Dakota

for two years, and then I finished at the University of

Pennsylvania in Philadelphia.  And I interned with a medical

internship there in Philadelphia at the University of

Pennsylvania.  Penn, Penn.

Q.  Did you receive your medical degree?

A.   Yes.

Q.   How long did you practice medicine?

A.   35 years.

Q.   And what was your medical practice in?

A.   It was an old-fashioned general practice.  I did a lot of medicine, general surgery.  I was certified for 19 different surgical procedures.  And I did obstetrics and some pediatrics.  And I had a fair amount of experience with geriatrics in that I was a director of two nursing homes for approximately ten years each.

Q.   During the course of your career, did you diagnose and treat elderly patients then?

A.   I think about a third of my practice was geriatrics. Yes, I did.

Q.   All right.  And did you diagnose and treat patients with Alzheimer's disease?

A.   Yes.

Q.   As part of your practice, did you review medical records?

A.   Yes.

Q.   And when reviewing medical records, would you arrive at diagnoses related to patients in your practice and care?

A.   Yes.

Q.   All right.  In this case did you review Stanley Downen's medical records?

1    A.   Yes.

2    Q.   Did you review depositions from the Montana Veterans'

3    Home staff?

4    A.   Yes.

5    Q.   Did you review depositions from the Columbia Falls

6    Police Department?

7    A.   Yes.

8    Q.   Did you review discovery responses from the Montana

9    Veterans' Home in this case?

10   A.   Yes.

11   Q.   Based on the materials you reviewed, did you come to an

12   understanding of the plaintiff Stanley Downen's medical

13   condition prior to his death?

14   A.   Yes.  I thought that Mr. Downen had, most probable,

15   Alzheimer's disease.

16   Q.   And based on your knowledge, skill, training and

17   experience, were you able to independently arrive at any

18   general diagnoses of Mr. Downen's condition based on the

19   materials reviewed alone?

20   A.   Yes.

21   Q.   Based on your review of the records, were you able to

22   observe any problems that Mr. Downen experienced, any health

23   problems Mr. Downen experienced, as a result of what I'll

24   call the Tasing incident of June 1st, 2012?

25   A.   Yes, I did.

**Q.** And what health conditions were you able to diagnose from Mr. Downen as a result of that episode?

**A.** It seemed to me, when you lay out the trajectory, although it's variable, but the usual trajectory of people with Alzheimer's disease and put Stanley Downen in that position, in that trajectory, and then applies the Taser to him, it seemed like it probably shortened his life by a couple of years.

**Q.** And do you state that opinion on a more-probable-than-not basis?

**A.** Yes.

**Q.** And do you state that opinion based on your knowledge, skill, training and experience of 35 years as a medical practitioner?

**A.** Yes.

**Q.** Doctor, in addition to the medical records that you reviewed in this case, did you review any peer-reviewed literature?

**A.** Yes.

**Q.** What material did you review that helped inform your views about this case?

**A.** Well, as far as the Alzheimer's condition, just standard textbooks of medicine. Harrison's Textbook, primarily.

**Q.** Doctor, I'm sorry to interrupt. But for the record, what is Harrison's Medical Textbook?

1    **A.**   It's one of the two standard, most used and accepted,

2    textbooks in medicine that physician and medical students

3    use for their training and for reference thereafter.

4    **Q.**   Is this a peer-reviewed text?

5    **A.**   Yes.

6    **Q.**   Are the different chapter headings in Harrison's edited

7    by qualified medical doctors on staff?

8    **A.**   Yes.

9    **Q.**   Are each of those chapters periodically reviewed--

10   peer-reviewed and then edited?

11   **A.**   They come out with a new textbook usually every four

12   years that has been revised and reedited.

13   **Q.**   Doctor, it's my understanding in this case that you

14   intend to offer opinions about the progressive physiological

15   implications of Alzheimer's disease.  Is that correct?

16   **A.**   Alzheimer's disease is almost all the time a progressive

17   disease.

18   **Q.**   All right.  And, Doctor, it's my understanding that the

19   opinions that you intend to offer about Alzheimer's disease

20   come from your review of Harrison's, a peer-reviewed text,

21   as well as from your experience, knowledge, skill and

22   training as a medical professional of 35 years.  Is that

23   correct?

24   **A.**   Yes.  It comes from my ten years of medical training,

25   review of texts other than--also more than just Harrison,

1    and 35 years of experience in medicine.

2    Q.   In terms of the opinions that you intend to offer about

3    Stanley Downen's progression through Alzheimer's, what forms

4    the basis of your testimony in that regard?

5    A.   I think he was going down the standard course that

6    people would with Alzheimer's disease.  And I think, you

7    know, when he was Tasered--he died 20 days later--I think he

8    probably had maybe two or three more years left in his life.

9    I think the Tasering hastened his death.

10        It didn't--it didn't accelerate his Alzheimer's.  It

11   created another process.  Another process that destroyed

12   tissue on top of the slow progressive process of Alzheimer's

13   disease that slowly destroys tissue.  Another acute process,

14   with a different pathophysiology, destroyed additional

15   tissue and pushed him over the edge.

16   Q.   Is this also an opinion you intend to offer to a

17   reasonable degree of medical certainty?

18   A.   Yes.

19   Q.   And it's my understanding that the source of that

20   opinion comes from your experience as a clinical

21   practitioner, as well as from peer-reviewed literature that

22   you have reviewed; is that correct?

23   A.   Yes.  And the application of the well-accepted medical

24   principles of diagnosis.

25   Q.   All right.  And forming a general diagnosis in Stanley

1    Downen's case is something that you in fact did.  Correct?

2    A.   Yes.

3    Q.   All right.  Doctor, there is one part of your testimony

4    that I'm sure we'll hear questions about on

5    cross-examination.

6        You reviewed some articles about the effects of

7    electrocution on the human body; is that correct?

8    A.   Yes.

9    Q.   All right.  Were those articles peer-reviewed?

10   A.   Most of them were, yes.

11   Q.   All right.  And are those articles referenced in the

12   materials that you reviewed as submitted in your expert

13   witness report?

14   A.   Yes.

15   Q.   Doctor, in terms of the articles on electrocution that

16   you reviewed, are your opinions that Stanley Downen's death

17   was hastened by this Tasing episode solely based on what you

18   read in those articles on electrocution, or were your

19   opinions also based on your review of the medical record and

20   your knowledge, skill, training and experience treating

21   Alzheimer's patients?

22   A.   The latter.

23   Q.   All right.  So I'll rephrase.  Is it fair for me to say

24   that your opinions about Stanley Downen's death being

25   hastened were not solely based on these articles on

1    electrocution, correct?

2    **A.**   I don't know if I--personal experience, is that probably

3    not allowed?

4    **Q.**   Correct.

5    **A.**   Okay.

6    **Q.**   What I want to establish here, though, is that your

7    opinions about Stanley Downen and his death being hastened

8    are not solely based on those articles.  Is that fair?

9    **A.**   No.  I've read other articles and other texts that

10   aren't included in that.

11   **Q.**   Okay.  Is it true that Stanley Downen experienced other

12   adverse health effects as a result of the incident on

13   January 1st, 2010--or, I'm sorry, 2012?

14   **A.**   Well, he had a laceration and contusion to his head.

15   And he perhaps might have had a concussion, although I don't

16   think he was knocked unconscious.  But you don't have to be

17   unconscious to suffer a concussion, so that's a possibility.

18       A facial laceration, scalp contusion, and perhaps a

19   concussion.

20   **Q.**   Did that incident and injury also contribute to the

21   hastening of Stanley Downen's death, in your opinion?

22   **A.**   I'm not so sure.  It could have.

23   **Q.**   In terms of any other health effects suffered by Stanley

24   Downen during this Tasing episode, were there any other

25   injuries that you observed in your review of the medical

record?

**A.**   No.

**Q.**   Doctor, in terms of the way you arrived at your opinions
in this case, how did you arrive at the opinions in this
case related to Stanley Downen?

**A.**   Well, I took advantage of my training and my textbooks
and literature and my knowledge of principles of diagnosis
and applied those to--after--while reading Mr. Downen's
medical records.

**Q.**   And if you could briefly describe the process of
arriving at a diagnosis, that would be helpful.

**A.**   Well, I think that when you start your medical training,
the first thing we do is we learn how normal people are.
How their symptoms are, how their physical examination is,
and what the laboratory results on somebody normal would be.

     And then we study diseases and we learn how their
physical examinations and their history differs, their
examinations in the laboratory differs with different
diseases.  And we try--if somebody is sick, we try and put
the disease into a different compartment.  Is it neurologic?
Is it cardiovascular?  Is it renal?  And once we've done
that, then we try and say is it degenerative?  Is it
infectious?  Is it vascular?  Is it some toxin, et cetera?
And we try and pigeonhole it.

     And then we try and apply the best matched treatment

1   that we can to that specific disease after we've made the

2   diagnosis.

3   Q.   Is arriving at a diagnosis for a patient a methodology

4   that you would use nearly daily in your medical practice?

5   A.   Yes.  It's just as I just described to you.  We start

6   with the history and look for abnormalities from normal in

7   the history.  Does that point to a specific organ?

8        If they are short of breath, we think of the lung or the

9   heart.  Then we look for physical findings that might back

10  that up.  Is the heart enlarged or the heart sounds

11  irregular and abnormal?

12       And then we look for lab.  Is his echocardiogram

13  abnormal?  Does his chest x-ray show an enlarged heart with

14  fluid?  And then we treat accordingly.

15  Q.   Doctor, in terms of the essential elements in the

16  methodology of arriving at a diagnosis for a patient, have

17  those elements changed very much during the course of your

18  practice as a medical practitioner?

19  A.   They haven't in the last couple hundred years, so far as

20  I know.  I think that's the start of Hippocrates.

21  Q.   And in terms of the methodology of arriving at a

22  diagnosis, is this a reliable science based on your

23  knowledge and experience?

24  A.   It's the best we have.  It's pretty reliable.

25  Q.   Doctor, did you apply the principles of arriving at a

1    general diagnosis reliably in your dealing with arriving at

2    a diagnosis of Mr. Downen in this case?

3    A.   Well, I think so.  He was an elderly person who had an

4    age-related progressive onset of increasing dementia.  And

5    they did a fairly reasonable job of excluding

6    non-Alzheimer's diseases that could have been treated.

7        You can only diagnose Alzheimer's with 100 percent

8    accuracy at autopsy.  You need a biopsy of the brain to do

9    that.  But without that, I think they did a good job and I

10   agreed with his diagnosis of Alzheimer's disease.

11   Q.   In terms of arriving at opinions or diagnoses of 100

12   percent accuracy, is that a requirement of the methodology

13   of forming a general diagnosis?

14   A.   Not for Alzheimer's disease because it requires an

15   autopsy; or even a brain biopsy would cause more damage than

16   the benefit you would get.

17       And the main thing, to evaluate somebody with dementia,

18   is to rule out a treatable cause.  Do they have some

19   infection?  Some intoxication?  A vitamin deficiency?  Do

20   they have a tumor or a subdural hematoma or something like

21   that?  And once that's excluded in somebody who is fairly

22   elderly, who has a gradual progression of loss of cognitive

23   powers, I think you can pretty reliably assert the diagnosis

24   of Alzheimer's disease.

25   Q.   And were you able to do that in Mr. Downen's case?

**A.** Yes.

**Q.** All right. And, Doctor--

    THE COURT: Let's--unless you are at a point you've got one more question, we're going to take the break until 1:30.

    MR. DUERK: We'll do that. Thank you, Your Honor.

    THE COURT: All right. We'll be in recess until 1:30.

    (Whereupon, court was in recess at 11:45 a.m., reconvened at 1:32 p.m.)

    THE COURT: Please be seated.

    Dr. Peschel, if you will resume the hot seat.

    Mr. Duerk, you can continue your *Daubert* examination.

    MR. DUERK: Thank you, Your Honor.

**Q.** (By Mr. Duerk) Dr. Peschel, I would like to try and speed things along here.

    The two remaining topics that we have yet to discuss: First, whether or not the events of June 1st, 2012, increased the trajectory of Stanley Downen's decline; and, second, the topic of de-escalation.

    First with Stanley Downen's progression. Did the Tasing episode and the events of June 1st, 2012, cause hastening in Stanley Downen's decline?

**A.** I think so. He certainly progressed much more rapidly after the incident than I would have thought he would have

1  otherwise.

2  **Q.**   Do you base that opinion on your review of the medical

3  record?

4  **A.**   That and my--my knowledge of taking care of what the

5  normal trajectory is with people with Alzheimer's disease.

6  **Q.**   In this case, did you use your skills in forming a

7  general working diagnosis in--I'm sorry.  I'll back up.

8       Did you use your skills in forming a general diagnosis

9  to inform your opinions about Stanley Downen's progression

10  in this case?

11  **A.**   Yes.

12  **Q.**   And did you reliably apply the methodology of forming a

13  general diagnosis to inform your opinions in that regard

14  also?

15  **A.**   Yes.

16  **Q.**   In terms of the increased trajectory of Stanley Downen's

17  decline, is it your opinion to a reasonable degree of

18  medical certainty that the events of the Tasing episode

19  hastened his ultimate death?

20  **A.**   Yes.

21  **Q.**   All right.  Doctor, on the point of de-escalation, do

22  you have experience using de-escalation techniques in

23  treating elderly patients as part of your professional

24  background?

25  **A.**   Yes.

**Q.**  You said that many of your patients came from a geriatric population; is that true?

**A.**  I think I saw about 40 patients a day.  I think about a third of those people were over 65.

**Q.**  Did you, yourself, participate in de-escalating elderly patients as part of your career as a doctor?

**A.**  Yes, very often.

**Q.**  Are you familiar with the general principles of de-escalating elderly and confused patients in particular?

**A.**  I have something that works well for me, and I think I am, yes.

**Q.**  Did you receive training, both on-the-job training and classroom training, in de-escalating patients throughout your 35-plus years of experience as a care provider?

**A.**  Mainly on-the-job training.

**Q.**  Did you, in fact, serve as the medical director of a nursing home facility at two different times during your career?

**A.**  Two different nursing homes for approximately ten years each.

**Q.**  And during those ten years did you witness the use of de-escalation techniques on members of the elderly population at those nursing homes?

**A.**  Yes.

**Q.**  Have those de-escalation techniques remained consistent

1  for the most part during the course of your career as a
2  medical care provider?
3  **A.**  Well, they have for me, yes.
4  **Q.**  And in terms of the opinions that you plan to express on
5  the topic of de-escalation for elderly patients, are those
6  topics that you are--I'm sorry.
7      Is the topic of de-escalation technique a topic you are
8  familiar with based on your knowledge, skill, training, and
9  experience of 35 years as a medical doctor?
10 **A.**  Yes.
11 **Q.**  Are all of the opinions that you plan to express at time
12 of trial in this matter on the topic of de-escalation based
13 on your knowledge, skill, training and experience to a
14 reasonable degree of medical certainty?
15 **A.**  Yes.
16 **Q.**  Doctor, a few other questions and I think we're wrapped
17 up.
18     Do you maintain medical malpractice coverage today?
19 **A.**  Yes.
20 **Q.**  Are all of your medical licenses still current?
21 **A.**  Yes.
22 **Q.**  Do you still write prescriptions?
23 **A.**  Yes.
24 **Q.**  Do you still treat patients today?
25 **A.**  Yes.

**Q.** In terms of all of your opinions, now to summarize, did you use a reliable methodology in arriving at the opinions that you plan on expressing at trial, in your mind?

**A.** Yes.

**Q.** And did you apply the methodology of creating a general diagnosis in Stanley Downen's case?

**A.** Yes.

**Q.** And did you create--or come to a general diagnosis in Stanley Downen's case in the same way that you would have in your 35-plus-year career as a medical doctor treating patients?

**A.** Yes.

**Q.** And in terms of all of the opinions that you plan to express at trial, will you express those opinions to a reasonable degree of medical certainty based on all of the experience that you've testified to today?

**A.** Yes.

MR. DUERK: Nothing further at this time, Your Honor.

THE COURT: Mr. Crowley.

MR. CROWLEY: Ms. Jones, Your Honor.

THE COURT: Ms. Jones.

<u>CROSS-EXAMINATION</u>

<u>BY MS. PRINZING JONES</u>:

**Q.** Hello, Dr. Peschel.

**A.**  How are you?  Good to see you again.

**Q.**  We met before because I took your deposition; is that
right?

**A.**  That's right, yes.

**Q.**  Okay.  I'm going to talk to you a little bit about--

**A.**  I'm just starting to recover from that.

**Q.**  Me, too.

    I'm going to talk to you a little bit about that, but
first I want to--

      THE COURT:  What deposition?  In his case?  That's
nothing to do with this case.

    The question here is, can he give his opinions?  That
goes to his methodology and the reliability of what he's
done.  I'm not interested in impeaching him.

    If you have questions that go to his qualifications,
have at it, but we're not going to go over his deposition.

      MS. PRINZING JONES:  The only purpose of the
deposition would be relative to his qualifications, Your
Honor.

      THE COURT:  Would be what?

      MS. PRINZING JONES:  Relative to his qualifications.
I think he'll admit.  It's not going to come up, Your Honor.

      THE COURT:  Let's get going.

**Q.**  (By Ms. Prinzing Jones)  All right, you've never treated
anyone who has been Tased?

1        THE COURT:  Okay, wait now.  I can't hear you.  And

2    you talk so rapidly I'm not sure, unless I get one of those

3    headsets, I'm going to be able to hear you.  So slow down.

4        MS. PRINZING JONES:  Okay.  Your Honor, we have Dr.

5    Peschel's report that we can bring up on the screen.  I

6    think that would help guide our discussion here.  Would that

7    be acceptable?

8        THE COURT:  Yes.

9    Q.   (By Ms. Prinzing Jones)  You signed a report in this

10   case; is that right?

11   A.   Yes.

12   Q.   And in the report you identified your opinions that you

13   expect to render to the jury.

14   A.   Yes.

15   Q.   And in your report you stated that your opinions are

16   regarding the effects of Taser electrocution.

17        Can you see the screen?  I have your report up.

18   A.   Oh, yes, I can.

19   Q.   Okay.  So your opinion was regarding the effects of

20   Taser electrocution; is that right?

21   A.   Yes.

22   Q.   And you've discussed that Downen would have been

23   susceptible to electrical injury to his brain.  Right?

24   A.   Yes.

25   Q.   And your theory is, is that there would be

electroporation to his brain through the Taser application
to his bicep and left hip.  Is that right?

**A.**   Well, what is written here isn't quite what I meant.

Let me tell you what I meant, is he has a progressive
conversion of his normal neurons to abnormal neurons through
the natural aging process that's accelerated in people who
have Alzheimer's disease.  Okay?

So he is--the percentage of the normal-functioning
neurons in his brain has decreased quite a bit.  His reserve
has decreased quite a bit.  Okay?

Now, if you take and submit any kind of an injury,
additional injury--that could be a concussion, central
nervous system infection or an electrical injury--through
whatever mechanism, electricity works to harm the tissue.
Electroporation may just be one of the methods.

In somebody who has no reserve left, they are not going
to do as well.  They are going to have more organ
dysfunction and less of a chance for recovery than somebody
who has a normal brain.

**Q.**   And it's your opinion that electroporation in his brain
is what happened to Stanley Downen and hastened his death.

**A.**   An electrical injury, whether it was through
electroporation or heating or denaturation or proteins or
any other unknown mechanism at this time.  I don't think we
really know.

I don't know how electricity damages tissue. I know it damages tissue. I don't know the exact mechanism. Electroporation may be one of the mechanisms and it's one they talk about in the literature a fair amount.

But that would not cause his Alzheimer's or accelerate it, but it would--it would take away--it would injure more neurons through a different process. And so the net would be, in somebody who has Alzheimer's, they just don't have any room left, any reserve left to suffer any more additional loss of neurons as somebody who wouldn't have Alzheimer's disease.

So if you are going to injure somebody with electrical current, someone with Alzheimer's is going to be much more susceptible to having a bad outcome than somebody who doesn't have.

Q. You mentioned concussion, but nowhere in your report did you ever disclose an opinion that you diagnosed Stanley Downen with a concussion; isn't that right?

A. I don't know whether Stanley had a concussion or not. He had a laceration and a contusion; that's the bruise. A laceration's a cut. He may have had a concussion when he fell. I'm not sure. I don't know if he did or not.

Q. And you didn't render that opinion in your report, right?

A. I don't remember. But I don't know if he had a

1    concussion or not.  It's possible.

2    **Q.**  All right.

3    **A.**  I don't know.

4    **Q.**  So I think we're on the same page.  Injury to neurons in

5    the brain hastened Mr. Downen's death.  That's your opinion?

6    **A.**  Yes.

7    **Q.**  Okay.  Now, I want to talk to you about the reliability

8    and scientific basis of that opinion.  Okay?

9    **A.**  Okay.

10   **Q.**  Okay.  Now, to get there you did some research, right?

11   **A.**  To get where?  To--

12   **Q.**  Your opinions.

13   **A.**  I--I just did my--through my normal training and

14   35 years of education--or experience, I mean, and my

15   previous experience with people with Alzheimer's disease, is

16   what I used.

17       I didn't go out and do any additional research, other

18   than maybe reading some articles that related to my previous

19   case.

20   **Q.**  All right.  So do you know whether it's scientifically

21   possible for electricity from a Taser application from

22   the--to the left bicep and hip, whether it's scientifically

23   possible for electricity to go from those points to the

24   brain?

25   **A.**  Oh, I would be surprised if it wouldn't.  If you put

1  electricity in one side of Flathead Lake, you can probably

2  measure it on the other side of Flathead Lake. It goes

3  through water and ions quite easily and very nicely.

4  **Q.**  How do you reach that opinion?

5  **A.**  I would be surprised if it didn't. Electricity goes

6  through water. It's conducted very easily in aqueous

7  environments, including the human body.

8  **Q.**  There are ten papers that are listed as references to

9  your report. Ten papers.

10  **A.**  Okay.

11  **Q.**  Do any of those ten papers scientifically support the

12  theory that electricity from the Taser application to the

13  bicep and hip can travel to the brain?

14  **A.**  I don't know they do, but I don't know that they

15  disprove it either.

16  **Q.**  Okay. Now, those ten reference materials, do anything

17  in those reference materials scientifically support the

18  theory that a Taser application has sufficient current to

19  cause electroporation beyond the very tip of the probe

20  insertion?

21  **A.**  I don't know if they do and I don't know if it disproves

22  it either.

23  **Q.**  Okay. Did you do--

24  **A.**  I think the issue is open.

25  **Q.**  Did you do anything to scientifically investigate

whether your opinion was reliable as to electroporation of the brain from a Taser application to the left bicep and left hip?

A.   I don't want to get hung up on electroporation.  That is just one of the mechanisms how electricity can harm the brain.  Electroporation may have not even been involved in Stanley Downen's case.  It may or may not.  I don't know.

   But I do think that electricity can injure tissue.  And I think the Taser, in Stanley's condition, may have accelerated the trajectory of his mental decline and ultimate death.

Q.   What did you do, in reaching your opinions, to render the opinion on a reliable basis that scientifically electricity gets from the Taser applications at the hip and the bicep to the brain?  What did you do to investigate that?

A.   Let me leave the electricity out for just a minute.

   I know how to diagnose illness.  I know how to diagnose Alzheimer's disease, and I think Stanley Downen had Alzheimer's disease.

   I also know how to follow the trajectory of chronic illness, because people--just because you have one disease does not give you immunization to prevent you from getting another disease.  And if somebody has Alzheimer's and they have a certain trajectory of decline that you are following

1    and, all of a sudden, they get worse, you are going to

2    reevaluate that person.  In somebody with an immediate

3    decrease in cognitive function, you are going to reevaluate

4    them to make sure they don't have a brain tumor or they

5    haven't fallen down and have a subdural hematoma, they don't

6    have a drug overdose even of their own prescription

7    medication, or a CNS infection, et cetera.

8         And what I'm sure about is Stanley Downen had

9    Alzheimer's disease and he had a rather sudden change,

10   adverse change, in the trajectory of his illness, dying

11   20 days later after he was Tasered and after he fell down

12   and struck his head.

13        Now, as to what caused that, whether it was the

14   electricity from whatever mechanism, or a concussion or not,

15   I don't know what it was.  But I am certain that his

16   trajectory changed adversely after this event.

17   Q.   Okay.  So your opinion is based on the fact that this

18   event happened in time, and after that time he got worse.

19   A.   Yes.

20   Q.   Okay.  That would be a temporal relationship, right?

21   A.   Yes.

22   Q.   Okay.  So your opinion is based purely on the temporal

23   relationship between the Taser occurred and his condition

24   got worse.  Is that what you are telling us?

25   A.   I thought he probably had another two to three years

1  before he was going to die, if he wouldn't have been

2  Tasered, rather than the 20 days.

3  Q.   What reference materials that you have produced in

4  support of this report indicate that all Alzheimer's

5  patients follow this normal trajectory that you are

6  testifying about?

7  A.   There is nothing presented that all of them follow that

8  trajectory.  It can be variable.  But most of them follow a

9  trajectory of eight to ten years from the beginning of their

10  Alzheimer's symptoms until their demise.  That's what most

11  of them follow.

12       And in my experience, you are two-thirds along the way

13  before you get admitted to the Alzheimer's ward.  You've

14  probably got a third left.  Most of my patients probably

15  live two to three to four years.  My mother lived five years

16  after she was admitted.

17  Q.   Some people follow a different trajectory for

18  Alzheimer's.  Would you agree with that?

19  A.   Absolutely.  But once the trajectory is set, it usually

20  doesn't change --

21  Q.   Okay.

22  A.   -- unless something else happens to change it.

23  Q.   Do you admit that there is no scientific support for the

24  theory that a Taser application can increase or aggravate

25  dementia in Alzheimer's?

**A.** The trouble is, when you read the--when you read the--if we talk about the amount of reserve we have in an organ-- okay, heart, brain, whatever we want. This time it's the brain--if you have a lot--you can lose a fair amount of reserve before you get organ dysfunction. Your kidney, you can lose three-fourths of your kidney before you have to go on dialysis. Okay? I don't know what the percentage is in the brain.

But then you take somebody who's healthy, who has a normal reserve, and compare that to somebody who is not healthy and has very little reserve, like in the brain in somebody with Alzheimer's disease, and then you apply the same insult, that's going to decrease that reserve by a different mechanism. In the same amount, the person with the good reserve is going to be able to tolerate that much better and even probably repair most of the damage and get back to normal or close to normal; where the person with no reserve and a decreased ability to repair is not going to get any better and their trajectory is going to change dramatically.

**Q.** And here your opinion is, the insult to Mr. Downen is electricity from the Taser. That's what your report says, right?

**A.** It's an added insult that he just didn't have any reserve to accommodate.

       Now, here's the other thing.  We talk about literature.
Now, when you look at the literature, I haven't seen any
literature where they have Tasered people with Alzheimer's.
If you have that, please show it to me.  All the literature
that I see is on healthy people that have been Tasered, and
it's been financed by Taser International.  But nobody's
Tasering sick people to answer the question that you have so
appropriately just asked me.  I don't have any literature to
that.

Q.   It's your opinion that Tasers have not been applied on
mentally ill individuals?

A.   No, that's not it.  I haven't seen any good double-blind
peer-reviewed studies where they have Tasered people with
Alzheimer's and compared the differences in their outcomes
in the trajectory as with healthy people.

Q.   But they have studied electricity as it relates to
Alzheimer's, right?

A.   You would have to be more specific --

Q.   Okay.  How about--

A.   -- or show me the study.

Q.   --ECT therapy studies from Harvard University.  Are you
aware of those studies?

A.   We used to do that along with pre-frontal lobotomies.
That's not done anymore, at least in our hospitals.

Q.   So there are studies actually showing there is

beneficial use to electrotherapy in Alzheimer's and dementia patients; isn't that right?

**A.**   I can give you my only experience with that, is they used electrotherapy at St. Pat's for quite a few years.  One psychiatrist did it.  He would take the patient in, put them under general anesthetic and administered electroshock therapy.  He thought he was helping these patients.

Ten years later Dr. Hoell, another psychiatrist, came to town and found that the machine wasn't even hooked up. Nobody even got any electroshock treatment.

Now, I--we don't do it anymore.  We have got medications that do the job better.  My own opinion is I think it damages the brain.  And you wouldn't give that to--I've never heard of anybody using electroshock therapy for someone with dementia.  I have for schizophrenia.  I've never even heard it suggested for dementia or Alzheimer's patients.  But if you have that information, I would like to see it.

**Q.**   Let's look at--

**A.**   There is a big difference between schizophrenia and dementia.

**Q.**   Can you look at your report on the page in front of me?

**A.**   Sure.

**Q.**   And let me just give you your report.

THE COURT:  Where are you going?

1    MS. PRINZING JONES:  May I approach, Your Honor?

2    THE COURT:  Do you need a copy of the report to look

3  at?

4  **A.**   Let's see how we do without it; but if I do, I'll

5  holler.

6    THE COURT:  You can approach.  But don't take it as

7  a practice.

8    MS. PRINZING JONES:  I apologize, Your Honor.

9  **A.**   Thank you.

10  **Q.**   (By Ms. Prinzing Jones)  I'm looking at No. 3, right?

11  **A.**   Okay, No. 3.  Yes, I've got it.

12  **Q.**   Okay.  Your opinion as to the ultimate acceleration of

13  progression through Alzheimer's disease cascade relates to

14  electric insult to Mr. Downen's brain.

15  **A.**   You know, these were put together quite rapidly

16  with--Rachel and I put these together and she did a great

17  job.  But I'm going to have to rely on what my testimony is

18  here as to what I really think happened.

19      I--I don't think that the electrical incident hastened

20  his Alzheimer's.  It just hastened his loss of neurons by a

21  different unrelated method that in total changed the

22  trajectory of his life span quite dramatically.

23  **Q.**   You are telling us that those opinions cannot be found

24  in your signed expert report; is that right?

25  **A.**   I think in here, if I had more time to go through all

this, I think I've kind of talked about the reserve of the
brain and how, if somebody has another incident, whether
it's concussion or an infection or electrical injury, that
if you have a lot of reserve, you can tolerate that better.
You've got better ability to repair the injury.

If you are somebody like Stanley Downen on the end stage
of any reserve in his--all of his organs, but especially his
brain, he just can't tolerate any additional injury that's
going to destroy neurons, whether it's a concussion or
electrical discharge.

And that's what I'm saying.  I'll leave this part alone
right here.  This isn't quite what I meant.

**Q.**   And you admit that nowhere in the report that you signed
did you disclose the opinion that some sort of concussion
diagnosed by you hastened the progression of his Alzheimer's
and death?

**A.**   Well, I may not have, but that doesn't mean that he
didn't have a concussion.  He sure could have.  He fell down
hard enough to cut his head and get a bruise, so he could
have had a concussion.  And just because I didn't mention it
doesn't mean he didn't have one.

**Q.**   Okay.

**A.**   I don't know if he had a concussion.  I don't know.

**Q.**   Let's talk about the reliability of that opinion that's
not been disclosed; but since you bring it up, let's talk

1  about the reliability of that.

2  **A.** Sure.

3  **Q.** No doctor who treated Stanley Downen diagnosed a

4  concussion. True?

5  **A.** I--I don't recall seeing that, but it's been awhile

6  since I've looked at those records.

7  **Q.** Imaging of Mr. Downen's head was conducted and was

8  normal. True?

9  **A.** You don't pick up concussion with imaging all the time.

10  **Q.** All right.

11  **A.** And most of the time you don't.

12  **Q.** No documented loss of consciousness occurred. True?

13  **A.** You know, when I was treating, I thought you couldn't

14  have a concussion without losing consciousness, but that's

15  been disproven. You don't have to lose consciousness to

16  have a concussion.

17  **Q.** And what you've told this Court is it might happen but

18  you don't really know, whether he had a concussion or not.

19  **A.** I don't know if he had a concussion. He could have. I

20  don't know. He had something that changed the trajectory of

21  his life span dramatically.

22  **Q.** There is not even case reports that anecdotally allege

23  that a Tasing can accelerate and hasten Alzheimer's. True?

24  You didn't even find a case report that said that.

25  **A.** I'm going to say again, I didn't say that it accelerated

his Alzheimer's.  Accelerated his demise, his change of
trajectory.

    Not because it increased the death of his neurons
through some Alzheimer's process, but it encouraged the
death of neurons through another process:  Electroporation
or some other process, denaturation or protein.  But sum
total, he lost more neurons quicker than he would have if he
wouldn't have had the electrical injury or the fall.

**Q.**  Can that theory be tested in any way?

**A.**  You would have to Taser.  You would have to get a
hundred people who have Alzheimer's and establish what their
trajectory is and match them, and then Taser half of them
and watch to see what their trajectory is compared to the
people who weren't Tasered.  I don't think you'll get that
approved by the IRB.

**Q.**  There have been epidemiological studies related to Taser
applications; isn't that right?

**A.**  I'm not sure.  You would have to show me the study that
you are talking about.

**Q.**  Did you review any of those in rendering your opinions?

**A.**  You want to present something in front of me?  I'll look
at it and then I'll answer.

**Q.**  Well, it's not listed, is it, in your report if you did?

**A.**  You'll have to show me what you are talking about and
I'll tell you if I listed it or not.

**Q.**   All right.  Looking to your report, you list, at 33 through 42, the studies that you relied on.

**A.**   Okay.  Now, what, you want 34 or 33?

**Q.**   33 through 42 are the only references that you list in support of your opinions.  Is that right?

**A.**   I've read much more than what I've--than I listed here. Okay?

**Q.**   But this is what you chose to list; is that right?

**A.**   That's what I had in my pile at home.  I didn't go out and research a whole bunch of other fresh literature.

**Q.**   All right.  And none of these studies, not one, supports the theory that a Taser causes electroporation of the brain. True?

**A.**   Now, I told you I don't care what the mechanism is that the electricity damaged the tissue that you want to use. Electroporation may be one of them and it may be one of the main ones.  I don't know.

There was probably multiple ways that electricity damages tissue in the same patient.  And we're just getting at the beginning of trying to tease that out and understand the various mechanisms.  Electroporation may be one of the mechanisms but it's certainly not the only one.  And all I know is something happened that changed the trajectory of his life span after he was Tasered.

**Q.**   None of the references that you list support

1   scientifically the theory that a Taser causes any lasting

2   tissue damage.  Right?

3   A.   Well, if you look at Taser International, they list

4   quite a few cases where people had problems and died and had

5   cardiac arrhythmias and other things.  75 patients or

6   something at one time.  And that data's old, so there is

7   probably much more than that.

8        So, no, I think people have been damaged from Taser.  I

9   think that's out there in the literature.  I think I could

10  go through my stuff and show you some cases.

11  Q.   Let me rephrase my question--or, actually, let me just

12  ask you the same question again.

13       Looking to the references that you list on your report,

14  none of those support reliably the theory that a Taser

15  causes tissue damage.  True?

16  A.   Well, maybe I didn't do a good job of getting the

17  references, but I'm sure that Taser does cause tissue

18  damage.  I'm sure that's been shown before.

19  Q.   Okay.  You told the judge earlier that your primary

20  source was Harrison's Text?

21  A.   Harrison's Textbook of Medicine.

22  Q.   Okay.  And that is a general medical reference --

23  A.   Yes.

24  Q.   -- right?  Nowhere in Harrison's is there any reference

25  to your theory here that a Taser can cause neuron damage.

1   Right?

2   **A.**   Harrison doesn't cover Taser.  It covers Alzheimer's,

3   and that's presented for my opinions on Alzheimer's

4   diagnosis.

5   **Q.**   Do you have any scientific basis for the opinion that

6   the electricity from the Taser would leave the vicinity of

7   the bicep and the hip?

8   **A.**   I don't see what difference that makes.

9   **Q.**   Let's talk about the trajectory of electricity.

10  **A.**   I don't know what difference that makes.  Electricity

11  injures tissue.  I think that's accepted.  Whether it's

12  alternating current or direct current or if the voltage is

13  high or low, electricity can injure tissue.

14  **Q.**   Okay.  Is it your opinion that a Taser application,

15  electricity would go through the whole body?

16  **A.**   It depends on how sensitive your measurement device is.

17  But I think if your device is sensitive enough, it will go

18  through every cell you have, probably.

19  **Q.**   Do you have any reliable scientific support for that

20  theory?

21  **A.**   I don't, but it doesn't make any difference for Stanley

22  Downen's case.  All I care about is how his trajectory was

23  changed after he was Tasered, and after he fell down and

24  struck his head.  He had a dramatic decrease in his life

25  expectancy, and that's--that's what I'm sure of and that's

1    what my diagnosis is.

2        You can come up with any idea of why that happened.  I

3    think the electricity had the most to do with it.

4    Concussion may have had something to do with it.  And I

5    think it all relates to improper de-escalation policy.  And

6    that's what I think and I base that on my knowledge and my

7    training and my diagnostic procedure.

8    Q.   All right.  So 35 years as a general practitioner is the

9    basis for your opinions here; is that it?

10   A.   And what I've read and what I've learned in school.

11   Q.   All right.  And you graduated from your undergraduate

12   degree in 1965 and your medical degree in 1970; is that

13   right?

14   A.   I think '68--undergrad '65, yes.  And then I went to two

15   different medical schools.  I graduated from one in '68 and

16   one in '70, and then I interned in '71.

17   Q.   And at the time that you graduated from medical school

18   Tasers didn't even exist.  They hadn't even been invented.

19   A.   That's probably right.

20   Q.   The first patent for a Taser was in 1974.  Do you

21   disagree with that?

22   A.   I wouldn't know about that.  I have no reason to argue

23   with that.

24   Q.   Over the course of your career you were not board

25   certified in any specialty?

**A.**   When I graduated, they didn't have a specialty in family practice.   So I had an ophthalmology residency offered to me.   I didn't take that.   And I just went out and did general practice.   There was no boards for general practice. There still isn't a board for general practice.

Now, I could have got grandfathered in if I had repeated the test that I took as part three of my national boards, which I got in the 97th percentile in the nation.   If I just would have repeated that I could have got board certified in family practice.   I had five years to do that.   One of my big mistakes.   I didn't do that.   I'm not board certified.

**Q.**   Thank you.   You are not board certified in any specialty, true?

**A.**   No.

**Q.**   You treated everything from sore throats to delivering babies, right?

**A.**   Yes.

**Q.**   Okay.   You have no specialized training in bioelectric engineering?

**A.**   No.

**Q.**   You have no specialized training in biophysiology?

**A.**   No.

**Q.**   You have no--you never treated anyone in your entire practice who's been Tased, not even once?

**A.**   Yes, that's right.

```
 1          MS. PRINZING JONES:  Your Honor, I have more but I
 2     think I'll be done.
 3          THE COURT:  Mr. Goicoechea.
 4                         CROSS-EXAMINATION
 5     BY MR. GOICOECHEA:
 6     Q.   Dr. Peschel, I want to first start with the subject of
 7     the comments you've made about concussion, and I want to
 8     make sure I understand because I think it's important for
 9     everybody in this case.
10          You are not prepared to say to a reasonable degree of
11     medical certainty that it's more likely than not Stanley
12     Downen suffered a concussion.  True?
13     A.   I don't know if he had a concussion.
14     Q.   So is that a true statement, sir?
15     A.   Yes.
16     Q.   You've talked a lot about electrical injury and
17     diagnosis.  I think you said right at the end that your
18     diagnosis for Stanley Downen was his normal trajectory
19     changed.  Is that right?
20     A.   Yes.
21     Q.   That's not a medical diagnosis, is it?  Change in normal
22     trajectory?
23     A.   The diagnosis is Alzheimer's disease.
24     Q.   Correct.  That's exactly my point.
25     A.   Right.
```

**Q.** Have you ever in your entire career as a physician made a diagnosis for any patient of yours, that their diagnosis is a change in normal trajectory?

**A.** I don't know quite what you are getting at. But you look hard for changes in the normal trajectory to make sure other illnesses haven't been acquired that may change that trajectory.

And so what you would do usually, is say if--if somebody had Alzheimer's disease and was very slowly--was stable and slowly progressing and, all of a sudden, they got a headache and they started to lose consciousness; and you took them down and you did a CAT scan and found they had a subdural hematoma and you found out they had fallen down six weeks before and nobody recorded it, you would write down Alzheimer's disease and you would also write down subdural hematoma. And you would get them to a neurosurgeon right away and get that evacuated. So you would apply another diagnosis that changed the trajectory to that.

So you are right, you wouldn't say change in trajectory of Alzheimer's. You would say Alzheimer's disease, status post subdural hematoma in addition. And so you have another additional diagnosis that caused the trajectory change.

**Q.** Okay, And that's exactly my point.

Let's talk about Stanley Downen's case. You've never made in your disclosure or in any of your testimony today an

1 additional medical diagnosis that changed Stanley Downen's

2 trajectory, have you?

3 A.   Well, I've suggested a couple diagnoses; that he might

4 have had a concussion and he--and he had electrical injury

5 from the Taser.

6 Q.   Have you given Stanley Downen a diagnosis of electrical

7 injury due to Taser?

8 A.   I wouldn't hesitate to give him that diagnosis, from

9 what I've read.  If you want me to redo my report, I could

10 change that.

11 Q.   I want to talk about your experience diagnosing patients

12 with electrical injury due to Taser.

13       Do you have any experience on that subject?

14 A.   Yes.

15 Q.   From what?

16 A.   From my own personal, and which we're not talking about.

17 Q.   Outside of your own personal experience, Dr. Peschel--

18 A.   No, I don't.

19 Q.   --do you have any experience in your entire medical

20 career diagnosing patients from injury due to Taser?

21 A.   No.

22 Q.   Do you have any specialized training during any of your

23 entire medical career that would allow you to make a

24 specific medical diagnosis of injury due to Taser?

25 A.   I don't know what specialized training you would need.

1    Electrical injury is a--gives you a unique type of

2 injury that I would say nothing else can cause.  But you get

3 a--you usually get a rapid--you get a combination of muscle

4 and nerve disease.  And the muscle disease presents itself

5 usually with tetany, maybe some weakness, muscle pain.  But

6 it's easy to document, because as the electroporation occurs

7 on a muscle membrane, certain things leak out from the

8 muscle into the blood.  And one is a creatinine

9 phosphokinase, a muscle enzyme that you can measure.  And

10 you can measure and document the amount of rate of biolysis

11 or electroporation of the muscle by the raised elevation of

12 CPK.  Stanley Downen did not have that test done.

13    The other thing is, the same thing happens with the

14 nerves.  And the pores widen and important things leak out

15 of the nerves faster than they can be made and you can't

16 measure that, only with the clinical course with any

17 neurologic change.  And what presents is depending on what

18 nerve is affected.  And that can come right away, that can

19 come later.  It can come on opposite sides of the body where

20 the electrical apparatus was applied, and it's variable.

21    I don't think you need any special training to diagnose

22 that or--you know, the standard textbooks have the treatment

23 for that and everything in there.

24 Q.  I think you said during your explanation today that part

25 of analyzing a change in a patient's trajectory, as you put

1    it, requires you to consider what disease processes may have

2    changed that trajectory.

3        Did you say that, or do you agree with that?

4    A.    Yes, I do.

5    Q.    In this instance with Stanley Downen, please tell us

6    what methodology you used to exclude other disease processes

7    from the cause of the change in Stanley Downen's trajectory.

8    A.    Okay.  Well, he had another imaging procedure of his

9    brain when he got to the hospital after he was Tasered,

10   which did not show a subdural hematoma, or a hemorrhage of

11   the brain, or a skull fracture or anything else, a brain

12   tumor.

13   Q.    Dr. Peschel, did you do anything else to rule out any

14   other disease processes that may have caused the change in

15   Stanley Downen's trajectory?

16   A.    Well, you have to understand I saw him--I was introduced

17   to him a couple years after he died, so I wasn't able to

18   draw any blood or send anything to the lab.  But, no, I

19   didn't.  I just had to go by the reports of what other

20   people had done.

21       But they did make an attempt to exclude, I'm sure,

22   subdural hematoma or intracerebral hemorrhage or something

23   from the fall.

24   Q.    And I'm not so much concerned what they have done.  I

25   want to make sure I know everything you've done and this

1  court knows everything you've done to exclude other

2  processes in your methodology.  So let me be clear about

3  that.

4      The methodology that you used in this case to evaluate

5  Stanley Downen's trajectory, tell me what you personally did

6  to exclude other disease processes.

7      You've already told us you looked at the film.  What

8  else?

9  **A.**   Well, I don't quite understand.  I wasn't there to order

10  anything or to do anything to evaluate him, nor to collect

11  any of his data.  All I have is the data that they have

12  given me to look at.  And the imaging procedure is all that

13  I have to really look at to exclude anything with.  I'm not

14  aware of anything else I have.

15      He had normal blood work, you know.  He didn't have an

16  electrolyte disturbance.  He didn't have, you know, like a

17  low sodium or something like that that could make you lose

18  consciousness or anything, so...

19  **Q.**   And are you satisfied that your methodology, as you've

20  described, ruled out other processes for the change in

21  Stanley Downen's trajectory?

22  **A.**   As far as--you know--you know, it wasn't my job to work

23  this poor guy up.  He was already worked up and dead when I

24  saw him, and so there really isn't any other tests I can go

25  back and reorder on him to give me anything else than what I

have.  All I have is he went downhill rapidly.  And I don't

see anything obvious, other than the possible concussion or

the electrical injury, that could cause it.  I don't know of

anything else that would have explained it.

**Q.**   Dr. Peschel, it's a well-known fact that pneumonia can

cause a deterioration in any elderly patient's trajectory.

True?

**A.**   True.  If you have a real fulminant pneumonia where you

have a fever and a productive cough and your white count is

real high and you are real septic from it, it can.

**Q.**   Stanley Downen had--

**A.**   But not just an infiltrate in the chest x-ray without a

fever or without a high white count.  That's not near as

toxic.

**Q.**   Stanley Downen had pneumonia, correct?

**A.**   He had an infiltrate in his chest x-ray, but I'm not

aware that he had a fever or a high white count.

**Q.**   It's your testimony that Stanley Downen did not spike a

fever during his hospital stay?

**A.**   No.  When he came in for his--for his evaluation, his

initial evaluation from the nursing home.

**Q.**   Do you know if Stanley Downen spiked a fever during his

hospital stay?

**A.**   He may well have.

**Q.**   And--

**A.** But, listen, don't let me get you off of your deal.

You asked me if a pneumonia would cause somebody to change his CNS status. It would if it's--if it's associated with a lot of infection and a fever and a high white count and a productive cough of yellow purulent sputum, it can, yes.

If it's just a dry infiltrate not associated with fever or high white count, it would be less likely to change the CNS status. It's possible.

**Q.** And you don't know if he had a fever as you sit here today?

**A.** I wouldn't be surprised if you could show me an elevation of his temperature at some time during those 20 days.

**Q.** And, sir, my question is: As you sit here today, you don't know whether he had a fever?

**A.** I do not.

**Q.** You don't know whether he had a productive cough?

**A.** No.

**Q.** You don't know whether he had any of the other telltale signs of a pneumonia?

**A.** It was my impression that this wasn't a real virulent pneumonia. It was just something they kind of more saw in the chest x-ray. I could be wrong. That was my impression when I read the record.

**Q.** So my point is, your methodology didn't include ruling
that out as a potential cause of the change in his
trajectory, did it?

**A.** Well, I doubt if that changed his trajectory enough to
cause his demise, no.

**Q.** And, sir, my question was a little bit different.

Your methodology did not include ruling that out as a
potential cause in the change of Stanley Downen's
trajectory, did your methodology?

**A.** You know, he had pneumonia listed on his diagnosis. He
had gallstones listed on his diagnosis. You know,
gallstones can cause you to get a fever and get infected and
everything. But I wasn't able to put my hand on his tummy
to see if he had any rebound tenderness or anything else
with it. So he did. He had those diagnoses: An infiltrate
in his lungs they called pneumonia. He had other things,
the cholelithiasis. I doubt if any of those things affected
the trajectory that led to his demise.

**Q.** Do you remember what my question was?

**A.** Probably--give it to me again.

**Q.** Your methodology that you employed in this case did not
do anything to rule out pneumonia as a potential cause of
Stanley Downen's change in trajectory, did it?

**A.** I don't know how to answer that.

**Q.** Is that the best answer you can give us?

A.    Probably is.

Q.    Dr. Peschel, you retired in 2005?

A.    I'm not sure when I retired.

Q.    You don't know when you retired?

A.    I don't.

Q.    Would you disagree if the CV you provided to us and the Court says 2005?

A.    No.  I just don't know when I retired.

Q.    And when you retired, you stopped routinely seeing patients.  True?

A.    Yes.

Q.    And you stopped routinely caring for patients, true?

A.    For--for--for massive amounts of patients coming in through the office, yes, but I did do a small amount of patient care.

Q.    But not routinely, true?

A.    Not in my office and not for pay.

Q.    But you haven't routinely seen patients since you retired.  Will you agree with that?

A.    I've seen small batches of patients who are personal friends on kind of a random basis as needed.

      And I am involved in some research where I'm working up and writing prescriptions and following a few--a few patients who have problems with their diabetes and cardiac arrhythmias.

**Q.** When were you the medical director at the Royal Manor Nursing Home?

**A.** It was when I first came to town. It wasn't the first day I got to town, but it was within the first few years. And I don't know the exact time. And I've got no way to really find out because both of those people, those administrators, are dead and they have been closed for a long time. But it was for approximately, I think, a 10-year period, approximately, for each nursing home. And they went concurrently.

**Q.** Meaning they ran at the same time?

**A.** Yes.

**Q.** When did you come to town?

**A.** In '74.

**Q.** Would you say that you started as a medical director at Royal Manor Nursing Home sometime in the late '70s?

**A.** You know, that would be a good guess, but it's only a guess. I can't remember.

**Q.** Is it a reasonable estimate?

**A.** I have--really have no idea.

**Q.** And let's move on, because it's perhaps more important.

**A.** Yeah.

**Q.** Ten years from that time frame would have meant that you stopped working as a medical director for both nursing homes sometime in the late '80s or early '90s. True?

**A.** Well, I can tell you when I stopped the Royal Manor was when they changed ownership and they became Evergreen.

**Q.** What year was that?

**A.** I don't know. But the Fergusons owned it. And the month that Evergreen took over I stopped being medical director of the Royal Manor.

Now, I stopped the Wayside Nursing Home before that. And I don't know what those years were.

**Q.** Did you do any work as a medical director for any nursing home after 1995?

**A.** I don't know, but I would be--I would be surprised if I did, but I just don't know those dates. If you could tell me what day Evergreen took over, that would give me my best landmark to go from either side. I don't think I did any work after that for anybody in the nursing home business.

**Q.** Have you done any work related to any nursing home in the last five years?

**A.** Oh, absolutely not, no.

**Q.** Have you ever been an instructor of students in an accredited health professional school?

**A.** No.

**Q.** Have you ever been an instructor of students in an accredited residency or clinical research program?

**A.** No.

**Q.** And it's my understanding, based on your previous

1  testimony, that you have not routinely treated Alzheimer's

2  patients in the last five years.  True?

3  A.  True.

4  Q.  Is it also true that you have not routinely interacted

5  with any patients admitted to a long-term care facility in

6  the last five years?

7  A.  Well, you know, my wife's parents and my mother and--

8  Q.  And just to be clear, outside of your own personal

9  family and friends.

10  A.  Yeah.  That I have interacted, made rounds on people who

11  were admitted to nursing homes?

12  Q.  Yes.  You've not done that in the last five years?

13  A.  I don't think so, no.

14  Q.  You are not a licensed nurse?

15  A.  No.

16  Q.  You are not trained as a nurse?

17  A.  No.

18  Q.  Never have been?

19  A.  No.

20  Q.  You are not a licensed CNA?

21  A.  No.

22  Q.  You are not trained as a CNA?

23  A.  No.

24  Q.  Never have been?

25  A.  No.

Q.   A licensed administrator of a long-term care facility?

A.   No.

Q.   Never have been?

A.   No.

Q.   You gave some opinions about the subject of de-escalation.  I want to talk about those very briefly.

     You have not actively been involved--or, excuse me.  You have not routinely been involved in de-escalating patients in the last five years, have you?

A.   No.

Q.   All of your experience, education and training related to de-escalation of patients is more than five years old.  True?

A.   Yes.  Yes.

Q.   That's all I have.

A.   Except--except maybe the one I was involved in.

Q.   Your own personal experience?

A.   Yes.

          MR. GOICOECHEA:  That's all I have, Your Honor.

          THE COURT:  Redirect?

          MR. DUERK:  None, Your Honor.

          THE COURT:  You can step down, Dr. Peschel.

     (End of Testimony - 2:28 p.m.)

<u>C E R T I F I C A T E</u>

STATE OF MONTANA      )
                      )  ss.
COUNTY OF MISSOULA    )

        I, Julie M. Lake, RDR, CRR, CSR, Freelance Court
Reporter for the State of Montana, residing in Missoula,
Montana, do hereby certify:

        That I was duly authorized to and did report the
proceedings in the above-entitled cause;

        I further certify that the foregoing pages of this
transcript represent a true and accurate transcription of my
stenotype notes.

        IN WITNESS WHEREOF, I have hereunto set my hand on
this the 30th day of January, 2014.



        _Julie M Lake_____
        Julie M. Lake, RDR, CRR, CSR
        Freelance Court Reporter
        State of Montana, residing in
        Missoula, Montana.